1
2
3
4
5
6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

7
8
9
10
11

KIMBERLY ROBERTS, ET AL.,

Plaintiffs,

v.

MARSHALLS OF CA, LLC, et al.,

Defendants.

Case No.  13-cv-04731-MEJ

**ORDER RE: MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

Re: Dkt. No. 70

12
13

**INTRODUCTION**

14    The parties in this putative class action have reached a tentative settlement agreement.  *See*
15  Bradley Decl., Ex. 1 ("Settlement"), Dkt. No. 70-4.  Plaintiffs Kimberly Roberts, Carneisha
16  Forney, and Laurie Mullen (collectively, "Plaintiffs") ask the Court to enter an order (1)
17  preliminarily approving the proposed settlement; (2) conditionally certifying the settlement
18  classes; (3) approving the Notice of Settlement; (4) approving class counsel, class representatives,
19  and claims administrator; (5) approving the establishment of a Qualified Settlement Fund; and (6)
20  scheduling a final approval hearing.  *See* Mot., Dkt. No. 70.  The Court heard oral argument on
21  March 16, 2017.  Having considered the parties' positions, the relevant legal authority, and the
22  record in this case, the Court **DENIES** Plaintiffs' Motion for the reasons set forth below.
23  //
24  //
25  //
26  //
27  //
28  //

United States District Court
Northern District of California

United States District Court
Northern District of California

**BACKGROUND**

**A.     Factual Allegations**[1]

Defendants TJ Maxx of CA, LLC ("TJ Maxx"); Marshalls of CA, LLC ("Marshalls"); and HomeGoods, Inc. ("HomeGoods") (collectively, "Defendants") are corporations engaged in the retail sales business in the State of California.  SAC ¶ 21.  Defendants employed non-exempt workers at their retail store locations and paid these workers an hourly wage based on a forty hour or less work week.  *Id.* ¶ 29.

Plaintiffs contend Defendants instituted a nationwide policy of "personal package and bag searches," which requires all hourly employees to wait in line and be searched for possible store items or merchandise taken without permission and/or other contraband.  *Id.* ¶ 30.  Employees are searched before leaving for their meal breaks and after clocking out at the end of their shifts.  *Id.* Plaintiffs allege these searches are necessary to the employees' primary work and done solely for Defendants' benefit.  *Id.*

Employees are not compensated for time spent waiting for these searches.  *Id.*  Because hourly employees often take meal breaks and/or end their shifts at the same time, there are frequently lengthy wait times.  *Id.* ¶ 31.  Plaintiffs contend they were not permitted to leave the store until they had been searched.  *Id.* ¶ 32.  As a result, Defendants prevented Plaintiffs from taking their full 30-minute meal or 10-minute rest breaks and did not compensate them for missed breaks.  *Id.* ¶ 30.

Plaintiffs further allege Defendants failed to provide them with wage statements that complied with California Labor Code section 226(a).  *Id.* ¶ 95.  Specifically, Defendants did not "incorporate the value of 'employee discounts' into the Regular Rate of Pay calculation."  *Id.* ¶ 34.  Because the Regular Rate of Pay is used to calculate the Overtime Rate of Pay, Defendants failed

---

[1] The factual background is taken from the Second Amended Complaint ("SAC").  Dkt. No. 44. The Settlement provides that the "Parties stipulate and agree that Plaintiffs will file the Third Amended Complaint [('TAC')] . . . , only if the Court grants Preliminary Approval of the Settlement.  As of the date the Court so orders, the [TAC] shall be the operative complaint unless and until . . . this Settlement Agreement does not become effective."  Settlement ¶ 3.6; *see id.* ¶ 1.38; Proposed TAC, Dkt. No. 70-4.  The SAC thus remains the operative Complaint.

1    to compensate employees at the proper Overtime Rate of Pay and thus did not fully pay Plaintiffs

2    the amount of overtime pay which they were owed.  *Id.* ¶¶ 34-35.

3         Finally, Plaintiffs allege that at the termination of their employment, Defendants did not

4    pay Plaintiffs and other class members their unused vested vacation wages or all wages earned.

5    *Id.* ¶¶ 88-93, 100-05.

6    **B.**    **Procedural Background**

7         Roberts originally brought this class action against The TJX Companies, Inc.; Marshalls of

8    CA, LLC; and HomeGoods, Inc.  *See* Compl., Dkt. No. 1.  She subsequently amended the

9    Complaint to identify T.J. Maxx and to remove The TJX Companies, Inc. as a defendant.  *See*

10   First Am. Compl., Dkt. No. 27.  Roberts filed the operative SAC on March 4, 2015.  *See* SAC.  In

11   addition to adding new claims, the SAC names as Plaintiffs Forney and Mullen.

12        The SAC alleges Defendants violated various provisions of the California Labor and

13   Business and Professions Code, as well as California's Industrial Welfare Commission ("IWC")[2]

14   wage orders.  Plaintiffs assert nine causes of action under California law against Defendants: (1)

15   failure to pay wages, Cal. Lab. Code §§ 204, 510, 1194, 1197-98; (2) failure to provide meal

16   periods or compensation in lieu thereof, *id.* §§ 226.7, 512; (3) failure to permit rest breaks or

17   provide compensation in lieu thereof, *id.* § 226.7; (4) failure to pay overtime compensation, *id.* §§

18   200, 203, 226, 226.7, 500, 510, 512, 558, 1194, 1198; Cal. Code Regs. tit. 8, § 11140(12); (5)

19   forfeiture of vacation pay, Cal. Lab. Code §§ 203, 227.3; (6) failure to furnish an accurate

20   itemized wage statement, *id.* § 226; (7) failure to pay compensation upon discharge, *id.* §§ 201-03;

21   (8) unfair business practices, Cal. Bus. & Prof. Code § 17200 et seq.; and (9) the Private

22   Attorneys' General Act of 2004 ("PAGA"), Cal. Lab. Code § 2698 et seq.  SAC ¶¶ 51-109.

23   Plaintiffs also assert their first through third causes of action violate "the applicable IWC Wage

24   Order."  *Id.* ¶¶ 53-56, 65, 71-72, 76, 78.

25   

26   [2] "The Industrial Welfare Commission (IWC) is the state agency empowered to formulate
     regulations (known as wage orders) governing employment in the State of California."  *Morillion*
27   *v. Royal Packing Co.*, 22 Cal. 4th 575, 581 (2000), *as modified* (May 10, 2000) (internal quotation
     marks omitted).  IWC Orders are codified in the California Code of Regulations title 8, section
28   11140.

United States District Court
Northern District of California

**SETTLEMENT TERMS**

The key provisions of the Settlement are as follows.

**A.     The Settlement Classes**

The parties seek to certify two classes for settlement purposes only: a Monetary Payment Class and a Prospective Relief Class.  Settlement ¶¶ 1.17, 1.28; *see* Joint Suppl. Br. at 2, Dkt. No. 72.  The Monetary Payment Class includes "all Class Members who do not submit a timely Request for Exclusion (i.e., opt-out), and therefore, are entitled to receive an Individual Settlement Payment."  Settlement ¶ 1.17; *see* Mot. at 9 ("[T]he Monetary Payment class [is] comprised of current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California at any time from October 10, 2009 through and including August 10, 2016.").

The Prospective Relief Class refers to "all non-exempt employees working at a T.J. Maxx, Marshalls, or HomeGoods branded retail store in the State of California during the Class Period."  Settlement ¶ 1.27; *see* Mot. at 9 ("[T]he Prospective Relief Class [is] comprised of all non-exempt employees working at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California at any time from October 10, 2009 through and including August 10, 2016 who will in the future be provided with wage statements substantially in the form of the Wage Statement Exemplar.").

Class members include "all current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or Homegoods branded retail store in the State of California during the Class Period."  Settlement ¶ 1.3.  The Class Period is defined as October 10, 1999 through and including August 10, 2016.  *Id.* ¶ 1.8.  Plaintiffs represent there are 82,947 potential class members.  Mot. at 11.

**B.     Remedies**

The Settlement provides for both injunctive and monetary relief.  Defendants agree to modify their wage statements to use the proposed Wage Statement Exemplar, a template format Defendants will use to issue wage statements to Prospective Relieve Class Members.  Settlement ¶¶ 1.27, 1.41, 3.13.6; *see id.*, Ex. E (Wage Statement Exemplar).  Defendants agree to make this modification as soon as practicable, but no later than June 30, 2017.  *Id.* ¶¶ 1.27, 1.41, 3.13.6

1    Defendants also agree to pay a maximum of $8.5 million (the "Total Settlement Amount").

2    *Id.* ¶ 1.39.  The Settlement allocates approximately $5,525,000 for the Net Distribution Fund,

3    which represents the funds that will be distributed to class members.  *Id.* ¶ 1.19.  The Net

4    Distribution Fund is defined as the Total Settlement Amount less $2,975,000 for (1) $2,610,000

5    for proposed Class Counsel's proposed attorneys' fees and costs; (2) $40,000 for proposed Class

6    Representative service awards; (3) $75,000 for the California Labor and Workforce Development

7    Agency's portion of the PAGA settlement; and (4) $250,000 in anticipated settlement

8    administration costs.  *Id.* ¶¶ 1.5-1.6, 1.19, 1.22, 1.33, 1.35.

9    **C.    Distribution of Funds**

10    Each class member will receive an Individual Settlement Payment, defined as "the amount

11    payable from the Net Distribution Fund to each Class Member who does not exclude

12    himself/herself from the monetary payment portion of this settlement[.]"  Settlement ¶¶ 1.16,

13    3.13.4.  The Settlement divides the Individual Settlement Payment into thirds: it allocates one-

14    third to alleged unpaid wages, one-third to alleged penalties, and one-third to alleged interest.  *Id.*

15    ¶ 3.13.5.

16    The Individual Settlement Payment will be determined in a two step-process.  First, the

17    dollar value of each week will be calculated by dividing the Net Distribution Fund by the total

18    number of weeks worked by the Monetary Payment Class Members during the Class Period,

19    rounded up.  *Id.* ¶ 3.13.4.  The dollar value of each week is then multiplied by the total number of

20    weeks the class member worked, rounded up.  *Id.*  Plaintiffs estimate that the average Individual

21    Settlement Payment will be $60.  Bradley Decl. ¶ 21.

22    The Settlement Administrator will mail the Individual Settlement Payments via First Class

23    U.S. Mail to the class members' last known mailing address within thirty days of the Settlement's

24    Effective Date, that is, the date the Court finally approves the Settlement.  Settlement ¶¶ 1.13,

25    3.13.3.  The Settlement Administrator will transmit unclaimed funds to the State of California

26    Controller's Office, Unclaimed Property Fund after they become void; checks will become void

27    120 calendar days after issuance.  *Id.*

28    //

United States District Court
Northern District of California

5

**D.     Objections and Opt-Outs**

Class members may exclude themselves from the Monetary Payment Class by timely

mailing a written request for exclusion to the Settlement Administrator.  *Id.* ¶ 3.12.6.  The request

for exclusion must contain the class member's full name, address, last four digits of his or her

social security number, and signature.  *Id.*  In addition, it must state in substance,

> I wish to exclude myself from the monetary portion of the
> Settlement in *Roberts v. T.J. Maxx of CA, LLC, Marshalls of C,
> LLC, HomeGoods, Inc.*, pending in the Northern District Court for
> the Northern District of California, Case No. 3:13-cv-04731-MEJ.  I
> understand that by requesting to be excluded from the monetary
> portion of the Settlement, I will receive no money from the
> Settlement.

*Id.*  Class members may not opt out of the Prospective Relief Class.  *Id.*

Class members may object to the Settlement by mailing a written notice of objection to the

Court.  *Id.* ¶ 3.12.7.  The objection must contain (1) the class member's full name, address, last

four digits of his or her social security number, and signature; (2) the case name and number; (3)

the basis for the objection; and (4) a statement indicating whether the class member intends to

appear at the final approval hearing.  *Id.*

**E.     Attorneys' Fees and Costs, Service Awards, and PAGA Award**

Defendants agree not to oppose any request by Class Counsel to recover a maximum

amount of $2,550,000 in fees and $60,000 in costs.  Settlement ¶¶ 1.6, 3.13.9.

The Settlement also provides for a total of $40,000 in service awards to Plaintiffs: a

maximum of $20,000 to Roberts and $10,000 each to Forney and Mullen.  *Id.* ¶¶ 1.33, 3.13.8.  If

the Court awards less than the requested amount, the un-awarded portion will be made available

for redistribution to the Monetary Payment Class Members as part of the Net Distribution Fund.

*Id.* ¶ 3.13.8.

Pursuant to California Labor Code section 2698, the Settlement provides for a maximum

award of $100,000 in PAGA penalties.  *Id.* ¶ 1.22.  Seventy-five percent of the PAGA Award will

be distributed to the California Labor and Workforce Development Agency; twenty-five percent

will be distributed to Class Members as part of the Net Distribution Fund.  *Id.*

//

United States District Court
Northern District of California

6

**F.      Settlement Administrator and Administration Costs**

The parties propose ILYM Group, Inc. to serve as Settlement Administrator.  *Id.* ¶ 3.4. The Settlement requires the Settlement Administrator to, among other things,

1.   establish (a) a toll-free telephone number; (b) a website with links to the Notice of Settlement, the Settlement Agreement, and motions for approval and for attorneys' fees; and (c) a post office box for receipt of class member communications;

2.   prepare, print, and mail the Notice of Settlement;

3.   receive and review requests for exclusion, if any;

4.   calculate Individual Settlement Payments;

5.   calculate and pay any and all payroll tax or other withholdings from the wage portion of the Individual Settlement Payments;

6.   provide weekly status reports to the parties;

7.   provide a due diligence declaration to the Court prior to the final approval hearing;

8.   mail Individual Settlement Payments to Class Members;

9.   pay the PAGA Award, Service Awards, and Class Counsel Fees and Costs Awards to the applicable entity;

10.  print and provide class members, Plaintiffs, and Class Counsel with the appropriate IRS forms; and

11.  provide a due diligence declaration for the Court upon the completion of the Settlement.

*Id.*  The Settlement allocates a maximum of $250,000 to pay the Settlement Administrator.  *Id.* ¶ 3.13.10.

**E.      Release of Claims**

The Settlement defines Released Parties as

> T.J. Maxx of CA, LLC, Marshalls of CA, LLC and HomeGoods, Inc. and their subsidiaries, affiliates and/or parents (including without limitation The TJX Companies, Inc., Marshalls of MA, Inc. and Newton Buying Company of CA, LLC), employee benefit plans sponsored or maintained by any of the foregoing, their attorneys, and their respective successors and predecessors in interest; all of

United States District Court
Northern District of California

> their respective officers, directors, employees, administrators, fiduciaries, trustees, beneficiaries and agents; and each of their past, present and future officer directors, shareholders, employees, agents, principals, heirs, representatives, accountants, auditors, consultants, insurers and reinsurers.

*Id.* ¶ 1.30.

In exchange for benefits under the Settlement, Monetary Payment Class Members release the Released Parties from the Monetary Payment Class Released Claims, defined as

> Claims . . . whether arising at law, in contract or in equity, and whether for economic or non-economic damages, restitution injunctive relief, penalties or liquidated damages as specified in Paragraph 3.8 [of the Settlement] and including without limitation all Claims that were alleged or that could have been alleged based on the facts stated in the [SAC] and [TAC] from October 10, 2009 through the Response Deadline.

*Id.* ¶ 1.18; *see id.* ¶ 3.8.  Moreover, Monetary Payment Class Members fully release any causes of action alleged in *Williams, et al. v. Marshalls of CA, LLC, et al.*, Case No. BC503806, pending in the Superior Court of California, County of Los Angeles, "but only from October 10, 2012 to the Response Deadline."  *Id.*

Prospective Relief Class Members release the Released Parties from the Prospective Relief Class Released Claims, which consist of

> all claims that were or could have been included in Plaintiffs' [SAC] and [TAC] that Defendants or the Released Parties failed to provide compliant wage statements under California Labor Code section 226 or any comparable state or federal law from the beginning of the Class Period through and including June 30, 2017[.]

*Id.* ¶ 1.28; *see id.* ¶ 3.9.

### LEGAL STANDARD

The Ninth Circuit maintains "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned."  *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (internal quotation marks omitted).  Federal Rule of Civil Procedure 23(e) nonetheless requires courts to approve any class action settlement.  "[S]ettlement class actions present unique due process concerns for absent class members[.]"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

United States District Court
Northern District of California

1026 (9th Cir. 1998); *see Allen*, 787 F.3d at 1223 ("[T]he district court has a fiduciary duty to look after the interests of those absent class members."). Where parties reach a settlement prior to class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

Preliminary approval of a class action settlement requires a two-step inquiry. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 672727, at *12 (N.D. Cal. Feb. 16, 2017). First, courts must determine if a class exists. *Staton*, 327 F.3d at 952. "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Second, courts consider "whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026. Where the parties settle prior to class certification, the Ninth Circuit requires "a more probing inquiry than may normally be required under Rule 23(e)." *Hanlon*, 150 F.3d 1011. At the preliminary approval stage, courts must "determine whether the settlement falls 'within the range of possible approval.'" *Booth v. Strategic Realty Tr., Inc.*, 2015 WL 3957746, at *6 (N.D. Cal. June 28, 2015) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1080 (N.D. Cal. 2007)).

Finally, courts examine "the settlement taken as a whole, rather than the individual component parts . . . for overall fairness." *Hanlon*, 150 F.3d at 1026. Courts cannot "delete, modify or substitute certain provisions. [ ] The settlement must stand or fall in its entirety." *Id.* (internal quotation marks and citation omitted).

### DISCUSSION

#### A.     Class Certification

Class certification is a two-step process. *See Amchem Prods.*, 521 U.S. at 613. Plaintiffs must first satisfy Rule 23(a)'s four requirements: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a)(1)-(4). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been

United States District Court
Northern District of California

9

satisfied[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011) (internal quotation marks omitted).

If Plaintiffs satisfy Rule 23(a)'s requirements, they must then demonstrate a class action may be maintained under Rule 23(b)(1), (2), or (3). *See Amchem Prods.*, 521 U.S. at 613. Plaintiffs move for certification under Rule 23(b)(3), which is appropriate where "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

      1.    <u>Rule 23(a)</u>

          a.    *Numerosity*

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). With 82,947 potential class members, joinder is impracticable. *See Edwards v. Nat'l Milk Producers Fed'n*, 2014 WL 4643639, at *4 (N.D. Cal. Sept. 16, 2014) ("Although there is no absolute minimum number of plaintiffs necessary to demonstrate that the putative class is so numerous so as to render joinder impracticable, joinder has been deemed impracticable in cases involving as few as 25 class members[.]" (internal quotation marks and edits omitted)). Plaintiffs meet their burden under Rule 23(a)(1).

          b.    *Commonality*

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Wal-Mart Stores*, 564 U.S. at 359 (internal quotation marks and brackets omitted); *see Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014) (finding it is not necessary "that every question in the case, or even a preponderance of questions, is capable of class wide resolution. So long as there is even a single common question, a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." (internal quotation marks omitted)). "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury" but "[t]his does not mean merely that they have all suffered a violation of the same provision of law." *Wal-Mart Stores*, 564 U.S. at 349-50 (internal quotation marks omitted). Rather, "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that

United States District Court
Northern District of California

determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Whether a question will drive the resolution of the litigation necessarily depends on the nature of the underlying legal claims that the class members have raised." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014); *see Parsons*, 754 F.3d at 676 ("[C]ommonality cannot be determined without a precise understanding of the nature of the underlying claims.").

Plaintiffs identify the following common questions: "whether [Defendants'] break and compensation policies are compliant with California law, whether [Defendants'] wage uniform wage [sic] statements are compliant with California law[,] and whether [Defendants'] closing procedures result in underpayment of wages to employees[.]" Mot. at 15.  Questions about Defendants' wage statements are common to the class.  As employees, all class members received wage statements from Defendants.  While the proposed classes consist of current and former employees of three affiliated, but separate corporations—T.J. Maxx, Marshalls, and HomeGoods[3]—Plaintiffs argue the wage statements violate the California Labor Code in the same way: the wage statements "fail to state[] the applicable hourly rates, the total hours worked and the name and address of the employer."  Mot. at 6; *see* SAC ¶¶ 94-99.  A determination that such omissions violate the California Labor Code would resolve claims on a class-wide basis.  As such, the Court is satisfied that Plaintiffs have met Rule 23(b)(2)'s commonality requirement.

### c.   *Typicality*

Rule 23(a)(3) requires the representative parties' claims or defenses be "typical of the claims or defenses of the class[.]"  Fed. R. Civ. P. 23(a)(3).  This "serves to ensure that 'the interest of the named representative aligns with the interests of the class.'"  *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (quoting *Hanlon*, 976 F.2d at 508).  "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical."  *Parsons*, 754 F.3d at 685 (internal quotation

---

[3] Plaintiffs allege "The TJX Companies, Inc. operates its business in four major divisions: [including] Marmaxx and HomeGoods[.]"  SAC ¶ 25.  "The Marmaxx Group . . . is comprised of the T.J. Maxx and Marshalls chains in the United States."  *Id.* ¶ 26.

marks omitted).  "'Measures of typicality include whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting *Torres*, 835 F.3d at 1141) (internal quotation marks omitted).

Plaintiffs fail to satisfy typicality.  Like other class members, Plaintiffs were Defendants' hourly employees during the Class Period: Roberts, Mullen, and Forney worked at Marshalls, HomeGoods, and T.J. Maxx, respectively.  Roberts Decl. ¶ 4, Dkt. No. 74; Mullen Decl. ¶ 4, Dkt. No. 70-7; Forney Decl. ¶ 4, Dkt. No. 70-8.  Plaintiffs conclusorily assert they "have held the same positions" as other class members, but they do not describe how their positions were similar.  Mot. at 15.  In wage and hour class actions, courts have declined to find commonality where plaintiffs purport to represent a putative class of employees but "failed to specifically identify all the job positions they seek to represent in connection with this request or explain their duties relative to the job positions they seek to represent."  *Tijero v. Aaron Bros., Inc.*, 2013 WL 60464, at *4 (N.D. Cal. Jan. 2, 2013); *see Lusby v. Gamestop Inc.*, 297 F.R.D. 400, 410 (N.D. Cal. 2013); *Nielson v. Sports Auth.*, 2012 WL 5941614, at *3 (N.D. Cal. Nov. 27, 2012).  Where plaintiffs fail to identify their positions relative to the putative classes', courts have been unable to find there are no dissimilarities among the classes that would "impede the generation of common answers apt to drive the resolution of the litigation."  *Wal-Mart Stores*, 564 U.S. at 350 (internal quotation marks and citation omitted); *see Tijero*, 2013 WL 60464, at *4; *Lusby*, 297 F.R.D. at 410; *Nielson*, 2012 WL 5941614, at *3.  The SAC also does not allege that Plaintiffs, like other class members, worked at least five or ten hours per day such that they were entitled to one or two 30-minute meal break(s), respectively.  *See* Cal. Lab. Code § 512(a).

Furthermore, under the terms of the Settlement, all employees are class members, regardless of their position.  *See* Settlement ¶ 1.3.  But Plaintiffs have not shown that class members were uniformly subject to the security screenings that allegedly give rise to Plaintiffs' claims.  For example, certain employees were permitted to perform bag inspections, which the SAC alleges and counsel argued at the hearing contributed to the problems for which Plaintiffs

seek redress.  *See* SAC ¶ 31 ("This creates lengthy lines and backups for employees authorized to conduct security screenings who are often times engaged in other job related duties."); *id.* ¶ 33 (alleging "[s]upervisors . . . required Plaintiffs to undergo . . . uncompensated security screenings").  But the SAC does not allege the class members who implemented Defendants' alleged policies and practices were also subject to such inspections themselves.

Plaintiffs' claims may be typical of those class members who held the same positions or worked the same hours as Plaintiffs, but the Court lacks sufficient information at this time to determine whether this is the case.  Accordingly, the Court finds Plaintiffs have not met Rule 23(a)(3)'s typicality requirement.

### d. *Adequacy of Representation*

Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "In making this determination, courts must consider two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (internal quotation marks omitted).  "This requirement is rooted in due-process concerns—'absent class members must be afforded adequate representation before entry of a judgment which binds them.'" *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (quoting *Hanlon*, 150 F.3d at 1020).

There is no evidence Plaintiffs have any conflicts of interest with other class members.  *See* Roberts Decl. ¶ 16 ("I am not aware of any conflicts of interest that prevent me from being confirmed as the Class Representative in this lawsuit."); Mullen Decl. ¶ 16 (same); Forney Decl. ¶ 16 (same); Bradley Decl. ¶ 13, Dkt. No. 70-4 ("[T]here is no evidence of antagonism between Plaintiffs' interests and those of the Settlement Class.").  There is also nothing in the record that suggests Plaintiffs and class counsel will not vigorously prosecute the action on class members' behalf.  Plaintiffs are represented by class action attorneys from Bradley/Grombacher LLP; Setareh Law Group; Aegis Law Firm, PC; The Cooper Law Firm, P.C.; and The Carter Law Firm. Plaintiffs' attorneys or their attorneys' firms have been named as class counsel or co-class counsel

United States District Court
Northern District of California

13

1    prosecuting numerous class action cases, including wage and hour class actions.  *See* Bradley

2    Decl. ¶ 17; Setareh Decl. ¶ 6, Dkt. No. 70-1; Carter Decl. ¶¶ 4-5, Dkt. No. 70-2; Cooper Decl. ¶¶

3    6-8, Dkt. No. 70-3; Wong Decl. ¶¶ 3-4, 7.

4         As discussed above, however, Plaintiffs have not shown their claims are typical to the

5    classes' claims.  Accordingly, Plaintiffs have not shown their interests align with those of the

6    classes, and the Court cannot conclude Plaintiffs satisfy Rule 23(a)(4).  *See Lusby*, 297 F.R.D. at

7    411 (despite no indication plaintiff or his counsel had conflicts of interest with putative class, "no

8    specific information is provided about Plaintiff beyond his being an overtime-eligible employee

9    who worked at one or more of Defendants' California retail stores.  In the absence of such

10   information, the Court cannot conclude, at this juncture, that Plaintiff is an adequate class

11   representative.").

12            e.    *Summary*

13        As Plaintiffs fail to show typicality and adequacy of representation, the Court finds

14   Plaintiffs have not satisfied Rule 23(a)'s prerequisites.

15        2.    Rule 23(b)(3)

16        Plaintiffs seek to certify this proposed class under Rule 23(b)(3), which requires the Court

17   to find that: (1) "the questions of law or fact common to class members predominate over any

18   questions affecting only individual members," and (2) "a class action is superior to other available

19   methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The

20   Court also finds Plaintiffs fail to show certification under Rule 23(b)(3) is appropriate.

21        "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)."

22   *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  The Rule 23(b)(3) "analysis presumes

23   that the existence of common issues of fact or law have been established pursuant to Rule

24   23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)."

25   *Hanlon*, 150 F.3d at 1022.  Rather, "[t]he 'predominance inquiry tests whether proposed classes

26   are sufficiently cohesive to warrant adjudication by representation.'"  *Tyson Foods, Inc. v.*

27   *Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting *Amchem Prods.*, 521 U.S. at 623).  "Common

28   issues predominate over individual issues when the common issues represent a significant aspect

14

of the case and they can be resolved for all members of the class in a single adjudication."
*Edwards v. First Am. Corp.*, 798 F.3d 1172, 1182 (9th Cir. 2015), *cert. dismissed sub nom. First Am. Fin. Corp. v. Edwards*, 136 S. Ct. 1533 (2016) (internal quotation marks omitted). "[T]he factors relevant to assessing superiority include '(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.'"  *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting Fed. R. Civ. P. 23(b)(3)(A)-(D).

The Court finds the existence of individual issues preclude certification under Rule 23(b)(3).  *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) ("[T]he existence of other potential individual issues . . . may make class treatment difficult if not impossible.").  The parties requested to strike most of the predominance argument Plaintiffs had included in their Motion.[4]  *See* Joint Suppl. Br. at 4-5 (striking "Moreover . . . (N.D. Cal. Apr. 21, 2016)." (Mot. at 16-17)).  At the hearing, Plaintiffs declined to elaborate on their predominance argument and instead rested on their Complaint: "The amended complaint puts the notice as to the predominance, what the class is and the subset of the class members, [and] is sufficient. . . ."  Oral Argument at 10:12-10:13.  In the SAC, Plaintiffs identify the following questions of law or fact as common the class:

> (a) Whether Defendants required Plaintiffs and class members to perform work off-the[-]clock without proper compensation;
> (b) Whether Defendants failed to compensate Plaintiffs and class members with minimum wages and overtime compensation;
> (c) Whether Defendants failed to provide proper meal periods to Plaintiffs and class members on days they worked shifts in excess of

---

[4] The remaining portion of Plaintiffs' argument is unhelpful.  *See* Mot. at 16-17 ("This Court has already held that a class identical to the proposed Settlement Class satisfies the predominance requirement with regard to liability on all of Plaintiffs' claims (except for the overtime claim). [ECF 150, 261, 311]." (brackets in original)).  As the Court previously noted, it is unclear to what this statement refers.  *See* Order ¶ 1, Dkt. No. 75.  It appears Plaintiffs are citing another case, though the Motion does not specify which one, and Plaintiffs did not further explain this sentence at the hearing.

United States District Court
Northern District of California

1         five and ten hours per day, and failed to compensate them with one
hour's wages in lieu of said meal periods;

2         (d) Whether Defendants failed to permit rest breaks to Plaintiffs and
class members for every four hours or major fraction thereof
worked, and failed to compensate them with one hour's wages in
lieu of said rest breaks;

3

4         (e) Whether Defendants failed to provide accurate itemized wage
statements to Plaintiffs and class members;

5         (f) Whether Defendants failed to timely pay all wages due to
Plaintiffs and former class members upon termination or within 72
hours of resignation;

6         (g) Whether Defendants' conduct was willful or reckless; and

7         (h) Whether Defendants engaged in unfair business practices in
violation of Business and Professions Code §§ 17200, *et seq.*

8

9 SAC ¶ 47.[5] But not all issues apply to the proposed classes as a whole; rather, some pertain to

10 individual class members.

11      First, Plaintiffs have not demonstrated their off-the-clock claims apply to both managerial

12 and non-managerial class members. *See* SAC ¶¶ 51-62. At the hearing, Defendants explained that

13 91% of class members are non-management and 9% are management employees; this

14 means approximately 75,841 class members are non-managerial employees and 7,465 class

15 members are managerial employees. Defendants further explained that the parties did not give

16 additional weight to managerial employees' claims because managers were the cause of some of

17 the problems for which Plaintiffs seek redress. *See also* SAC ¶ 33 ("Supervisors employed at

18 Defendants' retail stores, including Plaintiffs' stores, had knowledge of and required Plaintiffs to

19 undergo these uncompensated security screenings in accordance with Defendants' corporate

20 policy. Supervisors in Plaintiffs' stores permitted, required and enforced the corporately derived

21 and mandated security checks and requested that Plaintiffs and others similarly situated perform

22 these integral and indispensable duties without proper wages or overtime compensation."").

23 Defendants pointed out that "there is no reason to reward or accentuate a payout to a manager in

24 that scenario." Oral Argument at 10:16.

25      Yet the Settlement does just that. As discussed above, the Settlement does not distinguish

26

27      [5] The proposed TAC asserts the same common questions of law or fact. *See* Proposed TAC ¶
50(a)-(h).

28

United States District Court
Northern District of California

between class members' positions.  Regardless of whether a class member was a manager or a non-manager subject to screenings, all class members receive monetary benefits for alleged California Labor Code violations arising from bag inspections.  In other words, the Settlement provides benefits to class members who ostensibly are the cause of Plaintiffs' and other class members' injuries—benefits to which they would not be entitled based on the laws under which their claims are brought.

Second, not all class members would be entitled to damages for claims related to their termination.  Plaintiffs' fifth cause of action alleges Defendants violated California Labor Code section 227.3[6] by failing to pay Plaintiffs and class members all vested vacation wages at the end of their employment.  SAC ¶¶ 92-97.  Plaintiffs' seventh cause of action alleges Defendants violated California Labor Code sections 201-203[7] by failing to pay former employees all wages earned upon their termination.  *Id.* ¶¶ 105-10.  But the Settlement defines class members as "*all current and former* non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California during the Class Period."  Settlement ¶ 1.3 (emphasis added).  Plaintiffs' fifth and seventh causes of action are only relevant to class members who no longer work for Defendants; they do not apply to those class members who are currently

---

[6] California Labor Code section 227.3 provides in part that

> unless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages at his final rate in accordance with such contract of employment or employer policy respecting eligibility or time served[.]

[7] Under California Labor Code section 201(a), "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."  If an employee resigns from his or her employment and does not have a written contract for a definite period, "his or her wages shall become due and payable not later than 72 hours thereafter[.]"  Cal. Lab. Code § 202(a).  California Labor Code section 203(a) provides that "If an employer willfully fails to pay, without abatement or reduction . . ., any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced[.]"

United States District Court
Northern District of California

1   employees.  Plaintiffs do not identify how many class members are former employees who are

2   entitled to recover under these claims, versus current employees who are not.

3         Accordingly, the Court finds the proposed classes are not "sufficiently cohesive to warrant

4   adjudication by representation."  *Amchem Prods.*, 521 U.S. at 623.  Different class members seek

5   different relief by virtue of their status as either a managerial or non-managerial employee or as a

6   current or former employee.  At this point, certification pursuant to Rule 23(b)(3) is not warranted.

7         3.     Summary

8         Based on the foregoing analysis, the Court finds Plaintiffs also have not met their burden

9   under Rule 23(b)(3).

10  **B.     Preliminary Fairness Determination**

11        The Ninth Circuit has identified eight factors courts should consider in evaluating whether

12  a class action settlement is fair, adequate, and reasonable:

> (1) the strength of the plaintiffs case; (2) the risk, expense,
> complexity, and likely duration of further litigation; (3) the risk of
> maintaining class action status throughout the trial; (4) the amount
> offered in settlement; (5) the extent of discovery completed and the
> stage of the proceedings; (6) the experience and views of counsel;
> (7) the presence of a governmental participant; and (8) the reaction
> of the class members of the proposed settlement.

17  *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation omitted).

18  But where, as here, "the parties reach a settlement agreement prior to class certification, courts

19  must peruse the proposed compromise to ratify both the propriety of the certification and the

20  fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  As noted,

21  settlements negotiated prior to class certification "must withstand an even higher level of scrutiny

22  for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)

23  before securing the court's approval as fair."  *In re Bluetooth*, 654 F.3d at 946.  This "more

24  exacting review . . . ensure[s] that class representatives and their counsel do not secure a

25  disproportionate benefit 'at the expense of the unnamed plaintiffs who class counsel had a duty to

26  represent.'"  *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (quoting *Hanlon*, 150 F.3d

27  at 1027).

28        "Collusion may not always be evident on the face of a settlement, and courts therefore

United States District Court
Northern District of California

18

1    must be particularly vigilant not only for explicit collusion, but also for more subtle signs that

2    class counsel have allowed pursuit of their own self-interests and that of certain class members to

3    infect the negotiations."  *In re Bluetooth*, 654 F.3d at 947.  Subtle signs of collusion include

4              (1) when counsel receive a disproportionate distribution of the
              settlement, or when the class receives no monetary distribution but
5              class counsel are amply rewarded;
              (2) when the parties negotiate a "clear sailing" arrangement
6              providing for the payment of attorneys' fees separate and apart from
              class funds, which carries "the potential of enabling a defendant to
7              pay class counsel excessive fees and costs in exchange for counsel
              accepting an unfair settlement on behalf of the class; and
8              (3) when the parties arrange for fees not awarded to revert to
              defendants rather than be added to the class fund.
9

10   *Id.* (internal quotation marks and citations omitted).

11        "[T]he preliminary approval stage [i]s an 'initial evaluation' of the fairness of the

12   proposed settlement made by the court on the basis of written submissions and informal

13   presentation from the settling parties."  *In re High-Tech Employee Antitrust Litig.*, 2013 WL

14   6328811, at *1 (N.D. Cal. Oct. 30, 2013).  A full analysis of the fairness factors is therefore

15   unnecessary at this time; indeed, "some of these 'fairness' factors cannot be fully assessed until

16   the Court conducts the final approval hearing[.]"  *Lusby*, 297 F.R.D. at 412.  At this stage,

17   "[p]reliminary approval of a settlement and notice to the class is appropriate if '[1] the proposed

18   settlement appears to be the product of serious, informed, non-collusive negotiations, [2] has no

19   obvious deficiencies, [3] does not improperly grant preferential treatment to class representatives

20   or segments of the class, and [4] falls within the range of possible approval.'"  *Johnson v.*

21   *Quantum Learning Network, Inc.*, 2016 WL 4529607, at *1 (N.D. Cal. Aug. 30, 2016) (quoting *In*

22   *re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (first brackets added).

23   Ultimately, the "decision to approve or reject a settlement is committed to the sound discretion of

24   the trial judge[.]"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *as*

25   *amended* (June 19, 2000) (internal quotation marks omitted).

26        1.    Settlement Process

27        The Court first considers "the means by which the parties arrived at settlement."  *Harris v.*

28   *Vector Mktg. Corp.*, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011).  A settlement is entitled

to "[a]n initial presumption of fairness . . . if the settlement is recommended by class counsel after arm's-length bargaining." *Id.* (internal quotation marks omitted).  The Court is satisfied the Settlement is the product of serious, informed, non-collusive negotiations.  In addition to participating in informal settlement negotiations, the parties engaged in two days of formal mediation under the guidance of two mediators, Mark Rudy and Michael Dickstein.  Mot. at 20; Settlement ¶ 2.3.  The use of a mediator, though not dispositive, supports a finding that the Settlement is not the product of collusion.  *In re Bluetooth*, 654 F.3d at 948; *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012).

"For the parties 'to have brokered a fair settlement, they must have been armed with sufficient information about the case to have been able to reasonably assess its strengths and value.'"  *In re Zynga Inc. Sec. Litig.*, 2015 WL 6471171, at *8 (N.D. Cal. Oct. 27, 2015) (quoting *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 396 (C.D. Cal. 2007)).  One of Plaintiffs' counsel declares "the Parties each took their obligations in discovery extremely seriously and worked diligently to provide one another with sufficient information and documentation so as to be adequately informed prior to mediation."  Bradley Decl. ¶ 10.  The parties conducted extensive discovery over the course of four years, which "produced a thorough vetting (pre-settlement) of the factual and legal bases for Plaintiffs' claims and the key defenses to those claims."  Mot. at 20.  The parties engaged in written discovery, the production of documents, and depositions.  Bradley Decl. ¶ 9.  Accordingly, the Court finds this factor favors preliminary approval.

    2.    <u>Presence of Obvious Deficiencies</u>

The Court next considers whether the Settlement contains obvious deficiencies.  The Court finds none at this point.

The first *Bluetooth* red flag is whether counsel receive a disproportionate distribution of the settlement, or whether the class receives no monetary distribution but class counsel are amply rewarded.  654 F.3d at 947.  The Ninth Circuit has "established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach."  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  The Settlement exceeds this benchmark: it designates no more than $2,550,000 in attorneys' fees.  Settlement ¶¶ 1.6, 3.13.9.

Attorneys' fees—not including costs—therefore represent 30% of the Total Settlement Account. Such a percentage is not uncommon in wage and hour class action settlements such as this. *See Ruch v. AM Retail Grp., Inc.*, 2016 WL 1161453, at *12 (N.D. Cal. Mar. 24, 2016) (finding as reasonable fee award totaling no more than 30% of the settlement amount in wage and hour class action settlement); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *28 (N.D. Cal. Apr. 1, 2011), *supplemented*, 2011 WL 1838562 (N.D. Cal. May 13, 2011) (approving attorneys' fee of 42% of common fund in wage and hour class action); *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959, at *11 (C.D. Cal. Aug. 4, 2015) ("[A]n award of 30% is consistent with awards granted in similar complex [wage and hour] litigation."); *Stevenson v. Dollar Tree Stores, Inc.*, 2011 WL 4928753, at *5 (E.D. Cal. Oct. 17, 2011) ("[I]n California, where wage and hour class actions have settled prior to trial for millions of dollars, it is not uncommon for an attorneys' fee award to be in the realm of 25% to 30% of the settlement and, thus, in excess of $ 1 million." (internal quotation marks omitted)). At this point, the Court finds the proposed attorneys' fees do not suggest the presence of collusion.

The second *Bluetooth* factor asks whether the parties negotiated a 'clear sailing' agreement for the payment of attorneys' fees separate and apart from class funds. 654 F.3d 947. A clear sailing agreement "is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling." *Schuchardt v. Law Office of Rory W. Clark*, 2016 WL 232435, at *9 (N.D. Cal. Jan. 20, 2016) (internal quotation marks omitted). Concerns about collusion are reduced where the agreement lacks a reversionary or "kicker provision." *In re Bluetooth*, 654 F.3d at 947 ("indicia of possible implicit collusion" includes "a 'kicker': all [attorneys'] fees not awarded would revert to defendants rather than be added to the cy pres fund or otherwise benefit the class"). Under the terms of the Settlement, "Defendants agree not to oppose any application by Class Counsel for a Class Counsel Fees Award not to exceed Two Million, Five Hundred and Fifty Thousand Dollars ($2,550,000)[.]" Settlement ¶ 3.13.9. Any concerns of collusion, however, are ameliorated by the provision that "[i]n the event that the Court awards less than the full amount requested for the Class Counsel Fees Awards and Class Counsel Costs Award, the un-awarded amount will be made

available for distribution to Class Members as part of the Net Distribution Fund." *Id.* ¶ 3.13.9.

Thus, the Court is satisfied at this point that there is no indication of collusion under this factor.

The final *Bluetooth* factor considers whether the Settlement provides for un-awarded fees to revert to Defendants instead of class members. 654 F.3d at 947. The Settlement requires the Settlement Administrator to pay any unclaimed funds to the State of California Controller's Office, Unclaimed Property Fund, in accordance with California law. Settlement ¶ 3.13.3. Because there is no reversion, this factor does not suggest collusion.

In sum, the lack of *Bluetooth* factors and of other obvious deficiencies favors preliminary approval.

### 3.   Preferential Treatment

The third factor asks whether the Settlement affords preferential treatment to any class members. At the hearing, Defendants argued the Settlement does not afford preferential treatment to class members who worked part-time and/or were paid a lower hourly wage than those who worked full-time for a higher wage. Defendants contend the wage range is so narrow that it would not be practical to differentiate on a weekly basis. Defendants explained that 80% of class members are part-time workers; 9% are management and 91% are not. Differences in wages are primarily between non-management and management employees: wages for 94% of non-management workers ranged from $7.25 to $11.00 per hour, with an average wage of $9.00 per hour; the median wage for class members who worked in management was $12.00 per hour. Defendants also explained that the parties did not give additional weight to manager claims because they were not part of some of the claims, such as the off-the-clock claims.

As noted, the Settlement calculates a class member's Individual Settlement Payment by first calculating a dollar value for a work week, then multiplying that value by the total number of weeks the class member worked during the Class Period. *See* Settlement ¶ 3.13.4. The Court is not persuaded that the Settlement does not favor certain class members, even a small percentage of them. This formula does not take into account the number of hours the class member worked, or the class member's hourly wage. As a result, if a part-time class member and a full-time class member worked the same number of weeks, both class members would receive the same

22

1   Individual Settlement Payment despite the fact that the full-time class member worked more

2   hours.  Similarly, a class member who earned a lower hourly wage would receive the same

3   Individual Settlement Payment as a class member who earned a higher hourly wage, provided the

4   class members worked the same number of weeks.  It is also unlikely that class members worked

5   the same number of overtime hours per week, yet the Settlement does not account for this either.

6      The formula also does not distinguish between current and former employees.  The

7   Settlement awards benefits based on waiting time penalties—that is, penalties for Defendants'

8   allegedly willful failure to pay class members' wages or vested vacation pay upon class members'

9   discharge in accordance with California Labor Code sections 203 and 227.3—to class members

10  who have not been terminated or discharged.  As these class members continue to work for

11  Defendants, they are not legally entitled to waiting time penalties.  *Sillah v. Command Int'l Sec.*

12  *Servs.*, 154 F. Supp. 3d 891, 918 (N.D. Cal. 2015) ("'Waiting time' penalties under California

13  Labor Code § 203 may be collected only after an employee is discharged or quits until a lawsuit is

14  filed." (citing Cal. Lab. Code § 203)).  Plaintiffs do not address this discrepancy.

15     Because the Individual Settlement Payment is based only on the number of weeks a class

16  member worked and does not take into account the foregoing factors, the Court cannot find the

17  Settlement does not provide preferential treatment to certain class members.  *See Tijero*, 2013 WL

18  60464, at *10 (declining to approve settlement where, among other things, the settlement did not

19  take into account number of hours worked or wages).

20     The Settlement also allocates a maximum of $40,000 in service awards for the named

21  Plaintiffs: Roberts shall receive no more than $20,000, and Forney and Mullen shall each receive

22  no more than $10,000.  Settlement ¶ 3.13.8.  Service or incentive "awards are discretionary . . . ,

23  and are intended to compensate class representatives for work done on behalf of the class, to make

24  up for financial or reputational risk undertaken in bringing the action, and, sometimes, to

25  recognize their willingness to act as a private attorney general."  *Rodriguez v. W. Publ'g Corp.*,

26  563 F.3d 948, 958–59 (9th Cir. 2009).  Nonetheless, "district courts must be vigilant in

27  scrutinizing all incentive awards to determine whether they destroy the adequacy of the class

28  representatives."  *Radcliffe*, 715 F.3d at 1164.

United States District Court
Northern District of California

23

The Court notes that while Forney's and Mullen's proposed incentive awards fall within the typical range, albeit on the high side, Roberts' proposed award is twice the usual amount. *See Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015) ("Incentive awards typically range from $2,000 to $10,000." (collecting cases)). A service award of $20,000 is four times greater than the presumptively reasonable $5,000 award. *See Gaudin v. Saxon Mortg. Servs., Inc.*, 2015 WL 7454183, at *10 (N.D. Cal. Nov. 23, 2015) ("Many courts in the Ninth Circuit have also held that a $5,000 incentive award is 'presumptively reasonable.'" (collecting cases)); *Burden v. SelectQuote Ins. Servs.*, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013) ("Courts in this district frequently award $5,000 incentive awards, often in larger settlements than this one." (collecting cases)). The Court further notes that the Roberts Declaration is nearly identical to the Mullen and Forney Declarations and does not offer facts that justify an incentive award that is twice that of Mullen's and Forney's. In any event, a $10,000 incentive award, let alone a $20,000 award, is disproportionate to class members' anticipated recovery. *Smith v. Am. Greetings Corp.*, 2016 WL 2909429, at *10 (N.D. Cal. May 19, 2016) ("[T]o determine the reasonableness of a requested incentive payment, courts consider the proportionality between the incentive payment and the range of class members' settlement awards." (citing *Burden v. SelectQuote Ins. Servs.*, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013)). By Plaintiffs' estimate, class members will receive an average of $60, a miniscule fraction of the proposed $10,000 and $20,000 awards. *See Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 463 (E.D. Cal. 2013) (finding $7,5000 incentive award unreasonably high where class members would receive an average of $65.79).

Nonetheless, the Court does not find the service awards, on their own, prohibit preliminary approval. The Court will undertake a more thorough analysis if and when Class Counsel file a motion for attorneys' fees and costs. At that time, Class Counsel should present or be prepared to offer specific evidence of Plaintiffs' efforts to justify the service awards.

### 4.    Range of Possible Approval

Finally, the Court must consider whether the proposed Settlement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on

1   substantive fairness and adequacy, courts primarily consider plaintiffs' expected recovery

2   balanced against the value of the settlement offer." *Harris*, 2011 WL 1627973, at *9 (internal

3   quotation marks omitted).

4          Plaintiffs argue "[t]he Settlement represents a very strong result for the Class." Mot. at 21;

5   Bradley Decl. ¶ 21.  Each class members will receive on average over $60, and "Class Members

6   with longer terms of service will receive two to three times this amount, and perhaps more." *Id.*

7   (both).  Plaintiffs aver "[t]his will bring substantial relief to the Class, which is largely composed

8   of low-wage workers who, as a practical matter, lack the means to bring individual suits to assert

9   their rights." Mot. at 21.  However, Plaintiffs do not provide any estimates about Defendants'

10  potential liability.  They allege in their SAC that "the estimated damages involved in the

11  California claims will exceed $5,000,000[.]" SAC ¶ 12.  While this appears to be consistent with

12  the estimated $5,525,000 Net Distribution Fund (Settlement ¶ 1.19; Mot. at 12), Plaintiffs do not

13  explain in their SAC or Motion how they calculated the estimated damages or state whether $5

14  million represents the maximum recovery they could have obtained if parties were to litigate the

15  action on its merits.  Plaintiffs also fail to estimate how much the injunctive relief is worth.  *See*

16  *Miller v. Ghirardelli Chocolate Co.*, 2015 WL 758094, at *5 (N.D. Cal. Feb. 20, 2015), *appeal*

17  *dismissed* (Aug. 4, 2015), *appeal dismissed* (Jan. 19, 2016) ("When determining the value of a

18  settlement, courts consider both the monetary and nonmonetary benefits that the settlement

19  confers."); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *7 (N.D. Cal. Mar. 18, 2013) ("[T]he

20  Court finds that the settlement amount—which includes the size of the cash distribution, the cy

21  pres method of distribution, and the injunctive relief—to be a factor that weighs in favor of

22  approval.").  Without such information, the Court cannot at this point determine whether the

23  proposed Settlement is reasonable.  *See Tijero*, 2013 WL 60464, at *11.

24  **C.     Summary**

25         Even if Plaintiffs had met their burden under Rule 23(a) and (b)(3), the Court finds

26  Plaintiffs fail to demonstrate preliminary approval is otherwise appropriate.

27                                    **CONCLUSION**

28         Based on the foregoing analysis, the Court **DENIES** Plaintiffs' Motion for Preliminary

United States District Court
Northern District of California

25

1    Approval **WITHOUT PREJUDICE**.  If the parties wish to present another proposed settlement

2    for preliminary approval that addresses the inadequacies addressed in this Order, they may do so

3    no later than April 28, 2017.

4            This Order does not prohibit Plaintiffs from seeking leave to file the proposed TAC.

5

6    Dated: March 28, 2017

7    _____

8    MARIA-ELENA JAMES
     United States Magistrate Judge

United States District Court
Northern District of California