1   MARCUS J. BRADLEY, Bar No. 174156
    mbradley@bradleygrombacher.com
2   KILEY L. GROMBACHER, Bar No. 245960
    kgrombacher@bradleygrombacher.com
3   BRADLEY GROMBACHER, LLP
    2815 Townsgate Road, Suite 130
4   Westlake Village, CA  91361
    Telephone: (805)270-7100
5
    Attorneys for Plaintiffs
6   KIMBERLY ROBERTS, CARNEISHA FORNEY,
    and LAURIE MULLEN
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11
    KIMBERLY ROBERTS, CARNEISHA          Case No.  3:13-cv-04731 MEJ
12  FORNEY, and LAURIE MULLEN, on
    behalf of themselves, and all others **PLAINTIFFS' NOTICE OF MOTION AND**
13  similarly situated, and the general public, **MOTION FOR PRELIMINARY**
                                         **APPROVAL OF REVISED CLASS**
14                  Plaintiffs,          **ACTION SETTLEMENT**

15          v.                           Date:   July 13, 2017
                                         Time:  10:00 a.m.
16  TJ MAXX OF CA, LLC., a Delaware      Dept.:  B – 15th Floor
    corporation; MARSHALLS OF CA, LLC,
17  a Delaware limited liability company; [Filed concurrently with the Declaration Marcus
    HOMEGOODS, INC., a Delaware          J. Bradley]
18  corporation; and DOES 1-10, inclusive,

19                  Defendants.          Trial Date:  None
                                         Complaint Filed:  October 10, 2013
20

21

22

23

24

25

26

27

28

1    **TO THE COURT, THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

2         **PLEASE TAKE NOTICE** that on July 13, 2017 at 10:00 a.m., in the United States District

3    Court for the Northern District of California, San Francisco Courthouse, Courtroom B-5thFloor,

4    located at 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable Elena James,

5    Plaintiffs Kimberly Roberts, Carneisha Forney and Laurie Mullen ("Plaintiffs") will, and hereby do,

6    move this Court to:

7         1.    Preliminarily approve the settlement set forth in the Joint Stipulation of Class Action

8    Settlement and Release, attached as Exhibit 1 to the Declaration of Marcus Bradley;

9         2.    Approve distribution of the proposed Notice of Class Action Settlement to the

10   Settlement Class;

11        3.    Appoint ILYM Group, Inc. as the Settlement Administrator; and

12        4.    Set a hearing date for final approval of the settlement.

13        Further, pursuant to Northern District Local Rule 7-4(b), Plaintiffs respectfully request that

14   this Court grant Plaintiffs relief from the twenty-five page limit, and permit the filing of the attached

15   Memorandum of Points and Authorities not to exceed fifty (50) pages.   Such additional page length

16   is needed to fully address this Court's concerns with Settlement Agreement previously submitted by

17   the Parties.

18        This Motion is based upon:   (1) this Notice of Motion and Motion; (2) the Memorandum of

19   Points and Authorities in Support of Motion for Preliminary Approval of Revised Class Action

20   Settlement; (3) the Declaration of Marcus Bradley; (4) the Declaration of Scott Cooper; (5) the

21   Declaration of Shaun Setareh; (6) the Declaration of Samuel A. Wong; (7) the Declaration of Roger

22   R. Carter; (8) the Joint Stipulation of Class Action Settlement and Release; (9) the Notice of Class

23   Action Settlement; (10) the [Proposed] Order Granting Preliminary Approval of Class Action

24   Settlement; (11) the records, pleadings, and papers filed in this action; and (12) upon such other

25

26

27

28

1   documentary and oral evidence or argument as may be presented to the Court at or prior to the hearing

2   of this Motion.

3

4   Dated: May 30, 2017

5

6                                                    /S/ MARCUS J. BRADLEY
                                                     MARCUS J. BRADLEY
7                                                    KILEY L. GROMBACHER
                                                     BRADLEY GROMBACHER LLP
8                                                    Attorneys for Plaintiffs
                                                     KIMBERLY ROBERTS, CARNEISHA
9                                                    FORNEY, and LAURIE MULLEN

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................. 1

II.    FACTS AND PROCEDURE ................................................................................. 4

  A.   Facts Relevant to the Substantive Claims of the Litigation ............................ 5

    1.   Overview of Defendants' Business Operations and Pay Rates ............................. 5

    2.   Plaintiffs and the Members of the Putative Class Were Subject to Generally Applicable Policies and/or Practices Which Resulted in Time Worked "Off-the-Clock" .............................. 8

    3.   Plaintiffs' Regular Rate Claim ................................................................ 9

    4.   Plaintiffs and the Members of the Class Were Routinely Denied Legally Compliant Meal and Rest Break Periods ...................................................................... 9

    5.   The Uniform Wage Statements Provided to the Class Members ......................... 10

    6.   Vacation Pay Allegations ..................................................................... 10

  B.   Facts Relevant to the Plaintiffs ................................................................. 10

    1.   Kimberly Roberts .............................................................................. 10

    2.   Carneisha Forney .............................................................................. 11

    3.   Laurie Mullen .................................................................................. 12

  C.   Relevant Procedural Facts ...................................................................... 13

    1.   Procedural Background ........................................................................ 13

    2.   The Parties Completed Significant Discovery And Investigation ...........................14

    3.   Mediation...........................................................................................15

    4.   The Parties' Continued Negotiations Following the Court's Prior Settlement Order........15

III.    SUMMARY OF THE SETTLEMENT TERMS…………….…………………………16

  A.  The Proposed Settlement Fully Resolves Plaintiffs' Claims .......................................16

    1.  Composition of the Settlement Classes................................................. 16

    2.  Settlement Consideration ……………………………………………………17

    3.  Revised Formula for Calculating Settlement Payment……………………………18

    4.  The Parties' Reasons for Not Differentiating Between Employees Who
        Separated During the Class Period and Those Who did Not Separate
        During the Class Period……………………………………………………….. . . 21

    5.  Release by the Settlement Class………………………………………………23

IV.    ARGUMENT ........................................................................................................ 25

  A.  The Court Should Conditionally Certify the Proposed Monetary Payment Settlement Class

  and Prospective Relief Settlement Class ........................................................................ 25

    1.  The Settlement Classes are Sufficiently Numerous and Ascertainable ............................ 26

    2.  There Are Questions of Law and Fact Common to the Monetary Payment Class and

    Prospective Relief Class ........................................................................................ 27

    3.  The Representative Plaintiffs' Claims Are Typical of the Claims of the Monetary Payment

    Class and Prospective Relief Payment Class................................................................. 28

    4.  The Named Plaintiffs Are Adequate to Represent the Settlement Class ............................ 31

    5.  The Monetary Payment Class Can Be Conditionally Certified Because The Requirements

    of Rule 23(b)(3) Are Satisfied ................................................................................ 32

        a. Common Issues of Law and  Fact Predominate…………………………………………33

        b. The class action mechanism is superior to any other methods of adjudication……...…33

    6.  The Requirements For Conditionally Certifying the Prospective Relief Class Under Rule

    23(b)(2) Are Also Satisfied ................................................................................ 33

B.   The Proposed Class Action Settlement Should Receive Preliminary Approval .......................34

1.   The Court's Scrutiny of the Proposed Settlement is Lowered at the Preliminary Approval

Stage .............................................................................................................................. 34

2.   The Proposed Class Action Settlements Is Procedurally Fair, Adequate, and Reasonable . 35

a.   The Settlement is the product of arms' length negotiations and is therefore  entitled
to a presumption of fairness ………………………………………………...…………………35

b.  There are no obvious deficiencies with the Settlement or preferential treatment
to certain Class Members………………………………………………………………..36

c.   The parties conducted a thorough investigation of the factual and legal issues………37

d.   Defendants have asserted numerous defenses that create risk that the Class will
receive no recovery if the claims at issue are not settled……………………………37

e.   Exposure analysis…………………………………………………………………..41

3.   The Proposed Settlement Is Substantively Within the Range of Reasonableness ............... 41

C.   The Court Should Preliminarily Approve the PAGA Component of the Settlement…………44

D.   The Court Should Preliminarily Approve the Negotiated Plaintiffs' Service Award……..…45

E.   The Court Should Preliminarily Approve the Negotiated Attorneys' Fees and Costs………..46

F.   The Proposed Class Notice Adequately Informs Class Members About the Case and
Proposed Settlement………………………………………………………………………47

V.   CONCLUSION ..................................................................... 48

1

## TABLE OF AUTHORITIES

2

**FEDERAL CASES**

3

4

*Allen v. Bedolla*

5

  787 F.3d 1218, 1223 (9th Cir. 2015) ............................................................. 34

6

*Alvarado v. Costco Wholesale Corp.*

7

  2008 U.S. Dist. LEXIS 48935, *9-13 (N.D. Cal. 2008) ................................ 38

8

*Alvarez v. Nordstrom, Inc.*

9

   2011 U.S. Dist. LEXIS 56646 (C.D. Cal. May 24, 2011) ............................. 33

10

*Amchem Products, Inc. v. Windsor*

11

  521 U.S. 591, 620 (1997) ............................................................................... 24

12

*Amochaev v. Citigroup Global Markets, Inc.*

13

  No. 05-1298 PJH (N.D. Cal. 2008) ............................................................... 45

14

*Cervantez v. Celestica Corp.*

15

  618 F. Supp. 2d 1208, 1217 (C.D. Cal. 2009) .............................................. 38

16

*Churchill Village, LLC v. Gen. Elec.*

17

  361 F.3d 566 (9th Cir. 2004) ......................................................................... 35

18

19

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*

20

  258 F.R.D. 545, 557-58 (N.D. Ga. 2007) ...................................................... 24

21

*Cook v. Tiffany & Co.*

22

23

  2011 U.S. Dist. LEXIS 106230, at *4 (S.D. Cal. Sept. 19, 2011) ................. 33

24

*Costelo v. Chertoff*

25

  258 F.R.D. 600, 608 (C.D. Cal. 2009) ........................................................... 29

26

*D'Amato v. Deutsche Bank*

27

  236 F.3d 78, 85 (2d Cir. 2001) ...................................................................... 36

28

*Dearaujo v. Regis Corp.*

No. 2:14-CV- 01408-KJM-AC, 2016 WL 3549473, at *6 (E.D. Cal. June 30, 2016) .................. 25

*Edwards v. Nat'l Milk Producers Fed'n,*

2014 WL 4643639, at *4 (N.D. Cal. Sept. 16, 2014 ...................................................... 27

*Eisen v. Carlisle & Jacqueline*

417 U.S. 156, 173, 94 S. Ct. 2140, 2150, 40 L. Ed. 2d 732, 746 (1974) ........................... 47

*Ellis v. Costco Wholesale Corp.*

657 F.3d 970, 984 (9th Cir. 2011). .............................................................................. 29

*Evon v. Law Offices of Sidney Mickell*

688 F.3d 1015, 1031 (9th Cir. 2012 .............................................................................. 31

*Farris v. Cnty. of Riverside*

667 F. Supp. 2d 1151, 1164-65 (C.D. Cal. 2009) ........................................................... 39

*Franklin v. Kaypro*

884 F.2d 1222, 1225 (9th Cir. 1989) .............................................................................. 35

*Frlekin v. Apple Inc.*

2015 U.S. Dist. LEXIS 151937, at *4, *10-11, *35 (N.D. Cal. Nov. 7, 2015) ...................... 38, 43

*Hanlon v. Chrysler Corp.*

150 F.3d 1011, 1027 (9th Cir. 1998) .............................................................................. 35

*Hernandez v. BCI Coca-Cola Bottling Co.*

2012 U.S. Dist. LEXIS 55301, at *17-22 (C.D. Cal. Apr. 12, 2012) ................................... 40

*Holak v. K Mart Corp.*

2014 U.S. Dist. LEXIS 139879, at *21 (E.D. Cal. Sept. 30, 2014) .................................... 40

*Hopson v. Hanesbrands Inc.*

Case No. 08-00844, 2009 U.S. Dist. LEXIS 33900, at *24 (N.D. Cal. Apr. 3, 2009); *see*, *e.g.*

*Hurst v. Buczek Enters.*, LLC, 870 F. Supp. 2d 810, 829 (N.D. Cal. May 2, 2012) .......................... 40

*In re Amtrak Train Derailment in Philadelphia, Pennsylvania*, No. 15-MD-2654, 2016 WL

1359725, at *4 (E.D. Pa. Apr. 6, 2016) ................................................................... 25

*In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 U.S. Dist. LEXIS

108195 (N.D. Cal. Nov. 5, 2008 ............................................................................. 36

*In re Bluetooth Headset Prods. Liab. Litig.*

654 F.3d 935, 946 (9th Cir. 2011 ............................................................................ 36

*In re Initial Pub. Offering Sec. Litig.*

260 F.R.D. 81, 116 & n.308 (S.D.N.Y. 2009) .......................................................... 24

*In re Mego Fin. Corp. Sec. Litig.*

213 F.3d at 463 ...................................................................................................... 45

*In re Nat'l Football League Players' Concussion Injury Litig.*

961 F. Supp. 2d 708, 714 (E.D. Pa. 2014 ............................................................... 34

*In re Processed Egg Prod. Antitrust Litig.*,

No. 08-MD-2002, 2014 WL 828083, at *2 (E.D. Pa. Feb. 28, 2014) ........................ 26

*In re Tableware*

484. Supp. 2d 1078, 1079 (N.D. Cal. 2007 ............................................................. 35

*International Union of Operating Engineers-Employers Canst. Industry Pension, Welfare and

Training Trust Funds v. Karr*

994 F. 2d 1426, 1430 (9th Cir. 1993) ..................................................................... 25

*Jimenez v. Allstate Ins. Co.*

765 F.3d 1161, 1165 (9th Cir. 2014) ...................................................................... 27

*La Fleur v. Medical Management Intern, Inc.*,

No. 13-00398-VAP, 2014 WL 2967475, *8 (C.D. Cal. June 25, 2014 ...................... 36

*Lindow v. U.S.*, 7

38 F.2d 1057, 1062 (9th Cir. 1984) ................................................................... 38, 39

*Linney v. Cellular Alaska P'ship*

  151 F.3d 1234, 1242 (9th Cir. 1998) ............................................................. 44

*Mangold v. Calif. Public Utilities Comm'n*

  67 F.3d 1470 (9th Cir. 1995) ........................................................................ 46

*Matsushita Elec. Indus. Co. v. Epstein,*

  516 U.S. 367 (1996) ..................................................................................... 25

*Matter of Continental Illinois Securities Litig.*

  962 F.2d 566 (7th Cir. 1992) ........................................................................ 45

*Milligan v. Am. Airlines, Inc.*

  577 Fed. Appx. 718, 719 (9th Cir. 2014) ...................................................... 40

*Officers for Justice v. Civil Serv. Comm'n*

  688 F.2d 615 (9th Cir. 1982) ........................................................................ 42

*Ogiamien v. Nordstrom, Inc.*,

  2015 U.S. Dist. LEXIS 22128, at *15; 165 Lab. Cas. (CCH) P36, 317

   (C.D. Cal. February 24, 2015 ....................................................................... 41

*Parsons v. Ryan*

  754 F.3d 657, 675 (9th Cir. 2014) ................................................................ 27

*Prods. Liab. Litig.* ("*Volkswagen*")

  2016 WL 4010049, *14 (N.D. Cal. July 26, 2016) ...................................... 35

*Quinlan v. Macy's Corp. Servs., Inc.*

  2013 U.S. Dist. LEXIS 164724 (C.D. Cal. 2013) ........................................ 41

*Radcliffe v. Experian Info. Sols. Inc.*,

  715 F.3d 1157, 1165 (9th Cir. 2013). ........................................................... 31

*Rau v. Darling's Drug Store, Inc.*

  388 F. Supp. 877, 879 (W.D. Penn. 1975) .................................................... 39

*Reber v. Aimco/Bethesda Holdings, Inc.*

   2008 U.S. Dist. LEXIS 81790, at *25 (C.D. Cal. August 25, 2008) ............................. 40

*Ridgeway v. Wal-Mart Stores, Inc.*

   2014 U.S. Dist. LEXIS 126806, at *28-29 (N.D. Cal. Sept. 10, 2014) .......................... 40

*Rodriguez v. West Pub. Corp.*

   563 F.3d 948, 965 (9th Cir. 2009) ........................................................ 42, 45

*Ruch v. AM Retail Group, Inc.*

   2016 WL 1161453, at *7 (N.D. Cal. Mar. 24, 2016) ...................................... 35

*Rutti v. Lojack Corp.*

   596 F.3d 1046, 1056 (9th Cir. 2010) ..................................................... 38

*Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005)). .................................. 29

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) ................................. 32

*Stevens v. Safeway, Inc.*

   2008 U.S. Dist. LEXIS 17119 (C.D. Cal. 2008) .......................................... 45

*Stiller v. Costco Wholesale Corp.*

   298 F.R.D. 611 (S.D. Cal. 2014) ........................................................ 41

*Torres v. Mercer Canyons Inc.*,

   835 F.3d 1125 ......................................................................... 29

*Troester v. Starbucks Corp.*

   2014 U.S. Dist. LEXIS 37728 (C.D. Cal. Mar. 7, 2014) ................................. 39

*Tyson Foods, Inc. v. Bouaphakeo*

   136 S. Ct. 1036, 1045 (2016) ........................................................... 26

*Wal-Mart Stores, Inc. v. Dukes*

   564 U.S. 338, 359, 131 S. Ct. 2541, 2556, 180 L. Ed. 2d 374 (2011) ...................... 27

*Wolin v.  Jaguar Land Rover N. Am., LLC*

617 F.3d 1168, 1175-76 (9th Cir. 2010) ........................................................ 26

*Vizcaino v. Microsoft Corp.*

290 F.3d 1043 (9th Cir. 2002) ...................................................................... 46

*Zinser v. Accufix Research Inst.*

253 F.3d 1180, 1186 (9th Cir. 2001) ............................................................ 25

**<u>STATE CASES</u>**

*Chavez v. Netflix, Inc.*

(2008) 162 Cal. App. 4th 43, 66 n.11 .......................................................... 47

*Downtown Palo Alto Com. For Fair Assessment v. City Council*

(1986) 180 Cal. App. 3d 384, 394 .............................................................. 40

*Hosp. v. Super. Ct.*

(2005) 131 Cal. App. 4th 893, 902-903 ........................................................ 39

*Laffitte v. Robert Half Int'l*

(2016) 1 Cal. 5th 480 .................................................................................. 46

*Lealao v. Beneficial Cal. Inc.*

(2000) 82 Cal. App. 4th 19, 48 .................................................................... 46

*Morgan v. United Retail*

(2010) 186 Cal. App. 4th 1136, 1147 .......................................................... 40

*Neary v. Regents of University of California*

(1992) 3 Cal. 4th 273, 277 .......................................................................... 44

*Serrano v. Priest*

(1977) 20 Cal. 3d 25, 35 .............................................................................. 46

*Soto v. Motel 6 Operating, L.P.*

(2016) 4 Cal.App.5th 385, 392, 208 Cal.Rptr.3d 618 .................................. 42

## FEDERAL STATUTES

29 California Federal Rule § 531.3(b) ......................................................................... 39

29 U.S.C. § 207(e) ..................................................................................................... 39

California Federal Rule of Civil Procedure Rule 23(a) ............................................... 26

California Federal Rule of Civil Procedure Rule 23(a)(1) ..................................... 26, 27

California Federal Rule of Civil Procedure Rule 23(a)(2) .......................................... 27

California Federal Rule of Civil Procedure Rule 23(a)(3) .......................................... 29

California Federal Rule of Civil Procedure Rule 23(a)(4) .......................................... 31

California Federal Rule of Civil Procedure Rule 23(b)(2) ..................................... 27, 33

California Federal Rule of Civil Procedure 23(b)(3) ............................... 24, 26, 32,33

California Federal Rule of Civil Procedure Rule 23(c)(2) ..................................... 33, 47

California Federal Rule of Civil Procedure 23(c)(2)(B) ............................................. 33

## STATE STATUTES

California Labor Code § 203(a) ................................................................................. 41

California Labor Code Sections 226 ................................................. 10, 11, 12, 39, 40

California Labor Code § 226(e) ................................................................................. 40

California Labor Code § 226(e). ................................................................................ 40

California Labor Code §226(a)(2) ............................................................................. 40

California Labor Code § 226 (a)(2) ........................................................................... 10

California Labor Code § 226(a) ........................................................................... 10, 40

California Labor Code §226 (a)(9). ........................................................................... 10

California Labor Code Sections 512 ........................................................... 10, 11, 12, 39

California Labor Code Section 2698 ............................................................................ 5

## OTHER AUTHORITY

8 CCR § 11070 (Wage Order 7-2001), ............................................... 10,11, 12, 39

Conte & Newberg, *Newberg on Class Actions*, section 7.20 (4th ed. 2002) § 11.25 ........................ 34

Manual for Complex Litigation (4th ed. 2004) ............................................................. 34, 48

*Newberg on Class Actions* § 11:38 (4th ed. 2008)). .......................................................... 45

Newberg on Class Actions § 13:18 (5th ed.) ................................................................ 25

Newberg, on Class Actions § 11:25 ......................................................................... 35

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.     INTRODUCTION**

3          On February 1, 2017, Plaintiffs Kimberly Roberts, Carneisha Forney and Laurie Mullen

4    ("Plaintiffs") filed a motion for preliminary approval of a class action settlement intended to resolve

5    this action.  On March 28, 2017, the Court denied the motion without prejudice, requesting further

6    elaboration on issues of typicality, adequacy and predominance ("Prior Settlement Order" or "PSO").

7    The Court also expressed concern about the formula for class member settlement distribution,

8    specifically, the fairness of a single workweek calculation given the different positions (full-time

9    versus part-time, manager versus non-manager, current versus former employee) covered by the

10    settlement and inquired about the settlement amount versus potential exposure.  The Court granted the

11    parties leave to re-submit a revised Settlement that addressed the concerns raised in the Court's March

12    28, 2017 Order.   Plaintiffs and Defendants T.J. Maxx of CA, LLC, Marshalls of CA, LLC;

13    HomeGoods, Inc. ("Defendants") (collectively with Plaintiffs, the "Parties") have engaged in

14    additional arms-length negotiations and, by this Motion, Plaintiffs seek preliminary approval of the

15    Revised Joint Stipulation of Class Action Settlement and Release.[1]

16          The basic terms of the Revised Settlement provide for the following:

17          (1)     The creation of two Settlement Classes – one tethered to the significant injunctive relief

18                   components of the Settlement and the other to the monetary benefits provided by the

19                   Settlement-- defined as:

20                   (a) Prospective Relief Class: all non-exempt employees working at a T.J. Maxx, Marshalls or

21                   HomeGoods branded retail store in the State of California at any time from October 10, 2009

22                   through and including August 10, 2016 who will in the future be provided with wage

23                   statements substantially in the form of the Wage Statement Exemplar attached as Exhibit E to

24                   the Settlement Agreement (Exhibit 1 of the Declaration of Marcus Bradley ("Bradley Decl.");

25                   (b) Monetary Payment Class:  all current and former non-exempt employees who worked at a

26                   T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California during the

27                   Class Period.  Class Members are members of the Monetary Payment Class established by this

28

---

[1] Hereinafter "Settlement Agreement" or "Settlement."  Unless indicated otherwise, capitalized terms
used herein have the same meaning as those defined by the Settlement Agreement.

Settlement, and Class Members will remain members of the Monetary Payment Class for all purposes if they do not exclude themselves from the monetary portion of the Settlement, pursuant to the terms of this Settlement Agreement[2].

Upon consideration of the Court's prior concerns, the Monetary Relief Class is further divided into two sub-classes:

(i) <u>Manager/Coordinator Monetary Payment Class Members</u>[3]: means: (1) all current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California during the Class Period; (2) who at any point during the Class Period held a non-exempt manager or coordinator title; and (3) who do not submit a timely Request for Exclusion (i.e., opt out)[4].

(ii) <u>Non-Manager/Non-Coordinator Monetary Payment Class Members</u>: means: (1) all current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California during the Class Period, (2) who never held a manager or coordinator title during the Class Period; and (3) who do not submit a timely Request for Exclusion (i.e., opt out).[5]

(2) A completely non-reversionary Class Settlement Amount of $8,500,000. The Class Settlement Amount includes:

(a) Attorneys' fees not to exceed Two Million, Five Hundred and Fifty Thousand Dollars ($2,550,000), which will be distributed as $1,071,000 (or 42%) to Bradley Grombacher LLP, $714,000 (or 28%) to Setareh Law Group, $382,500 (or 15%) to Aegis Law Firm, PC, $229,500 (or 9%) to The Cooper Law Firm, P.C. and $153,000 (or 6%) to The Carter Law Firm. Any amounts not approved by the Court shall be paid out as part of the Net Distribution Fund for monetary payments to Monetary

---

[2] Declaration of Marcus J. Bradley at Ex 1, at §1.19.
[3] Bradley Decl., Ex 1 at §1.17.
[4] Employees who held a non-exempt manager title or coordinator title are grouped together as Manager/Coordinator Monetary Payment Class Members because non-exempt employees with a manager or coordinator job title generally worked full-time schedules (whereas Non-Manager/Non-Coordinator Monetary Payment Class Members generally worked part-time schedules) and because non-exempt employees with a manager or coordinator job title, on average, earned higher hourly rates than the Non-Manager/Non-Coordinator Monetary Payment Class Members.
[5] Bradley Decl, Ex 1 at § 1.22.

Payment Class Members.

(b)  Class Counsel Costs not to exceed Sixty Thousand Dollars ($60,000).  Any amounts not approved by the Court shall be paid out as part of the Net Distribution Fund for monetary payments to Monetary Payment Class Members.

(c)  Settlement Administration Costs, currently estimated at $250,000, to be paid to the jointly selected settlement administrator, ILYM Group, Inc.  Any amounts not incurred by ILYM or approved by the Court shall be paid out as part of the Net Distribution Fund for monetary payments to Monetary Payment Class Members.

(d)  A $75,000 payment to the California Labor & Workforce Development Agency ("LWDA") for the LWDA's portion of the PAGA Award pursuant to the Labor Code Private Attorneys General Act of 2004 ("PAGA").  Any amounts not approved by the Court shall be paid out as part of the Net Distribution Fund for monetary payments to Monetary Payment Class Members.

(e)  Plaintiffs' Service Awards of $10,000, each, to Carneisha Forney and Laurie Mullen and $20,000 to Kimberly Roberts, for their services on behalf of the Settlement Class and for agreeing to broader releases than those required of other Class Members.  Any amounts not approved by the Court shall be paid out as part of the Net Distribution Fund for monetary payments to Monetary Payment Class Members.

(f)  A Net Settlement Amount estimated to be Five Million, Five Hundred and Twenty-Five Thousand Dollars ($5,525,000) (i.e., the Total Settlement Amount of $8,500,000 minus the California Labor & Workforce Development Agency's portion of the PAGA Award ($75,000), proposed Class Counsel Fees Award ($2,550,000), proposed Class Counsel Costs Award ($60,000), proposed Service Awards ($40,000) and anticipated Settlement Administration Costs ($250,000)). The Net Settlement Amount will be allocated based upon either a Manager/Coordinator Monetary Payment Class Member Amount or a Non-Manager/Non-Coordinator Monetary Payment Class Member Amount. **The entire Net Settlement Amount will be paid to all Class Members who do not opt out of the Settlement Class, and without the**

**need to submit claims for payment.**

(g)    The value of the individual payments to Settlement Class members shall be determined based upon a hybrid work week/job position formula. The total value of the Non-Manager/Non-Coordinator Monetary Payment Class Member Amount (i.e., payments to Monetary Class Members who held a non-exempt manager title or a coordinator title during the Class Period) will be set so that the per workweek payment to Manager/Coordinator Monetary Payment Class Members is 25% higher than the per workweek payment to Non-Manager/Non-Coordinator Monetary Payment Class Members (rounded to the nearest cent) to account for the fact that individuals who held either a non-exempt manager title or a non-exempt coordinator title during the Class period made a collective median final hourly rate (i.e., $11.98 per hour) that is 25% higher (rounded to the nearest percent) than the median final hourly rate of individuals in the Non-Manager/Non-Coordinator category (i.e., $9.00 per hour)..

An objective evaluation of the Settlement confirms that the relief negotiated on the Class' behalf is fair, reasonable, and adequate in light of the risks of continued litigation. The Settlement was negotiated by the Parties at arm's length with helpful guidance from Michael Dickstein and Mark Rudy, experienced and well-respected class action mediators. Taking into account guidance received from this Court, the Settlement confers substantial benefits, both monetary and non-monetary to Class Members. The relief offered by the Settlement is particularly impressive when viewed against the difficulties encountered by plaintiffs pursuing wage and hour cases (*see infra*). Indeed, by settling now rather than proceeding to trial, Class Members will not have to wait (possibly years) for relief, nor will they have to bear the risk of class certification being denied or of Defendants prevailing at trial.

As discussed below, the revised proposed Settlement satisfies all criteria for preliminary settlement approval under federal law and falls within the range of reasonableness. Accordingly, Plaintiffs respectfully request that this Court grant preliminary approval of the Settlement Agreement.

## II.    FACTS AND PROCEDURE

The claims of this litigation arise from Defendants' alleged failure to: implement legally compliant meal and rest period policies; pay all wages owed due for time spent participating in security checks performed

during employee break periods and at the end of shifts and for off-the-clock work performed during store opening and closing procedures; incorporate employee discounts into employee's regular rate of pay; provide accurate wage statements; pay all wages owed at separation, and pay all accrued vacation pay.  Plaintiffs' operative Second Amended Complaint ("SAC") alleges many of these claims.  Additional claims that were investigated by Plaintiffs' counsel, but have not yet been alleged, are included in Plaintiffs' proposed Third Amended Complaint ("TAC").  A 'clean' version of the TAC along with a redlined version showing all changes to the SAC are included in Exhibit D to the Settlement Agreement.[6]  Plaintiffs' proposed TAC (i.e., Exhibit D to the Settlement Agreement) alleges the following claims: (1) failure to pay wages in violation of California Labor Code section 204, 510, 1194, 1194.2, 1197 and 1198 and the applicable Industrial Welfare Commission ("IWC") Wage Order; (2) failure to provide meal periods or compensation in lieu thereof in violation of California Labor Code sections 226.7 and 512 and the applicable IWC Wage Order; (3) failure to provide rest breaks or compensation in lieu thereof in violation of California Labor Code section 226.7 and the applicable IWC Wage Order; (4) failure to pay overtime compensation in violation of California Labor Code sections 200, 203, 226, 226.7, 500, 510, 512, 558, 1194 and 1198 and the applicable IWC Wage Order; (5) failure to pay vacation wages in violation of California Labor Code sections 203 and 227.3, both as a derivative and a direct claim; (6) failure to timely provide accurate, itemized wage statements in violation of California Labor Code section 226, both as a derivative and a direct claim; (7) failure to timely pay wages at termination in violation of California Labor Code sections 201-203, both as a derivative and a direct claim; (8) unfair business practices in violation of California Business & Professions Code section 17200 *et seq.*; and (9) penalties under the Private Attorney General Act ("PAGA"), California Labor Code section 2698 *et seq.*

### A.     Facts Relevant to the Substantive Claims of the Litigation

#### 1.     Overview of Defendants' Business Operations and Pay Rates

Defendants are all subsidiaries of The TJX Companies, Inc. ("TJX").  TJX is, and has been throughout the class period, an international off-price apparel and home fashions company.   TJX operates four divisions however, as noted in the company's 10K Report, the "retail chains are highly integrated… We function as one TJX. … To maximize our global presence, we take a 'no walls'

---

[6] Details regarding the changes included in the TAC are also specified in Section II.C.1 below.

approach, sharing ideas, talent, initiatives, and best practices across the Company[7]."

T.J. Maxx and Marshalls chains in the United States are referred to collectively as "The Marmaxx Group" or "Marmaxx." Both chains sell family apparel (including footwear and accessories), home fashions (including home basics, accent furniture, lamps, rugs, wall décor, decorative accessories and giftware) and other merchandise. The primary difference between T.J. Maxx and Marshalls is the product assortment. The HomeGoods chain is an off-price retailer of home fashions in the United States.

The settlement class is compromised of the non-exempt employees – full time and part time, managerial and non-managerial, coordinators and non-coordinators – who staff Defendants' retail stores in the State of California. Across each of the chains at issue in this litigation, Defendants rely on a primarily full-time, non-exempt workforce to staff the following positions:

- Assistant Store Manager- duties include: follow up on cash variance, recruiting, training and developing hourly associates[8];

- Assistant Store Manager (Merchandise)- duties include: managing the flow and distribution of store merchandise to meet business needs, interview and recommendations re: hiring, associate performance evaluations, and oversees functions related to opening and closing of store[9];

- Assistant Store Manager (Operations)- duties include: managing the flow and distribution of store merchandise to meet business needs, interview and recommendations re: hiring, associate performance evaluations, and oversees functions related to opening and closing of store[10];

- Assistant Store Manager (Customer Experience)- duties include: managing the flow and distribution of store merchandise to meet business needs, interview and recommendations re: hiring, associate performance evaluations, and oversees functions related to opening and closing of store[11];

- Merchandise Coordinator- duties include: ensuring fixtures are properly signed, ensure quick efficient flow of goods into departments, assists in resolving rewrap and no ticket merchandise, provides

---

[7] The TJX Companies 2014 Annual Report available at http://nasdaqomx.mobular.net/nasdaqomx/7/3475/4966/document_0/TJX_2014_AR.PDF (last viewed April 1, 2016).
[8] Bradley Decl, Ex 5 (D0000112-113. D00000653).
[9] Bradley Decl, Ex 5 (D0000114-115; D0000655-656, 680-681).
[10] Bradley Decl, Ex 5 (D0000116-117; D00000657-658).
[11] Bradley Decl, Ex 5 (D0000118-119; D00000659-660).

customer service, processes cash register transactions[12];

- Cash Office Coordinator- duties include: balancing funds from the cash register, management of overages/shortages, prepare and maintain cash office reports,[13]

- Backroom Coordinator- duties include: maintaining organizations, cleanliness and recovery standards for the backroom area, support recycling team, processes and prioritizes and prepares merchandise[14]

- Administrative Coordinator- duties include: verifying cash, check charge totals for accuracy, prepare, balance registers, maintain cash files[15];

- Customer Experience Coordinator/Customer Service Coordinator/Front End Coordinator- duties include: sales, returns, phone calls, customer questions/complaints and line controls. Providing prompt and courteous service, controls lines, opens/closes registers, approves markdowns, ensuring front line associates also provide prompt courteous and knowledgeable service to all customers and resolving customer service issues [16] ;

- Key Carrier Coordinator- duties include: supplemental management coverage in the stores, ensures store team acts in accordance with store plan, ensure operations procedures are addressed[17].

   <u>Defendants rely on a primarily part-time non-exempt workforce to staff the following positions:</u>

- Sales Associate/Merchandise Associate- duties include: processing merchandise, ring customer purchases, assist customers with questions/issues, balance register[18];

- Customer Service Associate/Loss Prevention Associate- duties include: conducting plain clothed loss prevention activities as well as leading meetings and educational programs for store staff;

- Custodial Associate- duties include: maintaining the interior and exterior standards of the store, monitoring custodial supplies, assist with floor moves.[19]

   The median final hourly pay rate (i.e., the hourly rate at the date of separation, or for current employees, the hourly rate at the date the Class Period cut off on 8/10/16) for employees who never held a manager position and never held a coordinator position while working in non-exempt positions at T.J. Maxx, Marshalls or

---

[12] Bradley Decl, Ex 5 (D00000416-417, D0000120-121; D00000661-663).
[13] Bradley Decl, Ex 5 (D00000406-407)
[14] Bradley Decl, Ex 5 (D00000123-126; D00000664-667.)
[15] Bradley Decl, Ex 5 (D0000127-130, D0000668-671.)
[16] Bradley Decl, Ex 5 (D00000408-410; D0000678-679.)
[17] Bradley Decl, Ex 5 ( D0000411-413.)
[18] Bradley Decl, Ex 5 (D00000414-415; D00000131-132; D0000672-677.)
[19] Bradley Decl, Ex 5 (D0000674-677.)

HomeGoods branded stores in California was $9.00.   Bradley Decl at ¶ 24. The median final hourly pay rate for non-exempt employees with a manager job title or coordinator job title at separation or as of the date the Class Period cut off on August 10, 2016 was $11.98.  Id.

Thus, the collective median pay rate for employees holding manager or coordinator positions under the Settlement Agreement is 25% higher than the median hourly pay for employees who never held a manager position or a coordinator position. Id.

### 2. Plaintiffs and the Members of the Putative Class Were Subject to Generally Applicable Policies and/or Practices Which Resulted in Time Worked "Off-the-Clock"

Plaintiffs' "off-the-clock" claims are predicated on California law and derive from uniform written policies (TJX's parcel/bag "security check" procedures and "closing" and "opening" procedures[20]). Pursuant to such policies and practices, Plaintiffs contend that they and the members of the Settlement Class, although clocked out of Defendants' timekeeping system, were not permitted to leave for a break or at the termination of their shift until their bags had been inspected.  Plaintiffs further contend that at the termination of their shift, they and other members of the Settlement Class were forced to wait after clocking out for managers to complete other tasks such as setting alarms, locking doors, and inspecting the store.[21]  Plaintiffs also contend that Defendants' opening procedures forced them and members of the Settlement Class to wait off-the-clock at the store's entrance during opening shifts for a second employee to arrive to enter the store and required employees to engage in other opening procedures prior to clocking in.

During the course of discovery, Defendants produced bag check policies and opening and closing procedure policies applying to all non-exempt employees working in Marshalls, T.J. Maxx or HomeGoods

---

[20] This discovery includes without limitation documents marked D00000332 (Operational/Shrink Controls- Opening/Closing), D00000338 and D00000432-437 (Store Opening and Closing Procedures) (Confidential), D00000058 and D00000599 ("Purse and Parcel Procedure") and D00000392 (Security Checks [Bag Inspections]). Some of these documents are marked "Confidential" under the Protective Order in this case, but can be provided for *in camera* review or filed under seal upon Request.  Exemplar documents which have not been marked as confidential are attached to the Bradley Declaration as Exhibit 4.

[21] See e.g. Defendants' security check "guideline" document and closing policies at Bradley Decl., Ex 4; See also Bradley Decl. Exhibit 2 (McPhearson Deposition at 49:14-51:16); Exhibit 3 (Morry Deposition at 24:17-29:2.))

branded retail stores in California during the Class Period.[22]   The general applicability of the "bag check"

practice and opening and closing procedures was further corroborated by the fact that non-exempt managers,

non-exempt coordinators as well as employees who never held a manager position or a coordinator position

participated in bag checks and engaged in opening and closing procedures during the Class Period.[23]

Based on the policies and practices specified above, Plaintiffs contend that Class Members are owed

wages, waiting time penalties under Labor Code section 203 and additional premium wages for overtime for

time spent in bag checks, time spent conducting opening and closing procedures off-the-clock (or waiting for

other employees to conduct them).   Plaintiffs also contend that their meal and rest breaks were shorter than

required by statute due to time spent participating in bag checks.

### 3.      Plaintiffs' Regular Rate Claim

Plaintiffs also contend that they and other members of the Settlement Class were provided an employee

discount and that Defendants uniformly failed to calculate the value of the discount clothing and goods and

nondiscretionary bonuses when computing hourly employees' overtime rate of pay.  See Bradley Decl., Ex D

to Ex 1 (TAC, ¶ 7.)  Based on this underlying claim, Plaintiffs assert they are owed overtime wages and vacation

pay at the appropriate rate and waiting time penalties under Labor Code section 203.  *See* Bradley Decl., Ex D

to Ex 1 (TAC, ¶¶ 82, 91.)

### 4.      Plaintiffs and the Members of the Class Were Routinely Denied Legally Compliant Meal and Rest Break Periods

In addition to investigating the derivative meal and rest break violation theory discussed above, i.e., that

meal periods and rest breaks were cut short because employees were required to spend part of those breaks in

bag checks, Plaintiffs also spent considerable time in discovery investigating 'direct' meal and rest break

theories (i.e., theories that Defendants failed to provide Plaintiffs and other Class Members meal and rest breaks

in accordance with California law).  Plaintiffs' investigation included deposing Defendants' PMK witnesses in

Boston as well as requesting written discovery and document productions relating to this issue.  In response,

Defendants produced their respective written meal and rest break policies applicable to California employees.[24]

Based on this investigation and discovery, Plaintiffs also allege that Defendants failed to staff their retail stores

---

[22] See Bradley Decl., Ex. 4.
[23] See e.g. Bradley Decl., Ex. 8 Roberts Vol I at 247:23-248:9; 254:24-255: 6; 330:7-20; 332:3-8;
[24]  These policies include without limitation polices produced as Bradley Decl. Ex  6 (D00000621-629 -Meal and Rest Break Policies).

in a sufficient manner to permit Plaintiffs and the members of the Settlement Class to receive full and timely break periods.

### 5.   The Uniform Wage Statements Provided to the Class Members

In addition to investigating a derivative wage statement theory (i.e., that Defendants' wage statements were inaccurate because they failed to reflect wages due for off-the-clock work, the correct regular rate of pay for overtime, and meal and rest break premiums allegedly owed), Plaintiffs also spent considerable time in discovery investigating "direct" wage statement claims.  Plaintiffs allege that, across all three chains at issue in this litigation, TJX furnished all of its employees, including Plaintiffs, with standardized wage statements that failed to comply with California Labor Code § 226(a). Plaintiffs allege Defendants' wage statements fail to include all information required by California Labor Code § 226 (a)(2) and §(a)(9).  See e.g. Bradley Decl. at Exhibit 7.

### 6.   Vacation Pay Allegations

Finally, Plaintiffs allege that Defendants failed to pay all vested vacation wages due and owing at the time of termination.   The parties conducted substantial discovery on this issue, including but not limited to, Plaintiffs requesting and reviewing Defendants' vacation pay policies and Defendants deposing each of the named Plaintiffs regarding these allegations.  Data produced by Defendants in the course of discovery, however, did not bear out such allegations.

### B.   Facts Relevant to the Plaintiffs

#### 1.   Kimberly Roberts

Plaintiff Kimberly Roberts ("Plaintiff Roberts") was employed by Marshalls as an hourly employee from approximately September of 2010 to July of 2013.   During her tenure with the company, Plaintiff held the positions of Assistant Store Manager or "ASM" and "ASM Merchandising Manager" at Defendants' Vallejo, Vacaville and San Francisco Marshalls retail stores.

During the Class Period, Plaintiff Roberts routinely worked shifts in excess of six hours, thereby entitling her to both meal and rest breaks under California Law[25].  See, e.g., 8 CCR § 11070 (Wage Order 7-2001), para. 11-12; California Labor Code sections 226.7 and 512.  Similarly, Plaintiff Roberts routinely

---

[25] See Bradley Decl., Ex 8 Roberts Deposition at 70:25-71:11

worked shifts in excess of eight hours and worked more than forty hours in a given workweek[26], thereby entitling her to overtime under California law[27].

Plaintiff Roberts testified that during the Class Period she routinely performed work "off-the-clock" for which she was not compensated including time spent waiting for her purse or other parcels to be inspected.[28] Plaintiff Roberts also testified that she spent time performing work duties off the clock prior to the store opening[29] and after store closing[30].  Plaintiff Roberts further testified about the employee discount and noted that the discount was the same for T.J. Maxx, HomeGoods and Marshalls because employees of any of the three brands could use their employee discount at stores for all three brands.[31]  Plaintiff Roberts alleged that the value of her employee discount was not included in her regular rate of pay for purposes of calculating overtime. Finally, Plaintiff Roberts testified that she believed she was not paid for all vacation time she believed she was due at the time of her separation.[32]

## 2.      Carneisha Forney

Plaintiff Carneisha Forney ("Plaintiff Forney") was employed by TJ Maxx as an hourly employee from approximately September 24, 2013 to September 17, 2014[33] in the position of "Customer Service Coordinator" and she was also designated as a "Key Carrier."  Plaintiff Forney performed work for Defendants at their retail stores located in Glendale and LaHabra, California.

During the Class Period, Plaintiff Forney routinely worked shifts in excess of six hours, thereby entitling her to meal and rest breaks under California Law.  See, e.g. 8 CCR § 11070 (Wage Order 7-2001), para. 11-12; California Labor Code sections 226.7 and 512.  Similarly, Plaintiff Forney routinely worked shifts in excess of eight hours and worked more than forty hours in a given workweek[34], thereby entitling her to overtime under California law.

Plaintiff Forney testified that during the Class Period she routinely performed work "off-the-clock" for which she was not compensated including time spent waiting for security checks to be performed on her

---

[26] Bradley Decl, Ex 8 Roberts Deposition at 70:25-71:11
[27] See Bradley Decl., Ex 8 Roberts Deposition at 70:25-71:11.
[28] Bradley Decl, Ex 8 Roberts at 128:5-7.
[29] Bradley Decl, Ex 8 Roberts at 207:10-208:16, 210:5-213:18.
[30] Bradley Decl, Ex  8Roberts at 253:15-256:13,257:2-11.
[31]Bradley Decl, Ex 8  Roberts at 359:23-361:18.
[32] Bradley Decl, Ex 8 Roberts at 362:9-21.
[33] Bradley Decl, Ex 8 Forney at 49:5-51:1
[34] Bradley Decl, Ex 8 Forney at 103:10-25, 115:12-20

purse[35]. Plaintiff Forney also testified that she spent time performing work duties off the clock prior to the store opening [36] and after store closing [37]. Plaintiff Forney also testified about the employee discount and acknowledged a policy noting that the employee discount was the same for T.J. Maxx, HomeGoods and Marshalls and that employees of any of the three brands could use their employee discount at stores for all three brands.[38] Plaintiff Forney alleged that the value of her employee discount was not included in her regular rate of pay for purposes of calculating overtime. Plaintiff Forney also testified that she believed she was not paid for all vacation time she was due at the time of her separation.[39]

### 3. Laurie Mullen

Plaintiff Laurie Mullen ("Plaintiff Mullen") was employed by HomeGoods as an hourly employee from approximately August 1, 2012 to June 2013. During her tenure with the company, Plaintiff Mullen held both a Coordinator position ("Customer Service Coordinator") and worked as a Sales Associate.[40]. Plaintiff Mullen performed work for Defendants at their retail store located in Lake Forest, California.

During the Class Period, Plaintiff Mullen routinely worked shifts in excess of six hours, thereby entitling her to meal and rest breaks under California Law[41]. Similarly, Plaintiff Mullen routinely worked shifts in excess of eight hours and worked more than forty hours in a given workweek[42], thereby entitling her to overtime under California law. See 8 CCR § 11070 (Wage Order 7-2001), para. 11-12; California Labor Code sections 226.7 and 512.

Plaintiff Mullen testified that during the Class Period and when she worked in a both Coordinator and Sales Associate positions she routinely performed work "off-the-clock" for which she was not compensated including time spent waiting for managers to complete tasks and duties during the closing shifts[43]. Plaintiff Mullen also testified that she had to wait "off-the-clock" on days she worked opening shifts prior to clocking in.[44] Similar to the other named Plaintiffs, Plaintiff Mullen testified about using her employee discount and

---

[35] Bradley Decl, Ex 9 Forney 215:1-18.
[36] Bradley Decl, Ex 9 Forney at 190:20-25.199:3-200:1.
[37] Bradley Decl, Ex 9 Forney at 224:9-228:10.
[38] Bradley Decl, Ex 9 Forney at 354:10-356:2.
[39] Bradley Decl, Ex 9 Forney at 350:8-22.
[40] Bradley Decl, Ex 10 Mullen 40:12-41:3.
[41] Bradley Decl, Ex 10 Mullen at 77:5-10.
[42] Bradley Decl, Ex 10 Mullen at 77:5-10.
[43] Bradley Decl, Ex 10 Mullen at 198:18-199:13; 202:4-203:25.
[44] Bradley Decl, Ex 10 Mullen at184:5-187:2.

acknowledged a policy noting that the employee discount was the same for T.J. Maxx, HomeGoods and Marshalls and that employees of any of the three brands could use their employee discount at stores for all three brands.[45] Plaintiff Forney alleged that the value of her employee discount was not included in her regular rate of pay for purposes of calculating overtime. Finally, Plaintiff Mullen also testified that she was confused regarding the payment of her vacation time at separation and was not sure how it was calculated or her eligibility.[46]

### C.   Relevant Procedural Facts

#### 1.   Procedural Background

On September 17, 2013, Plaintiff Roberts served notice of her intent to bring a PAGA representative action on behalf of herself and similarly situated allegedly aggrieved employees of The TJX Companies, Inc., Marshalls of CA, LLC and HomeGoods, Inc. Shortly thereafter, on October 10, 2013, Plaintiff Roberts filed a class action complaint against The TJX Companies, Inc., Marshalls of CA, LLC and HomeGoods, Inc., alleging: (1) failure to pay overtime in violation of the Fair Labor Standards Act; (2) failure to pay overtime in violation of California law; (3) failure to pay vacation wages at termination[47]; (4) failure to provide accurate, itemized wage statements; (5) failure to timely pay final wages; and (6) unfair competition. On March 7, 2014, Plaintiff Roberts amended the complaint to identify T.J. Maxx of CA, LLC as a defendant and to remove The TJX Companies, Inc. as a defendant. On March 4, 2015, Plaintiff Roberts amended the complaint a second time to dismiss her cause of action for failure to pay overtime in violation of the Fair Labor Standards Act and to assert new claims for: (1) failure to pay minimum wages for all hours worked (including time spent participating in bag checks and other time spent performing off-the-clock job duties) in violation of California law; (2) failure to provide meal periods; (3) failure to provide rest breaks; and (4) PAGA penalties. At this time, Plaintiff Roberts also added Carneisha Forney and Laurie Mullen as named plaintiffs, which effectuated the consolidation of the Roberts action with an overlapping state court action, *Carneisha Forney v. The TJX Companies, Inc.* (Orange County Superior Court Case No. 30-2014-00705828-CU-OE-CXC) filed on February 14, 2014.

---

[45] Bradley Decl, Ex 10 Mullen at 246:18-25
[46] Bradley Decl, Ex 10 Mullen at 255:12-256:9.
[47] While Plaintiffs pled such claims with a good faith belief in their veracity, in the course of discovery it was discovered that the claim lacked evidentiary support.

Following the filing of the Second Amended Complaint in Roberts, the Forney action was dismissed on March 5, 2015.  (For her part, Plaintiff Forney served notice of her intent to bring a PAGA representative action on behalf of herself and similarly situated allegedly aggrieved employees of The TJX Companies, Inc. on February 11, 2014, while Plaintiff Mullen did so with respect to T.J. Maxx of CA, LLC, Marshalls of CA, LLC and HomeGoods, Inc. on May 19, 2015.)

Plaintiffs were employed by Defendants as non-exempt employees.   Plaintiffs seek to represent two classes:

(1) the Monetary Payment Class, comprised of current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California at any time from October 10, 2009 through and including August 10, 2016 who do not submit a timely request for exclusion (i.e., opt out); and

(2) the Prospective Relief Class, comprised of all non-exempt employees working at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California at any time from October 10, 2009 through and including August 10, 2016. Because the Prospective Relief Class includes prospective relief only (i.e., Defendants' agreement to begin providing wage statements in substantially the same format as the Wage Statement Exemplar by June 30, 2017), there is no right to opt-out of the Prospective Relief Class.[48]

**2. The Parties Completed Significant Discovery And Investigation**

The Parties have diligently engaged in both formal and informal discovery to investigate the Claims alleged in this Action.  Specifically, prior to and after filing their complaints, Plaintiffs interviewed numerous employees of Defendants about their work experiences to gain an understanding of the potential claims at issue.  Plaintiffs issued initial disclosures on January 20, 2014, while Defendants issued initial disclosures on January 17, 2014 and supplemental disclosures on October 1, 2015.  Plaintiffs then issued three sets of requests for the production of documents and two sets of special interrogatories to each of the Defendants, to which Defendants fully responded.  Similarly, Defendants issued requests for the production of documents to Plaintiffs, to which Plaintiffs likewise responded.  In total, the parties exchanged over 2,300 pages of documents related

---

[48] The settlement class definitions differ from the definitions in the operative complaint.

1   to Plaintiffs' allegations.

2          A number of depositions were also taken, including the depositions of Plaintiff Roberts (two-

3   day deposition), Plaintiff Forney (full-day deposition), Plaintiff Mullen (full-day deposition) and six

4   depositions of Defendants' persons most knowledgeable regarding Defendants' relevant policies and

5   procedures, including Defendants' timekeeping systems, policies and procedures; meal and rest break

6   policies and procedures; payroll systems, policies and procedures; and store operations, including

7   opening and closing and bag check policies and procedures, four of which were conducted in Boston,

8   Massachusetts.

9          Defendants also produced wage statement samples, average pay rates, the number of current

10  and former non-exempt retail employees, the number of current non-exempt employees at each retail

11  store and weeks worked information for all non-exempt employees who had worked at a T.J. Maxx,

12  Marshalls or HomeGoods branded store during the relevant time period.

13         The Parties prepared detailed mediation briefs prior to mediation. Plaintiffs retained an expert

14  to analyze employee time and payroll records.

15         **3. Mediation**

16         On April 12, 2016, the Parties attended a full day of mediation with Michael Dickstein, a well-

17  known and experienced wage and hour class action mediator.  At this first mediation session, the

18  Parties were unable to come to an agreement to resolve this Action.

19         However, continued discussions between the Parties culminated in a second full day of

20  mediation on June 12, 2016, this time with the assistance of Mark Rudy, another well-known and

21  experienced wage and hour class action mediator.  At this second day of mediation, the Parties agreed

22  to the material terms of this Settlement.

23         At all times, each Party was represented by their respective counsel during the arms-length,

24  good-faith negotiations facilitated by Mr. Dickstein and Mr. Rudy.

25         **4. The Parties' Continued Negotiations Following the Court's Prior Settlement Order**

26         Following this Court's Prior Settlement Order, the parties engaged in further arms-length

27  negotiations and exchanged data relating to the number of non-exempt employees who held a

28  manager job title or a coordinator job title during the Class Period and the number of workweeks

worked by these employees.  Bradley Decl. ¶¶ 21, 22. Employees who held a manager title or a coordinator title were analyzed separately to address the Court's concern regarding positions that were generally full-time and associated with higher hourly wages. Id. Defendants also provided similar information with regard to non-exempt employees who did not hold a manager title or a coordinator title during the Class Period.  Id. This data is detailed in the amended Settlement Agreement and below in the discussion of the updated settlement payment formula for Monetary Payment Class Members. Now that the revised Agreement has been reduced to writing, the parties submit the same to the Court for preliminary approval.

**III.     SUMMARY OF THE SETTLEMENT TERMS**

        **A.     The Proposed Settlement Fully Resolves Plaintiffs' Claims**

                **1.     Composition of the Settlement Classes**

The Settlement Classes consist of all current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California during the Class Period.  The Settlement Class is divided into two subclasses, the Monetary Payment Class (which is further subdivided into Manager/Coordinator Monetary Payment Class Members and Non-Manager/Non-Coordinator Monetary Payment Class Members) and the Prospective Relief Class.

The Manager/Coordinator Monetary Payment Class Members include all current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California during the Class Period, are members of the Monetary Payment Class (defined below), and at any point during the Class Period held a non-exempt manager or a non-exempt coordinator title.  As noted above employees who held a non-exempt manager or a non-exempt coordinator title are grouped together as Manager/Coordinator Monetary Payment Class Members because non-exempt employees with a manager or coordinator job title generally worked full-time schedules (whereas Non-Manager/Non-Coordinator Monetary Payment Class Members generally worked part-time schedules) and because non-exempt employees with a manager job title or coordinator job title, on average, earned higher hourly rates than the Non-Manager/Non-Coordinator Monetary Payment Class Members.  All Monetary Payment Class Members who never held a manager

1  job title or a coordinator job title during the Class Period are classified as Non-Manager/Non-
2  Coordinator Monetary Payment Class Members.

3       Class Members are members of the Monetary Payment Class (which again consists of both
4  Manager/Coordinator and Non-Manager/Non-Coordinator Monetary Payment Class Members)
5  established by this Settlement if they do not properly elect to exclude themselves from the monetary
6  portion of the Settlement. Class Members are also members of the Prospective Relief Class regardless
7  of whether they exclude themselves from the Monetary Payment Class because, in contrast to the
8  Monetary Payment Class, the Prospective Relief Class is a mandatory, no-opt-out class pursuant to
9  Federal Rule of Civil Procedure 23(b)(2).   (Bradley Decl., Ex 1 at ¶¶ 1.3, 1.31.)

10      There are approximately 82,550 Class Members and they account for an estimated 5,433,068
11  total workweeks during the Class Period. Bradley Decl. ¶ 23. The number of Manager/Coordinator
12  Monetary Payment Class Members (if there are no opt-outs) is anticipated to be 9,187 and they would
13  account for an estimated 1,465,093 workweeks during the Class Period. Id. The total number of Non-
14  Manager/Non-Coordinator Monetary Payment Class Members (if there are no opt-outs) is anticipated
15  to be 73,363 and they would account for an estimated 3,967,975 workweeks during the Class Period.
16  (Bradley Decl Ex 1. at ¶ 3.13.4.3.)

17       **2.       Settlement Consideration**

18      Plaintiffs and Defendants have agreed to settle all class claims and representative claims alleged in the
19  Actions in exchange for the Total Settlement Amount of $8,500,000. The Total Settlement Amount includes:
20  (1) settlement payments to participating Monetary Payment Class members; (2) a requested $2,550,000 in
21  attorneys' fees and up to $60,000 in litigation costs/expenses to Class Counsel; (3) a requested $75,000 payment
22  to the LWDA to account for the LWDA's portion of the PAGA Award; (4) Settlement Administration Costs
23  of approximately $250,000; and (5) requested aggregate Service Awards of up to $40,000, to Kimberly Roberts,
24  Carneisha Forney and Laurie Mullen for their services on behalf of the Settlement Class.   (Bradley Decl.
25  Settlement Agreement at ¶¶ 1.19, 1.39.)

26      Subject to the Court approving Attorneys' Fees and Costs, the payment to the LWDA, Settlement
27  Administration Costs, and the Plaintiffs' Service Awards, the Net Distribution Fund will be distributed to all
28  Participating Class Members. **Because the Class Settlement Amount is non-reversionary, 100% of the Net**

**Distribution Fund will be paid to Participating Class Members, and without the need to submit claims for payment.**[49]  (Bradley Decl., Ex 1, Settlement Agreement at ¶¶ 1.21 [defining the "Net Distribution Fund"].) In addition, employer-side taxes will be paid by Defendants in addition to the Total Settlement Amount. (Settlement Agreement at ¶ 1.43.)

### 3.   Revised Formula for Calculating Settlement Payments

The Parties' original settlement agreement provided for the individual settlement payments of the members of the Settlement Class to be determined based solely upon a straight workweek formula. Following the Court's Prior Order, the Parties engaged in additional negotiations and amended the payment formula so that no members of the Settlement Class would - receive preferential treatment or, alternatively, be prejudiced by the settlement formula.  As presently constituted, the dollar value of each week will differ for Manager/Coordinator Monetary Payment Class Members and Non-Manager/Non-Coordinator Monetary Payment Class Members in order to provide a 25% higher workweek value for Manager/Coordinator Monetary Payment Class Members. Such value was determined by accounting for the median hourly pay differential between Manager/Coordinator Class Members and Non/Manager/Non-Coordinator Class Members.

Specifically, Defendants analyzed the final hourly pay at separation or at the close of the Class Period on August 10, 2016 (for non-exempt employees still employed as of that date) based on their job title.  As noted above, Defendants' pay data revealed that the median final hourly rate was $9.00 for the pool of Class Members who never held a manager job title and never held a coordinator job title and $11.98 for the pool of Class Members falling into the category of non-exempt employees who held a manager job title or coordinator job title as of their date of separation during the Class Period or as of August 10, 2016 (if they were still employed when the class closed).  In other words, the median final hourly rate for the latter category was 25% higher.  Based on this analysis, the Parties revised   the   Settlement   Agreement   to   account   for   this   pay   differential   and   provide

---

[49] As specified in paragraph 3.13.4.4, if there are any settlement funds remaining in the Net Distribution Fund after disbursing payments to Monetary Payment Class Members due to rounding the workweek values to the nearest cent, those funds will be donated to Legal Aid at Work, a non-profit charity that provides legal assistance in the field of employment. https://legalaidatwork.org/our-mission-and-how-we-work/

Manager/Coordinator Monetary Class Members with a 25% higher workweek value than Non-Manager/Non-Coordinator Monetary Class Members.

Thus, in order to determine Individual Settlement Payments, Monetary Payment Class Members will be placed into one of two categories: (1) the Manager/Coordinator Monetary Payment Class or (2) the Non-Manager/Non-Coordinator Monetary Payment Class depending on whether s/he ever worked in a non-exempt position with a "coordinator" or "manager" job title during the Class Period.  Individual Settlement Payments will then be calculated based on the total number of workweeks each Class Member has worked during the Class Period.

To establish workweek amounts, the Settlement Administrator will first determine the workweek amount that will apply for Non-Manager/Non-Coordinator Monetary Payment Class Members.  The Non-Manager/Non-Coordinator Monetary Payment Class Member workweek amount ("NMNCWA") will be determined by solving for "NMNCWA" using the following formula:

$$(MCWW \text{ x } (NMNCWA \text{ x } 1.25)) + (NMNCWW \text{ x } NMNCWA) = NDF^{50}$$

Non-Manager/Non-Coordinator Monetary Payment Class Member workweek amount is identified using the formula above, the workweek amount for Manager/Coordinator Monetary Payment Class Members ("MCWA") will be determined by solving for "MCWA" using the following formula:

$$MCWA = NMNCWA \text{ x } 1.25$$

The Individual Settlement Payment to each Non-Manager/Non-Coordinator Monetary Payment Class Member will be determined by multiplying the total number of weeks s/he worked during the Class Period (rounded up) by the applicable workweek amount for Non-Manager/Non-Coordinator Monetary Payment Class Members. The Individual Settlement Payment to each individual Manager/Coordinator Monetary Payment Class Member will be determined by multiplying the total number of weeks s/he worked during the Class Period (rounded up) by the applicable workweek amount for Manager/Coordinator Monetary Payment Class Members.

---

[50] "NMNCWA"=Non-Manager/Non-Coordinator Monetary Payment Class Member workweek amount.  "MCWW"= Total Number of Manager/Coordinator Workweeks during Class Period. "NMNCWW"= Total Number of Non-Manager/Non-Coordinator Workweeks during Class Period. "NDF"= Net Distribution Fund

By way of example, if it is assumed that the Net Settlement Fund is $5,525,000 and there are no opt-outs, the total number of Class Members is anticipated to be 82,550 and they would account for an estimated 5,433,068 total workweeks during the Class Period.   The number of Manager/Coordinator Monetary Payment Class Members is anticipated to be 9,187 and they would account for an estimated 1,465,093 workweeks during the Class Period.   The total number of Non-Manager/Non-Coordinator Monetary Payment Class Members is anticipated to be 73,363 and they would account for an estimated 3,967,975 workweeks during the Class Period.   Using this example, the Settlement Administrator would first identify the Non-Manager/Non-Coordinator Monetary Payment Class Member workweek amount (i.e., "NMNCWA") by solving for "NMNCWA":

$$(1,465,093 \text{ x } (\text{NMNCWA x } 1.25)) + (3,967,975 \text{ x NMNCWA}) = \$5,525,000$$

Under this scenario, the workweek value for Non-Manager/Non-Coordinator Monetary Payment Class Members would be 0.952694, which would be rounded to the nearest cent as $0.95 per workweek.  The workweek value for Manager/Coordinator Monetary Payment Class Members would then be set 25% higher (0.952694 x 1.25), equaling 1.1908675, which would be rounded to the nearest cent as $1.19 per workweek.   A Non-Manager/Non-Coordinator Monetary Payment Class Member who worked 120 workweeks during the Class Period based on this example would receive a settlement payment of $114.00 (i.e., $0.95 x 120).  A Manager/Coordinator Monetary Payment Class Member who worked 120 workweeks during the Class Period based on this example would receive a settlement payment of $142.80 (i.e., $1.19 x 120).

If there are any settlement funds remaining in the Net Distribution Fund after disbursing payments to Monetary Payment Class Members due to rounding the workweek values to the nearest cent, those funds will be donated to a non-profit charity to be mutually agreed upon by the parties. Accordingly, Defendants agree to full payment of the Net Distribution Fund, but Defendants will not be required to pay Monetary Payment Class Members any amount exceeding the Net Distribution Fund.

Given that there are approximately 82,550 Class Members and assuming there are no opt-outs and that all other amounts (i.e., attorneys' fees and costs, payment to the LWDA, settlement administration costs and service awards to Plaintiffs) are approved in the amounts requested, the

average net recovery is estimated at $66.93 (estimated Net Distribution fund of $5,525,000 ÷ 82,550). This average net recovery is in accordance with other wage and hour class action settlements approved by California state and federal courts[51].

4. **The Parties' Reasons for Not Differentiating Between Employees Who Separated During the Class Period and Those Who Did Not Separate During the Class Period**

In the Prior Settlement Order, the Court expressed concern regarding the fact that Class Members who separated during the Class Period were not paid more than those who did not separate during the class period, which the Court indicated may be unfair given that the parties are settling Plaintiffs' separation pay claim as part of their settlement. After receiving the Court's order, the parties evaluated this issue at length, but concluded that differentiating between Monetary Payment Class members who separated during the Class Period was not in the interest of Class Members, appropriate or necessary to ensure the settlement was fair, adequate and reasonable, including because:

- *The Settlement Is Intended to Account for a Balancing of Interest between Separated and Non-Separated Employees.* In negotiating this Settlement, the parties had to weigh the potential increased value of Class Members with a separation pay claim with the desire to provide enhanced compensation for those Class Members who worked for Defendants for a prolonged time period during the Class Period and were still employed when the Class Period cut off on August 10, 2016. Class Members who never separated are more likely to have endured alleged violations under Plaintiffs' other claims or to have endured them more frequently to the extent the alleged violations occurred on a periodic basis. For example, it would seem unfair to provide an enhanced payment to an employee who worked only a few days and was terminated or abandoned the job when compared to a current employee that never separated but was employed by Defendants for years during the Class Period and thus may have been more likely to have been meaningfully affected

---

[51] See, e.g., *Doty v. Costco Wholesale Corp.*, Case No. CV05-3241 FMC-JWJx (C.D. Cal. May 14, 2007) (average net recovery of approximately $65); *Sorenson v. PetSmart, Inc.*, Case No. 2:06-CV-02674-JAM-DAD (E.D. Cal.) (average net recovery of approximately $60); *Lim v. Victoria's Secret Stores, Inc.*, Case No. 04CC00213 (Orange County Super. Ct.) (average net recovery of approximately $35); and *Gomez v. Amadeus Salon, Inc.*, Case No. BC392297 (L.A. Super. Ct.) (average net recovery of approximately $20); See, e.g., *Delgado v. New Albertson's, Inc.*, Case No. SACV08-806 DOC-RBNx (CD. Cal.) (average net recovery of approximately $45.); *Gomez v. Amadeus Salon, Inc.*, Case No. BC392297) (average net recovery of approximately $20); *Clay v. Bed Bath & Beyond Inc., et. al*, Case No. No. BC432877. (Los Angeles Super Ct.) (average net recovery of approximately $62.).

by the alleged violations.  For example, long-time employees that were not separated were more likely to use their employee discount and on more occasions (relating to Plaintiff's regular rate claim) and accrue vacation pay (relating to Plaintiff's vacation pay claim).  They are also more likely to have worked overtime and extended schedules during periodic busy seasons during the year, such as holidays (relating to Plaintiffs' claims regarding overtime, meal and rest breaks, bag checks, off-the-clock opening and closing time duties, and regular rate claims).  Employees who did not separate would also generally have endured alleged violations for a greater period of time, resulting in a more significant cumulative impact.  Weighing the interest of separating employees to an enhanced potential payment for waiting time penalties against the competing interest of current and long-time employees to receive a greater workweek value for the reasons specified above, the parties arrived at the reasonable and good-faith conclusion that these interests off-set, and thus, that no enhanced payment for separating employees was appropriate.

- *Differentiating between Separated Employees and Current Employees for Settlement Purposes Would Make the Settlement More Complicated, Would Be Difficult to Administer, and Could Create Significant Additional Settlement Administration Costs, Thereby Reducing The Settlement Payments To Class Members.*  There are also several practical problems with differentiating between current employees and separated employees in the context of this case that make doing so harmful to Class Members.  First, adopting yet another differentiating factor in the calculation of individual settlement payments (in addition to the Manager/Coordinator and Non-Manager/Non-Coordinator distinction) would create significant additional complexity to the settlement payment calculation, which creates added risk of confusion among Class Members.  Instead of simply identifying whether a Monetary Payment Class Member falls within the Manager/Coordinator or Non-Manager/Non-Coordinator groups, the claims administrator would have to identify if each of the Class Members in each group ever separated during their employment, which requires an intensive and time-consuming process of evaluating individual employment histories.  For example, Defendants employ many seasonal employees who may have separated multiple times during the Class Period.  Determining whether and how often any of the more than 82,000 class members were terminated over the nearly seven-year class period require analysis of a breathtaking

1    amount of employment history data that would be extremely time-consuming, burdensome and

2    expensive.  This, in turn, is likely to exponentially increase the cost of settlement administration,

3    which would be subtracted from the Total Settlement Amount and could significantly reduce the

4    remaining amount in the Net Distribution Fund available to Monetary Class Members, including

5    Class Members who separated.   There are also likely to be complicated tax consequences

6    associated with any formula that adds an additional premium to separating Class Members, that

7    could further complicate administration and the terms of the settlement agreement, including the

8    amounts allocated to wages, taxes and penalties for any given Class Member.  This is because the

9    allocation would likely have to be treated differently for separating Class Member by the settlement

10    administrator, potentially further exacerbating administration costs and increasing the likelihood of

11    errors.  Given the valuation of the separation pay claim and Defendants' defenses (detailed below),

12    the parties have reasonably determined that providing an additional premium for separating class

13    members is not necessary or advisable from a practical perspective.

14    • _Courts Regularly Approved Settlement Agreements With Separation Pay Claims Even Without A_

15    _Premium Payment for Separating Class Members._  Based on their experience and evaluation of

16    recent case law relating to the approval of similar class settlements, the parties determined that

17    granting preliminary approval of the Settlement here without any enhancement for separating class

18    members is consistent with the decisions of numerous other District Courts in the Ninth Circuit in

19    similar wage and hour class actions.[52]

20    For these reasons, the parties believe that the Settlement Agreement is fair, adequate and reasonable

21    based on the calculation formula and other factors set forth above, and thus, that preliminary approval is

22    appropriate without differentiation as to separating and current employee Class Members.

23    5.    **Release by the Settlement Class**

24

---

25    [52] _See, e.g., The Brawner v. Bank of Am. N.A.,_ 2016 U.S. Dist. LEXIS 4975, at *1-3 (N.D. Cal. Jan. 14, 2016) (granting final approval of employment class action settlement of case involving separation pay claim based on listed settlement payment factors that do not include whether class members

26    separated during the class period); _Bellinghausen v. Tractor Supply Co.,_ 306 F.R.D. 245, 251-52 (N.D. Cal. 2015) (same); _Ogbuehi v. Comcast of California/ Colorado/Florida/Oregon, Inc.,_ 303 F.R.D.

27    337, 348 (E.D. Cal. 2014) (granting preliminary approval of employment class action settlement of case involving separation pay claim based on a workweek formula that does not include whether a

28    class member was separated as a factor in determining payment amount); _Colllins v. Cargill Meat Solutions Corp.,_ 2011 U.S. Dist. LEXIS 69316, at *6-7 (E.D. Cal. June 28, 2011) (same).

In exchange for the Class Settlement Amount, Plaintiffs and Monetary Payment Class Members who do not opt out will agree to release the Released Parties for the Released Claims, which are defined as:

> Claims . . . whether arising at law, in contract or in equity, and whether for economic or non-economic damages, restitution injunctive relief, penalties or liquidated damages as specified in Paragraph 3.8 [of the Settlement] and including without limitation all Claims that were alleged or that could have been alleged based on the facts stated in the [SAC] and [TAC] from October 10, 2009 through the Response Deadline.

(Settlement Agreement ¶ 1.20.)  Moreover, Monetary Payment Class Members fully release any causes of action alleged in *Williams, et al. v. Marshalls of CA, LLC*, *et al.,* Case No. BC503806, pending in the Superior Court of California, County of Los Angeles, but only from October 10, 2012 to the Response Deadline. Id.

In addition, Prospective Relief Class Members (i.e., all Class Members regardless of whether they opt out of the Monetary Payment Class), agree to release the Prospective Relief Class Released Claims, which are defined as:

> [A]ll Claims that were or could have been included in Plaintiff's [SAC] and [TAC] that Defendants or the Released Parties failed to provide compliant wage statements under California Labor Code section 226 or any comparable state or federal law from the beginning of the Class Period through and including June 30, 2017, at which time Defendants shall use Wage Statements in substantially the same form as the Wage Statement Exemplar (Exhibit E to the Settlement Agreement).

(Settlement Agreement, ¶¶ 1.31-1.32.)

The releases in this case are directly related to Plaintiffs' claims and appropriate.  Courts routinely approve releases of claims that were, or likely would have been, denied certification for purposes of litigation. See *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial"); see also See, e.g., *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 116 & n.308 (S.D.N.Y. 2009) (granting preliminary approval of a settlement class that included certain members who had been excluded from the litigation class on grounds of "predominance") (citing *In re Initial Pub. Offering Sec. Litig.,* 226 F.R.D. at 194-95 (reasoning that the "predominance" and "manageability" concerns under Rule 23(b)(3) were intertwined and because the litigation was no longer going to trial, manageability was no longer an issue, and the "predominance defect [] no longer fatal")); *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 557-58 (N.D. Ga. 2007) (certifying a settlement class in an antitrust case despite noting serious questions about whether a litigation class

could be certified; finding "that the fact of settlement is relevant to the decision to certify a class" and that "Courts have, thus, certified classes at the settlement stage noting that such a certification does not present the same problems that certification of a litigation class proposing the same class definition would present"). More generally, the United States Supreme Court has ruled that a court may approve a release of claims that would otherwise fall outside of its traditional jurisdiction. See *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996) (ruling that a state court may approve a settlement of claims that could only have been brought in federal court).

Accordingly, the releases in the Settlement Agreement are narrowly tailored to the claims alleged in the Action, or which could have been alleged in the Action. See *International Union of Operating Engineers-Employers Canst. Industry Pension, Welfare and Training Trust Funds v. Karr*, 994 F. 2d 1426, 1430 (9th Cir. 1993) ("res judicata bars not only all claims that were actually litigated, but also all claims that 'could have been asserted' in the prior action").

## IV.   ARGUMENT

### A.   The Court Should Conditionally Certify the Proposed Monetary Payment Settlement Class and Prospective Relief Settlement Class

The Parties seek conditional certification of a Settlement Class defined as: all current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California during the Class Period[53]. A party seeking to certify a class must demonstrate that it has met all four requirements under Federal Rule of Civil Procedure 23(a), and at least one of the requirements of Rule 23(b)—in this case, Rule 23(b)(3). *See Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001).

Courts often "declin[e] to treat formal class certification as a prerequisite for preliminary approval and undertak[e] a more cursory class certification analysis at the preliminary approval stage." Newberg on Class Actions § 13:18 (5th ed.) (*citing, e.g., Dearaujo v. Regis Corp.*, No. 2:14-CV- 01408-KJM-AC, 2016 WL 3549473, at *6 (E.D. Cal. June 30, 2016) ("[D]espite the Supreme Court's cautions in *Amchem* . . . , a cursory approach appears the norm."); *In re Amtrak Train Derailment in Philadelphia, Pennsylvania*, No. 15-MD-2654, 2016 WL 1359725, at *4 (E.D. Pa. Apr. 6, 2016) ("[A] settlement class can be preliminarily certified

---

[53] The term "Class Period" means the period from October 10, 2009 through and including August 10, 2016.

1   based on a less rigorous analysis than that necessary for final certification."); *In re Processed Egg Prod.*

2   *Antitrust Litig.*, No. 08-MD-2002, 2014 WL 828083, at *2 (E.D. Pa. Feb. 28, 2014) (at the preliminary approval

3   stage, "the Court must determine whether the proposed class should be conditionally certified, and leave the

4   final certification decision for the Fairness Hearing.").

5       Although the Court declined to certify the Settlement Class in its prior Settlement Order, such

6   declination was tethered to the sparse factual record before the Court. By this renewed motion, Plaintiffs proffer

7   additional facts and information regarding the typicality of the claims and the adequacy of plaintiffs to serve as

8   Class Representatives. On this augmented record, Plaintiff submits that, under even the most stringent

9   standards, the present case satisfies all of the necessary requirements of Federal Rule of Civil Procedure 23(a):

10  Defendants' records show that the Class consists of approximately 82,000 individuals, making joinder of all

11  Class Members impracticable. Further, because all Class Members are either current or former employees of

12  Defendants, the Settlement Class is readily ascertainable from its regular business records. The California

13  statutes relating to each of Plaintiffs' claims apply with equal force and effect to all Class Members, and

14  Plaintiffs' wage and hour claims are typical of the proposed Settlement Class because they arise from the same

15  factual basis and are based on the same legal theories applicable to the other Class Members. Finally, Plaintiffs

16  are represented by competent counsel who have extensive experience in litigating wage and hour class action

17  cases. (*See* Bradley Decl. ¶¶ _; Cooper Decl. ¶¶ _; Seterah Decl. ¶¶ _; Carter Decl. ¶¶ _.)

18      Plaintiffs also satisfy Rule 23(b)(3), as the "proposed classes are sufficiently cohesive to warrant

19  adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016). Finally, the

20  potential for many lawsuits for small amounts, resulting in potentially inconsistent rulings, makes classwide

21  resolution a favored and superior method of adjudication. Se*e Wolin v. Jaguar Land Rover N. Am., LLC*, 617

22  F.3d 1168, 1175-76 (9th Cir. 2010) (finding that superiority is satisfied where the court finds that maintenance

23  of the litigation as a class action is efficient and fair).

24      A class action is therefore the most advantageous method of dealing with the claims of the Settlement

25  Class Members.

26             **1.**    **The Settlement Classes are Sufficiently Numerous and Ascertainable**

27      Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable[.]" Fed.

28  R. Civ. P. 23(a)(1). As this Court noted in its Prior Settlement Order, with an estimated 82,550 potential

1  participating class members, joinder is impracticable. (Prior Settlement Order at 10:11-13 citing *Edwards v.*

2  *Nat'l Milk Producers Fed'n*, 2014 WL 4643639, at *4 (N.D. Cal. Sept. 16, 2014) ("Although there is no

3  absolute minimum number of plaintiffs necessary to demonstrate that the putative class is so numerous so as to

4  render joinder impracticable, joinder has been deemed impracticable in cases involving as few as 25 class

5  members[.]" (internal quotation marks and edits omitted)). Thus, Plaintiffs meet their burden under Rule

6  23(a)(1) with respect to both the Monetary Payment Class and the Prospective Relief Class.

7          **2.**        **There Are Questions of Law and Fact Common to the Monetary Payment Class**

8                  **and Prospective Relief Class**

9       Rule 23(a)(2) requires the existence of ―questions of law or fact common to the class[.]‖ Fed.

10  R. Civ. P. 23(a)(2). "[F]or purposes of Rule 23(a)(2) even a single common question will do." *Wal-*

11  *Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 359, 131 S. Ct. 2541, 2556, 180 L. Ed. 2d 374 (2011)

12  (internal quotation marks and brackets omitted); *see Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir.

13  2014) (finding it is not necessary "that every question in the case, or even a preponderance of questions,

14  is capable of class wide resolution. So long as there is even a single common question, a would-be

15  class can satisfy the commonality requirement of Rule 23(a)(2)." (internal quotation marks omitted)).

16  Commonality requires the plaintiff to demonstrate that the class members have suffered the same

17  injury but "[t]his does not mean merely that they have all suffered a violation of the same provision

18  of law." *Wal-Mart Stores*, 564 U.S. at 349-50 (internal quotation marks omitted). Rather, "[t]hat

19  common contention . . . must be of such a nature that it is capable of classwide resolution—which

20  means that determination of its truth or falsity will resolve an issue that is central to the validity of

21  each one of the claims in one stroke." *Id.* "Whether a question will drive the resolution of the litigation

22  necessarily depends on the nature of the underlying legal claims that the class members have raised."

23  *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014); see *Parsons*, 754 F.3d at 676

24  ("[C]ommonality cannot be determined without a precise understanding of the nature of the underlying

25  claims.").

26       As the Court noted in its Prior Settlement Order, Rule 23(b)(2)'s commonality requirement is

27  satisfied in this action (Prior Settlement Order at 11:17-18.) Here, the Class claims of Defendants'

28  retail store employees turn upon answers to overarching common questions regarding Defendants'

policies and procedures that are capable of class-wide resolution for settlement purposes. For settlement purposes, the common questions raised by employees, include: whether Defendants' meal period and rest break policies, bag check policies, vacation pay policies, timekeeping and compensation policies (including for the calculation of overtime and employees' regular rate) are compliant with California law, whether Defendants' uniform wage statements are compliant with California law and whether Defendants' opening and closing procedures and policies result in underpayment of wages to employees (among others). Because each and every member of the proposed Settlement Class, by definition, personally performed labor, each Settlement Class member was subject to the same policies and asserts the same types of injury arising from the same conduct by Defendants. Thus, these common questions establish Rule 23(a) commonality as to the Monetary Payment Class.

In addition, because all members of the Prospective Relief class received and/or still receive wage statements that Plaintiffs claim are missing information required by Labor Code section 203(a), there are common questions as to the Prospective Relief class.

### 3. The Representative Plaintiffs' Claims Are Typical of the Claims of the Monetary Payment Class and Prospective Relief Payment Class

In its Prior Settlement Order, this Court noted a number of deficiencies in Plaintiffs' moving papers which precluded a finding of typicality. First, the Court noted that Plaintiffs failed to identify their job positions relative to the putative classes. (Prior Settlement Order at 12: 9-21). The Court also noted that Plaintiffs had failed to provide sufficient facts to establish that "Plaintiffs, like other class members, worked at least five or ten hours per day such that they were entitled to one or two 30-minute meal break(s), respectively. (Prior Settlement Order at 12:20-23.). Finally, the Court noted that Plaintiff's prior motion "had not shown that class members were uniformly subject to the security screening that allegedly give rise to Plaintiffs' claims." (Prior Settlement Order at 12:24:-13:5.)

Given the above, the Court notes that, while "Plaintiffs' claims may be typical of those class members who held the same positions or worked the same hours as Plaintiffs… the Court lacks sufficient information at this time to determine whether this is the case." (Prior Settlement Order at 13:6-9.) Plaintiffs now seek to supplement their previously conclusory statements with facts sufficient to permit this Court to make a finding

1  that Plaintiffs have satisfied Fed.R.Civ.P 23(a)(3) as to all members of the putative class.

2  Rule 23(a)(3) requires the representative parties' claims or defenses be "typical of the claims or

3  defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). This "serves to ensure that 'the interest of the named

4  representative aligns with the interests of the class.'" *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th

5  Cir. 2016) (quoting *Hanlon*, 976 F.2d at 508). Rule 23(a)(3) requires that the class representative's claims are

6  typical of the class.) "Typicality refers to the nature of the claim or defense of the class representative, and not

7  to the specific facts from which it arose or the relief sought." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970,

8  984 (9th Cir. 2011). "Under the 'permissive standards' of this Rule, "representative claims are 'typical' if they

9  are reasonably co-extensive with those of absent class members; they need not be substantially identical.'"

10  *Galvan*, 2011 U.S. Dist. LEXIS 127602, at *18 (quoting *Hanlon*, 150 F.3d at 1020). The "focus should be on

11  the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff." *Costelo v. Chertoff*,

12  258 F.R.D. 600, 608 (C.D. Cal. 2009) (quoting *Simpson v. Fireman's Fund Ins. Co.*, 231 F.R.D. 391, 396 (N.D.

13  Cal. 2005)).

14  Here, Defendants' liability turns upon three principal courses of conduct, each of which is shared by

15  Plaintiffs and the members of the putative Settlement Class:

16  (1) "Off-the-Clock" Work Associated With Bag Checks, Opening Procedures and Closing

17  Procedures:  Plaintiffs' primary claim, "off-the-clock" time attendant to Defendants' generally applicable

18  security parcel (i.e., bag check) policy, is shared amongst each of Defendants' non-exempt retail store

19  employees regardless of position or shift.  Plaintiffs further allege that Defendants' common policies related to

20  opening and closing procedures necessitated off-the-clock work.  Specifically, Plaintiffs allege that employees

21  were required to wait off-the-clock for the store to open to clock in on days when a key carrier or manager was

22  not present on time to open the doors.  Plaintiffs further assert that employees were forced to wait off-the-clock

23  while closing procedures were being conducted prior to being allowed to exit the store.   All non-exempt

24  employees of Defendants were subject to Defendants' bag check policies, opening procedures policy and

25  closing procedures policy. [54]  Consequently, Plaintiffs claim that these policies resulted in off-the-clock work

26  is typical for all non-exempt employees because all non-exempt employees were subject to the same polices.

27  [55]

28

---

[54] See, e.g., Bradley Decl., Ex 4.
[55] Bradley Decl., Exhibit D to Exhibit 1.

Although Defendants' dispute the frequency with which bag checks were actually performed at the store level, the facts establish that all of Defendants' retail store non-exempt employees were subject to Defendants' policies and practices with respect to opening procedures, closing procedures and bag checks. Indeed, several documents drafted and disseminated by Defendants memorialized the practice and make clear that, all non-exempt retail store employees, regardless of job position were subject to the parcel policy. These documents make no distinction between job positions or shifts, but rather made clear that all employees, regardless of position could be subject to a security bag, parcel or jacket check[56]. To wit, the policy applied across the board to each and every one of Defendants' non-exempt employees regardless of whether the employee was vested with managerial, coordinator or other duties. The opening and closing policies produced by Defendants' also appear to apply to all Associates working an opening and closing shift[57], and thus, Plaintiffs similarly contend that those policies are generally applicable to Class Members.

Accordingly, the issue of whether time allegedly spent off-the-clock during bag checks or waiting during opening or closing procedures is compensable will be shared amongst all Monetary Payment Class Members.

(2) <u>Non-Compliant Meal and Rest Breaks Due to Under-Staffing and Bag Checks</u>: Similarly, the understaffing allegations which resulted in break violations (both meal and rest) were also shared amongst Plaintiffs and the members of the Monetary Payment Class. Throughout their employment, Plaintiffs worked shifts, the duration of which entitled them to meal and/or rest breaks under California law. Yet, as a result of Defendants' alleged understaffing policies, Plaintiffs and the members of the Monetary Settlement Class were denied timely and adequate break periods. Plaintiffs also contend that the bag checks conducted at Defendants' stores under the policies noted above reduced the amount of time spent during meal breaks or rest breaks below the minimum 30 minute and 10 minute respective thresholds required under California law. Issues related to understaffing and whether bag checks reduced meal and rest break times below the minimum thresholds thus presents additional issues that Plaintiffs contend are common to all non-exempt employees regardless of job title.

(3) <u>Derivative and Direct Wage Statement Claim</u>: As detailed above, Plaintiffs also seek redress based

---

[56] See Bradley Decl., 4;
[57] See, e.g. Bradley Decl., Ex4.

1    upon Defendants' wage statements.[58]  Specifically, Plaintiffs allege that Defendants' wages statements failed

2    to comply with the mandates of California law because they: (1) failed to include all wages, overtime, bonuses

3    and vacation pay earned and all meal and rest premiums owed based on Plaintiffs other alleged claims (i.e.,

4    under a derivative violation theory); (2) failed to list all applicable rates of pay (under a direct violation theory);

5    and (3) failed to properly identify the employer (under a direct violation theory).  Plaintiffs' claims in this regard

6    are typical of both the Monetary Payment Class and Prospective Relief Class as the wage statement provided

7    to non-exempt employees were substantially the same in format throughout the Class Period[59].

8              **4.    The Named Plaintiffs Are Adequate to Represent the Settlement Class**

9              Rule 23(a)(4) requires that the representative parties "fairly and adequately protect the interests of the

10   class." Fed. R. Civ. P. 23(a)(4). "In making this determination, courts must consider two questions: '(1) do the

11   named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named

12   plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Evon v. Law Offices of*

13   *Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012) (internal quotation marks omitted). "This requirement is

14   rooted in due-process concerns— 'absent class members must be afforded adequate representation before entry

15   of a judgment which binds them.'" *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013)

16   (quoting *Hanlon*, 150 F.3d at 1020).

17            As the Court noted in its Prior Settlement Order, "there is no evidence Plaintiffs have any conflicts of

18   interest with other class members" and "[t]here is also nothing in the record that suggests Plaintiffs and class

19   counsel will not vigorously prosecute the action on class members' behalf." (Prior Settlement Order at 13:20-

20   26).  However, based upon the issues noted in the Court's typicality analysis, the Court noted, "… Plaintiffs

21   have not shown their interests align with those of the classes, and the Court cannot conclude Plaintiffs satisfy

22   Rule 23(a)(4)."  Given the augmented factual record before the Court, it is clear that Plaintiffs and their counsel

23   are sufficiently adequate to represent the Monetary Payment Class and Prospective Relief Class.

24

---

25   [58] See e.g. *Betorina v. Randstad US, L.P.*, No. 15-CV-03646-EMC, 2017 WL 1278758, at *4 (N.D. Cal. Apr.
     6, 2017) (Finding that the typicality requirement was satisfied because the Class Representatives, "possess the

26   same interest as the putative Class because they were employed by Defendant as a non-exempt security guard
     employee and thus were entitled to all legally required meal and rest periods, reimbursement of business

27   expenses, and overtime wages. Class Representatives also suffered the same injury as the putative Class: they
     were denied the legally required meal and rest periods and overtime wages and incurred unreimbursed business

28   expenses, as a result of Defendant's uniform practice applicable to non-exempt security guard employees."
     [59] See e.g. Bradley Decl., Ex 7.

1

2

**5.     The Monetary Payment Class Can Be Conditionally Certified Because The Requirements of Rule 23(b)(3) Are Satisfied**

3     A class may be certified under Rule 23(b)(3) when "questions of law or fact common to the class

4   members predominate over any questions affecting only individual members" and the class action mechanism

5   is "superior" to other methods of adjudicating the controversy. Fed.R.Civ.P. 23(b)(3). Here, both prongs of the

6   Rule 23(b)(3) analysis are satisfied.

7                              **a.     Common Issues of Law and Fact Predominate**

8     "The predominance inquiry ... asks whether proposed classes are sufficiently cohesive to warrant

9   adjudication by representation." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011). "The focus

10  is on the relationship between the common and individual issues." *Id.* In its Prior Settlement Order, the Court

11  determined that Plaintiffs had failed to establish predominance. Such finding was due, in large part, to the fact

12  that the Parties had moved to strike most of the predominance argument from the prior briefing. As such, the

13  Court was left with insufficient information to properly adjudicate this factor.

14     Upon the augmented record, it is clear that common issues of law and fact clearly predominate over

15  issues affecting only individual plaintiffs. The common issues include whether Defendants' bag check, opening

16  procedures and closing procedures policies result in underpayment of wages to employees, whether

17  Defendants' meal and rest break policies and procedures are compliant with California law, whether

18  Defendants must include the value of an employee discount in their regular rate calculations, whether Class

19  Members are owed waiting time penalties under Labor Code section 203, whether Defendants' uniform wage

20  statements are compliant with California law and whether Defendants pay all accrued vacation benefits to

21  members of the Settlement Class. Each of these inquiries turns upon policies which apply across the board to

22  Defendants' non-exempt employees. Although the frequency with which the policies and/or practices alleged

23  in the operative complaint, actually occur at the store level is disputed amongst the Parties, the fact that the

24  policies apply with equal force to all non-exempt employees cannot rightly be disputed. Moreover, to the extent

25  that liability varies amongst members of the Settlement Class, the payment formula crafted by the Parties

26  accounts for such.

27     Moreover, while this Court aptly noted that not all class members would be entitled to damages for

28  claims related to their termination, there are significant and meritorious reasons outlined at length above as to

1  why separated Class Members are not treated differently for purposes of this Settlement.   (*See* Section III.A.4

2  above.)

### b.      The class action mechanism is superior to any other methods of adjudication.

5      Given the size of the class it is clear that the "superiority" element is satisfied.  The fact that more than

6  80,000 individual claims "would not only unnecessarily burden the judiciary, but would prove uneconomic for

7  potential plaintiffs" weighs heavily in favor of a class action. See *Hanlon* at 1023.

### 6.      The Requirements For Conditionally Certifying the Prospective Relief Class Under Rule 23(b)(2) Are Also Satisfied

10      Prospective Relief Class Members include all non-exempt employees working at a T.J. Maxx,

11  Marshalls or HomeGoods branded retail store in the State of California during the Class Period.   (Settlement

12  Agreement, ¶ 1.31.)  As noted above, the Prospective Relief Class is a mandatory, no-opt-out class pursuant to

13  Federal Rule of Civil Procedure 23(b)(2).  The prospective relief provided under the Settlement is significant

14  and would result in Defendants changing their wage statements for all employees throughout the State of

15  California beginning on or before June 30, 2017 to the format in the Wage Statement Exemplar attached as

16  Exhibit E to the Settlement Agreement.  (*See* Settlement Agreement, ¶¶ 1.3, 1.31-1.32.)  This change comes at

17  a significant cost to Defendants and provides a substantial benefit to current employee Class Members and

18  former employee Class Members who may be rehired by Defendants (e.g., seasonal employees who often are

19  rehired every holiday season, etc.).

20      Because they involve only prospective relief, classes certified for settlement purposes under Rule

21  23(b)(2) do not require class members to have an option to opt-out and are not subject to the additional

22  requirements and findings set forth in Rule 23(b)(3).  *See* Fed. R. Civ. Proc. 23(b)(2), 23(b)(3), 23(c)(2)(B).

23  Settlements including similar mandatory, no-opt-out prospective relief classes have been approved and

24  enforced by district courts in the Ninth Circuit. *See, e.g., Cook v. Tiffany & Co.,* 2011 U.S. Dist. LEXIS 106230,

25  at *4 (S.D. Cal. Sept. 19, 2011) (granting final approval of class action employment settlement involving

26  "mandatory, no-opt out classes" in addition to a damages settlement class)*; Alvarez v. Nordstrom, Inc.*, 2011

27  U.S. Dist. LEXIS 56646 (C.D. Cal. May 24, 2011) (enforcing prior settlement involving a "mandatory, no-opt

28  out Prospective Relief Class" approved in earlier litigation against defendant).

1    Here, the prospective relief provided in the form of revised wage statements confers a significant

2    additional benefit on Prospective Relief Class members, with a significant additional value to Prospective Relief

3    Class Members in the form of wage statements that include additional information, which Plaintiffs believe will

4    reduce the risk of confusion and better allow employees to evaluate their pay and identify any issues or

5    concerns.  This significant additional relief would be made possible through the Court's approval of the

6    Settlement and certification of Prospective Relief Class for settlement purposes.

7    Thus, all of the requirements for conditionally certifying the Monetary Payment Class and the

8    Prospective Relief Class are met.

9    **B.    The Proposed Class Action Settlement Should Receive Preliminary Approval**

10    **1.    The Court's Scrutiny of the Proposed Settlement is Lowered at the Preliminary**

11    **Approval Stage**

12    As this Court rightly noted in its Prior Order, the Ninth Circuit maintains a strong judicial policy that

13    favors settlements, particularly where complex class action litigation is concerned. *Allen v. Bedolla*, 787 F.3d

14    1218, 1223 (9th Cir. 2015) (internal quotation marks omitted).  Class action settlements must be approved by

15    the court and notice of the settlement must be provided to the class before the action can be dismissed.  Fed. R.

16    Civ. P. 23(e)(1)(A). To protect absent class members' due process rights, approval of class action settlements

17    involves three steps:

18    1.    Preliminary approval of the proposed settlement;

19    2.    Notice to the class providing them an opportunity to exclude themselves; and

20    3.    A final fairness hearing concerning the fairness, adequacy, and reasonableness of the

21    settlement.

22    *See* Fed. R. Civ. P. 23(e)(2); Manual for Complex Litigation § 21.632 (4th ed. 2004).

23    At the preliminary approval stage, the Court evaluates whether the settlement is within the "range of

24    reasonableness," and whether notice to the class and the scheduling of a final approval hearing should be

25    ordered.  *See*, *generally*, 3 Conte & Newberg, *Newberg on Class Actions*, section 7.20 (4th ed. 2002) § 11.25.

26    For preliminary approval, scrutiny of the settlement is reduced.  *In re Nat'l Football League Players'*

27    *Concussion Injury Litig.*, 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) ("At the preliminary approval stage, the bar

28    to meet the 'fair, reasonable and adequate' standard is lowered.").

1    The Court need only review the parties' proposed settlement to determine whether it is within the

2    permissible "range of possible judicial approval" and thus, whether the notice to the class and the scheduling of

3    the formal fairness hearing is appropriate.  Newberg, § 11:25.  Preliminary approval should be granted if "the

4    proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious

5    deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class,

6    and falls within the range of possible approval.  *Ruch v. AM Retail Group, Inc.*, 2016 WL 1161453, at *7 (N.D.

7    Cal. Mar. 24, 2016) (quoting *In re Tableware,* 484. Supp. 2d 1078, 1079 (N.D. Cal. 2007).

8    In evaluating the fairness of a settlement, the Court should be guided by the judicial policy favoring

9    settlement of class action suits.  *See Churchill Village, LLC v. Gen. Elec.*, 361 F.3d 566, 576 (9th Cir. 2004);

10   *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (endorsing the trial court's "proper

11   deference to the private consensual decision of the parties" when approving a settlement).  As this Circuit has

12   observed, "settlements offer parties and their counsel relief from the burdens and uncertainties inherent in

13   trial. . . .  The economics of litigation are such that pre-trial settlement may be more advantageous for both sides

14   than expending the time and resources inevitably consumed in the trial process."  *Franklin v. Kaypro*, 884 F.2d

15   1222, 1225 (9th Cir. 1989).

16          **2.      The Proposed Class Action Settlements Is Procedurally Fair, Adequate, and**

17                    **Reasonable**

18                    **a.      The Settlement is the product of arms'-length negotiations and is**

19                             **therefore entitled to a presumption of fairness**

20   In evaluating the Settlement for preliminary approval, the Court "first considers 'the means by which

21   the parties arrived at settlement.'"  *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, and Prods. Liab.*

22   *Litig.* ("*Volkswagen*"), 2016 WL 4010049, *14 (N.D. Cal. July 26, 2016).  "Preliminary approval is appropriate

23   if the proposed settlement is the product of serious, informed, non-collusive negotiations."  *Id.*

24   Here, as the Court noted in its Prior Settlement Order, the Parties participated in two mediations with

25   Michael Dickstein and Mark Rudy, two well-respected mediators of wage and hour class actions.  Both

26   mediators helped to manage the Parties' expectations and provided a useful, neutral analysis of the issues and

27   risks to both sides.  A mediator's participation weighs considerably against any inference of a collusive

28   settlement.  *See  In re Apple Computer, Inc. Derivative Litig.*, No. C 06-4128 JF (HRL), 2008 U.S. Dist. LEXIS

1 108195 (N.D. Cal. Nov. 5, 2008); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's

2 involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of

3 collusion and undue pressure.")  At all times, the Parties' negotiations were adversarial and non-collusive.

4 　　　　The Parties were represented by experienced class action counsel throughout the negotiations resulting

5 in this Settlement.  Plaintiffs were represented by Bradley/Grombacher LLP, the Setareh Law Group, the Aegis

6 Law Firm, P.C., the Cooper Law Firm, P.C., and the Carter Law Firm.  Class Counsel employ seasoned class

7 action attorneys who regularly litigate wage and hour claims through certification and on the merits, and have

8 considerable experience settling wage and hour class actions.  (*See* Bradley Decl. ¶¶ 35-37.)  Defendants were

9 represented by Littler Mendelson which operates a respected wage and hour defense practice.

10 　　　　As this Settlement is the "result of arms'-length negotiations by experienced class counsel, [it is] entitled

11 to 'an initial presumption of fairness.'"  *Volkswage*n, 2016 WL 4010049, at *14 (internal citation omitted).

12 Indeed, this Court has noted that the settlement process factor favors preliminary approval.  (PSO at 20:19.)

13 　　　　　　**b.**　　　**There are no obvious deficiencies with the Settlement or**

14 　　　　　　　　　　**preferential treatment to certain Class Members**

15 　　　　The Court must also ask whether "the Settlement contains any obvious deficiencies" and "whether the

16 Settlement provides preferential treatment to any Class Member."  *Volkswagen*, 2016 WL 4010049, at **14,

17 16.  This Settlement contains no "glaring deficiencies" *Id*. at *14.  The Settlement does not provide for a

18 reversion of unpaid settlement funds to Defendant or distribute a disproportionate share of the settlement to the

19 attorneys that requires closer scrutiny in the Ninth Circuit.  *See Id*. at *14-15 (applying the factors set forth in *In*

20 *re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d 935, 946 (9th Cir. 2011)).

21 　　　　Moreover, given the reconfigured payment formula, no segment of the Class is given preferential

22 treatment, as the amount in settlement payment depends simply on the number of pay periods the Class Member

23 has worked while accounting for pay and liability disparities.  The Class Representatives will also seek, at a

24 later time (when the Motion for Attorneys' Fees is filed), incentive payments in an amount that are well within

25 the range of such awards in the Ninth Circuit for their work on the behalf of the Class, the reputation risk

26 undertaken, and for the execution of a general release. *See*, *e.g*., *La Fleur v. Medical Management Intern, Inc*.,

27 No. 13-00398-VAP, 2014 WL 2967475, *8 (C.D. Cal. June 25, 2014) (awarding $15,000 to each named

28 plaintiff for services to the Class, reputational harm and general release).    Accordingly, the Settlement is

1    procedurally fair, adequate and reasonable.

2          c.      **The parties conducted a thorough investigation of the factual and**

3                  **legal issues**

4          Furthermore, the Settlement is the product of informed negotiations following extensive investigation

5    by Plaintiffs' Counsel.  During this matter's pendency, the Parties thoroughly investigated and researched the

6    claims in controversy, their defenses, and the developing body of law.  The investigation entailed the exchange

7    of information pursuant to formal and informal discovery methods, including interrogatories and requests for

8    admission, and dozens of depositions.  In the course of written discovery, Plaintiffs received and analyzed

9    hundreds of pages of documents, *inter alia*, the following information and evidence with which to properly

10   investigate and evaluate the claims, including: (1) Defendants' written policies regarding, e.g., meal and rest

11   period policies, time-keeping, final pay, vacation pay, overtime, security checks and opening and closing

12   procedures; (2) wage statements; and (3) time punch records.  Apart from written discovery, Class Counsel also

13   deposed Defendants' persons most knowledgeable to testify about their labor policies and practices and

14   defended Plaintiffs' depositions.

15         Overall, Class Counsel performed an exhaustive investigation into the claims at issue, which included:

16   (1) determining Plaintiffs' suitability as putative class representatives through interviews, background

17   investigations, and analyses of their employment files and related records; (2) evaluating all of Plaintiffs'

18   potential claims; (3) researching similar wage and hour class actions as to the claims brought, the nature of the

19   positions, and the type of employer; (4)  analyzing Defendants' labor policies and practices; (5) deposing

20   Defendants' persons most knowledgeable;  (6) defending Plaintiffs' lengthy depositions; (7) researching

21   settlements in similar cases; (8) conducting a discounted valuation analysis of claims; (9) drafting the mediation

22   brief; (10) participating in two separate full-day mediation sessions; and (11) finalizing the Settlement

23   Agreement.  The extensive document and data exchanges have allowed Class Counsel to appreciate the

24   strengths and weaknesses of the claims alleged against the benefits of the proposed Settlement.  (Bradley Decl.

25   ¶13.)

26         d.      **Defendants have asserted numerous defenses that create risk that the**

27                 **Class will receive no recovery if the claims at issue are not settled**

28         Throughout this litigation, Defendants have indicated that they intend to vigorously contest class

certification and Plaintiff's claims on the merits. While Plaintiffs' do not agree with Defendants' arguments regarding class certification or their defenses on the merits to Plaintiffs' claims, Plaintiffs recognize that there is a risk that the Court and/or a jury will agree with Defendants, and thus, limit or eliminate Class Members' ability to recover on the claims at issue. A summary of the defenses on the merits that Defendants have asserted to Plaintiffs' various claims include without limitation, the following:

### Plaintiffs' Bag Check Claim and Derivative Meal and Rest Break Claims:

- Employees are not required to bring a bag to work and therefore any time spent in bag checks cannot, as a matter of law, constitute compensable work. See, e.g., *Frlekin v. Apple Inc.*, 2015 U.S. Dist. LEXIS 151937, at *4, *10-11, *35 (N.D. Cal. Nov. 7, 2015) (granting summary judgment in favor of employer in bag check case where employer did not require employees to bring bags to work and they did so solely for personal convenience).

- Bag checks simply involve another employee or manager glancing into an Associate's bag, which takes only a few seconds, and there are rarely, if ever, lines to participate in a bag check, and thus, the time is *de minimis* and not compensable under prevailing law. See, e.g., *Lindow v. U.S.,* 738 F.2d 1057, 1062 (9th Cir. 1984) (explaining "[m]ost courts have found daily periods of approximately 10 minutes de minimis even though otherwise compensable" and concluding "that the 7 to 8 minutes spent by employees reading the log book and exchanging information, even if not preliminary, was *de minimis* and therefore not compensable") *Rutti v. Lojack Corp.*, 596 F.3d 1046, 1056 (9th Cir. 2010) (explaining an employer's obligation to pay for the employees' efforts had to be moderated by the *de minimis* rule); *Alvarado v. Costco Wholesale Corp.*, 2008 U.S. Dist. LEXIS 48935, *9-13 (N.D. Cal. 2008) (granting summary judgment on a bag check claim because the "several minutes" the plaintiff had to wait to be let out of the building was *de minimis*); *Cervantez v. Celestica Corp.*, 618 F. Supp. 2d 1208, 1217 (C.D. Cal. 2009) (time passing through an employer's mandatory security check was *de minimis*).

- Bag checks occur randomly and are not required each time an Associate exits the store.

### Plaintiffs' Direct Meal and Rest Break Claim:

- Defendants' meal and rest break policies comply with California law and Defendants informed employees of their meal and rest break rights through their policies and by posting the applicable Wage Order in each of their stores.

- Employees are required to take compliant meal and rest breaks under Defendants' policies.

- Defendants' timekeeping system automatically pays meal period premiums when employees' timekeeping records identify a missing/short/late meal period.

- Defendants typically provide 15-minute paid rest breaks (more than the 10-minute rest break required by law), and thus, even if there was some delay in the beginning of a rest break (e.g., due to a bag check), which Defendants deny, it would not have pushed the rest break below the 10-minute threshold required by law. See, e.g., 8 CCR § 11070 (Wage Order 7-2001), ¶ 12.

Defendants typically provide 45-minute to 1 hour meal breaks, and thus, even if there was some delay in the beginning of a meal break (e.g., due to a bag check), which Defendants deny, it would not have pushed the meal break below the 30-minute threshold required by law.  See, e.g., 8 CCR § 11070 (Wage Order 7-2001), ¶ 11; California Labor Code sections 226.7 and 512.

### *Plaintiffs' Employee Discount Regular Rate Claim and Derivative Overtime and Vacation Pay Claims*

- Defendants' 10% Associate discount does not compensate employees for hours worked, and thus, the discount is appropriately excluded from the regular rate of pay. See 29 U.S.C. § 207(e) (explaining that "payments to an employee which are not made as compensation for his hours of employment" are not included in the regular rate); *Huntington Memorial Hosp. v. Super. Ct.*, 131 Cal. App. 4th 893, 902-903 (2005) (California has adopted the FLSA's definition of "regular rate of pay"); *Rau v. Darling's Drug Store, Inc.*, 388 F. Supp. 877, 879 (W.D. Penn. 1975) (explaining "benefits provided by plaintiff's employer, such as food and merchandise discounts, were in the nature of gifts and not based upon the number of hours worked" and therefore should not be included in the employee's regular rate for purposes of overtime).

- The 10% discount still results in Defendants making a profit, and thus, there is no actual cost to Defendants of providing the Associate discount, such that it could be accurately characterized as a type of wage.  See 29 C.F.R. § 531.3(b) (explain that in determining "goods or facilities which are regarded as part of wages" the reasonable value is "not more than the actual cost to the employer" and "excludes any profit to the employer").

- Associates' use of the employee discounts is entirely optional and there is no practical way to know what Associates used the discount and to what extent.

### *Plaintiffs' Opening and Closing Time Claims*

- Defendants' require their employees to certify that their time records are correct each pay period and that they have accurately recorded all hours worked.

- Defendants' timekeeping policies prohibit Associates from working off-the-clock and so any time worked off-the-clock at opening or closing was prohibited and should have been reported to Defendants to make a correction to pay.

- At closing, Defendants require all employees to remain on the clock and working until all closing procedures are completed.  Thus, by policy, no employee should be either working or waiting off-the-clock at store closing.

- To the extent a Monetary Settlement Class member spent any time spent engaging in opening or closing procedures off-the-clock, which Defendants deny, they spent only a few minutes doing so, and thus, that time is *de minimis* and not compensable under prevailing law. See *Lindow v. U.S.*, 738 F.2d at 1062 ("[m]ost courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable"); *Troester v. Starbucks Corp.*, 2014 U.S. Dist. LEXIS 37728 (C.D. Cal. Mar. 7, 2014) (granting summary judgment on closing time claim because the time spent in and around the store after clocking out was *de minimis*); *Farris v. Cnty. of Riverside,* 667 F. Supp. 2d 1151, 1164-65 (C.D. Cal. 2009) (same); *Alvarado*, 2008 U.S. Dist. LEXIS 48935, at *3-4 (concluding that the "several minutes" the plaintiff had to wait to be let out of the building during closing shifts was *de minimis*).

*Plaintiffs' Wage Statement Claim*

- Defendants did report the name and address of the employer on Plaintiffs' wage statements on the front of the wage statement or on the back side of the same detachable wage statement, and thus, substantially complied with California Labor Code section 226(a)'s requirements.  See Cal. Lab. Code §226(a)(2) (specifying only that the paycheck must show "total hours worked" without specifying that "total hours worked" necessarily must be a separate line item on the pay stub); *Morgan v. United Retail*, 186 Cal. App. 4th 1136, 1147 (2010) ("There is nothing in the plain language of section 226 to support Morgan's argument that wage statements which accurately list the total regular hours and overtime hours worked during the pay period must also contain a separate category with the sum of those two figures.") (emphasis added); *Hernandez v. BCI Coca-Cola Bottling Co.*, 2012 U.S. Dist. LEXIS 55301, at *17-22 (C.D. Cal. Apr. 12, 2012) (citing *Downtown Palo Alto Com. For Fair Assessment v. City Council*, 180 Cal. App. 3d 384, 394 (1986) (applying substantial compliance standard to Section 226(a) claim and explaining that "[u]nless the intent of the statute can only be served by demanding strict compliance with its terms, substantial compliance is the governing test.")), *affirmed by Hernandez v. BCI Coca-Cola Bottling Co.*, 554 Fed. Appx. 661 (9th Cir. 2014).

- Defendants' pay stubs accurately report employees' hourly rate and further accurately report that the overtime premium is paid at ½ the hourly rate.

- For most employees, the total hours worked would be the same as their hours worked because they did not work daily or weekly overtime in any or most pay periods, and thus, the total hours worked would be clearly listed in compliance with California Labor Code section 226(a).

- Even if Plaintiffs could show a technical deficiency in Defendants' pay stubs, they cannot establish any injury stemming from the purported deficiency sufficient to allow recovery under Cal. Lab. Code § 226(e).  See *Milligan v. Am. Airlines, Inc.*, 577 Fed. Appx. 718, 719 (9th Cir. 2014) ("The injury requirement ... cannot be satisfied simply if one of the nine itemized requirements in [§ 226(a)] is missing from a wage statement."); *Holak v. K Mart Corp.*, 2014 U.S. Dist. LEXIS 139879, at *21 (E.D. Cal. Sept. 30, 2014) ("Because Plaintiff did not view her wage statements (even though the injury required to find a violation of California Labor Code section 226 is minimal) the minimal injury requirement is not met.") (internal citation omitted); *Ridgeway v. Wal-Mart Stores, Inc.*, 2014 U.S. Dist. LEXIS 126806, at *28-29 (N.D. Cal. Sept. 10, 2014) ("the statute requires that an employee may not recover for violations of section 226, subdivision (a) unless he or she demonstrates *an injury* arising from the missing information") (italics in original).

- There is no evidence of a knowing and intentional violation of 226(a).  See Cal. Lab. Code § 226(e); *Hurst v. Buczek Enters.*, LLC, 870 F. Supp. 2d 810, 829 (N.D. Cal. May 2, 2012) (finding that failure to provide compliant wage statements was not knowing and intentional and granting summary judgment on wage statement claim); *Reber v. Aimco/Bethesda Holdings, Inc.*, 2008 U.S. Dist. LEXIS 81790, at *25 (C.D. Cal. August 25, 2008) (same)

*Plaintiffs' Separation Pay Claim*

- To the extent this claim is alleged as a derivative claim, it fails for the same reasons as the underlying claims.

- This claim fails because even if Plaintiffs' or Class Members were not paid all amounts owed at separation (which Defendants' vehemently deny), there was a good faith dispute as to whether additional wages are owed and Plaintiffs cannot show that any such alleged underpayment was "willful" so as to justify the payment of penalties under California Labor Code section 203. *See* Cal. Lab. Code § 203(a) (requiring a "willful" violation to assert liability);

Furthermore, while Defendants have agreed to request certification for settlement purposes only, if the Settlement is not approved, Defendants have indicated that they intend to vigorously contest certification, which creates further risk for Class Members. See, e.g., *Ogiamien v. Nordstrom, Inc.*, 2015 U.S. Dist. LEXIS 22128, at *15; 165 Lab. Cas. (CCH) P36, 317 (C.D. Cal. February 24, 2015) (denying certification of bag check case); *Quinlan v. Macy's Corp. Servs., Inc.,* 2013 U.S. Dist. LEXIS 164724 (C.D. Cal. 2013) (same); *Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611 (S.D. Cal. 2014) (granting motion for decertification of closing time claim); *Holak*, 2014 U.S. Dist. LEXIS 139879, at *21-22 (denying certification of direct wage statement claim); *Ridgeway*, 2014 U.S. Dist. LEXIS 126806, at *28-29 (granting summary judgment and denying certification of direct wage statement claim).

### e.  Exposure analysis.

Given the number of putative class members, Defendant's potential exposure could have reached into high eight figures. Wages owed to class members attendant to security checks (both throughout the day and at the closing shift), however, accounted for approximately less than one million dollars. Indeed, much of Defendant's exposure would have derived from waiting time and PAGA penalties. Yet, the amount of such penalties which would actually be awarded are inherently uncertain given the statutory discretion afforded to reduce the amount of PAGA penalties, and the willfulness requirement of waiting time penalties.

### 3.  The Proposed Settlement Is Substantively Within the Range of Reasonableness

To determine whether a settlement should be preliminarily approved, the Court should also evaluate whether it "falls within the range of possible approval." *Volkswagen*, 2016 WL 4010049, at *16. In assessing the probability and likelihood of success, "the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations, and rough justice." *Officers for Justice v. Civil Serv. Comm'n*, 688

1   F.2d 615, 625 (9th Cir. 1982) (internal quotation marks omitted).  There is "no single formula" to be applied,

2   but the Court may presume that the parties' counsel and the mediator arrived at a reasonable range of settlement

3   by considering Plaintiffs' likelihood of recovery.  *Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 965 (9th Cir.

4   2009).

5           Plaintiffs were cautiously optimistic about the chances of prevailing at certification on their claims as

6   well as at trial.  Nevertheless, Plaintiffs recognize that if the litigation had continued, they may have encountered

7   significant legal and factual hurdles that could have prevented the Class from obtaining full recovery for their

8   claims, or perhaps even any recovery (under the worst-case scenario).  In particular, Plaintiffs' decision to settle

9   was influenced by the following considerations:  (i) the strength of Defendants' defenses both to certification

10  and on the merits; (ii) the risk of losing on any of a number of dispositive motions that could have been brought

11  between now and trial (e.g., motions to decertify the class, motions for summary judgment, motion to strike the

12  PAGA claims as unmanageable, and/or motions in limine) which may have eliminated all or some of Plaintiffs'

13  claims, or barred evidence necessary to prove such claims; (iii) the risk of losing at trial; (iv) the chances of a

14  favorable verdict being reversed on appeal; and (v) the difficulties attendant to collecting on a judgment.

15          Moreover, the settlement includes an injunctive component whereby Defendant has agreed to

16  modify its wage statement to address the alleged deficiencies.  Such modifications effectuate the

17  purpose of Section 226 (to give employees clarity as to how their wages are calculated, so they can

18  verify that their wages are calculated appropriately under California law).  See e.g. *Soto v. Motel 6*

19  *Operating, L.P.*, 4 Cal.App.5th 385, 392, 208 Cal.Rptr.3d 618 (Ct. App. 2016) ("section 226(a)'s

20  statutory purpose ... is to *document* the *paid wages* to ensure the employee is fully informed regarding

21  the calculation of *those wages*." (emphasis in original)).

22          The potential risks attending further litigation also support preliminary approval.  Courts have

23  long recognized the inherent risks and "vagaries of litigation," and emphasized the comparative

24  benefits of "immediate recovery by way of the compromise to the mere possibility of relief in the

25  future, after protracted and expensive litigation." *Nat'l Rural Telecommunications Coop.*, 221 F.R.D.

26  at 526. Proceeding to certification and subsequently through trial (and the inevitable appeals) could

27  add four years or more to the resolution of this case, which has already been pending for approximately

28  three and a half years.

Moreover, as developments throughout this litigation have shown, the law regarding certification of similar claims and class-wide proof of damages by just and reasonable inference in wage and hour cases, among other issues, is precarious. For example, the Ninth Circuit Court of Appeals recently affirmed the denial of certification in a case involving similar "lockdown" claims. See e.g. *Eric Stiller and Joseph Moro et al. v. Costco Wholesale Corp.*, Ninth Circuit Court of Appeal Case Number 15-55361.  On a related note, during the pendency of this litigation the Honorable William Alsup granted summary judgment in favor of defendant Apple on similar claims to the "bag check" allegations in the present matter.  *Frlekin v. Apple Inc.*, N.D. Cal. Case No. C 13-03451 WHA, 2015 WL 6851424 (N.D. Cal. Nov. 7, 2015). The *Frlekin* Court determined that employees were not working when they were waiting for exit inspections.

Additionally, in late 2015, the California Private Attorneys General Act (PAGA) was amended to allow employers the right to "cure" certain commonly litigated defects in employee wage statements within 65 days of notice by the employee in order to avoid litigation. Such amendment represents the general risk of the law changing over time. Bradley Decl. at ¶45. These are just a few examples of how Plaintiffs' claims could have been weakened or obviated by legislation or unfavorable legal rulings during the pendency of litigation and appeal.

To be sure, a number of cases have found wage and hours actions to be amenable to class resolution. However, some courts have gone the other way, finding that some of the very claims at issue here--meal period, rest period, and off-the-clock violations--were not suitable for class adjudication because they raised too many individualized issues. [60] Thus, given the uncertainty surrounding both certification and liability as to the claims alleged in the litigation, it was a virtual certainty that the litigation would proceed, at some point in the course of the litigation, through the appellate process.

---

[60] *Jimenez v. Allstate Ins. Co.*, 2012 U.S. Dist. LEXIS 65328 (C.D. Cal. Apr. 18, 2012) (denying motion to certify meal and rest break classes based on employer's practice of understaffing and overworking employees); *Gonzalez v. Officemax N. Am.*, 2012 U.S. Dist. LEXIS 163853 (C.D. Cal. Nov. 5, 2012) (same); *Brown v. Fed. Express Corp.*, 249 F.R.D. 580, 587-88 (C.D. Cal. 2008) (denying certification of driver meal and rest period claims based on the predominance of individual issues); *Kenny v. Supercuts, Inc.*, 252 F.R.D. 641, 645 (N.D. Cal. 2008) (denying certification on meal periods claim); *Blackwell v. Skywest Airlines, Inc.*, 245 F.R.D. 453, 467-68 (S.D. Cal. 2007) (declining to certify class action because individual issues predominated when different employee stations provided different practices with respect to meal periods).

1    Additionally, early resolutions save time and money that would otherwise go to litigation. Parties'

2    resources, as well as the Court's, would be further taxed by continued litigation. And if this action had settled

3    following additional litigation, the settlement amount would likely have taken into account the additional costs

4    incurred, such that there may have been less available for Class Members. Cost savings is one reason why

5    California policy strongly favors early settlement. *See Neary v. Regents of University of California*, 3 Cal. 4th

6    273, 277 (1992) (explaining the high value placed on settlements and observing that "[s]ettlement is perhaps

7    most efficient the earlier the settlement comes in the litigation continuum."). Moreover, given that the class

8    members in this case are primarily low wage workers for whom receiving speedy remuneration is particularly

9    important, the potential for years of delayed recovery is a significant concern. Considered against the risks of

10   continued litigation, and the importance of the employment rights and a speedy recovery to plaintiff class

11   members, the totality of relief provided under the proposed Settlement is more than adequate and well within

12   the range of reasonableness. This concern also supports settlement.

13    In summary, although Plaintiffs and their counsel maintained a strong belief in the underlying merits

14   of the claims, they also acknowledge the significant challenges posed by continued litigation through trial.

15   Accordingly, when balanced against the risk and expense of continued litigation, the settlement is fair, adequate,

16   and reasonable. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("the very essence of a

17   settlement is compromise, a yielding of absolutes and an abandoning of highest hopes").

18   **C.    The Court Should Preliminarily Approve the PAGA Component of the Settlement**

19    Pursuant to the Settlement Agreement, $100,000 from the Class Settlement Amount shall be allocated

20   to the resolution of the PAGA claim, of which 75% ($75,000) will be paid directly to the LWDA, and the

21   remaining 25% will be added to the Net Settlement Amount. This result was reached after good-faith

22   negotiation between the parties. Where PAGA penalties are negotiated in good faith and "there is no indication

23   that [the] amount was the result of self-interest at the expense of other Class Members," such amounts are

24   generally considered reasonable. *Hopson v. Hanesbrands Inc.*, Case No. 08-00844, 2009 U.S. Dist. LEXIS

25   33900, at *24 (N.D. Cal. Apr. 3, 2009); *see, e.g.*, *Nordstrom Com. Cases*, 186 Cal. App. 4th 576, 579 (2010)

26   ("[T]rial court did not abuse its discretion in approving a settlement which does not allocate any damages to the

27   PAGA claims.").

28    The PAGA component of the Settlement is the product of arms'-length negotiations between counsel

1   well versed in the intricacies of PAGA litigation and more importantly, wage and hour employment law.

2   (Bradley Decl. ¶41.)  Class Counsel conducted extensive formal and informal investigation and discovery into

3   the claims at issue and have assessed both the strengths and weaknesses of the claims and the risks of continued

4   litigation.  Based on the preceding, Class Counsel strongly believe that the PAGA component of the Settlement

5   appropriately reflects the relative strengths of the Parties' respective claims and defenses, as well as the

6   substantial risks presented in continuing the litigation.

7   **D.    The Court Should Preliminarily Approve the Negotiated Plaintiffs' Service Awards**

8        The Settlement provides for Plaintiffs' Service Awards of $40,000, to Plaintiffs for their services on

9   behalf of the Settlement Class and for agreeing to broader releases than those required of other Class Members.

10  Specifically, Plaintiff Roberts shall receive $20,000 and Plaintiffs Mullen and Forney will each receive

11  $10,000,[61] "Incentive awards are fairly typical in class action cases . . . Such awards are discretionary and are

12  intended to compensate class representatives for work done on behalf of the class . . . ."  *Rodriguez v. West*

13  *Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) (citing 4 *William B. Rubenstein et al.*, *Newberg on Class*

14  *Actions* § 11:38 (4th ed. 2008)).  These payments work both as an inducement to participate in the suit and as

15  compensation for time spent in litigation activities.  *See In re Mego Fin. Corp. Sec. Litig*., 213 F.3d at 463

16  (describing the service award as an incentive to the class representatives); *Matter of Continental Illinois*

17  *Securities Litig.*, 962 F.2d 566, 571 (7th Cir. 1992) (stating that an enhancement award should be in such an

18  amount "as may be necessary to induce [the class representative] to participate in the suit").

19       While the Court noted that Ms. Roberts award is larger than those received by the other Plaintiffs, it

20  determined that such amount would not prohibit preliminary approval.  (PSO at 24: 22-23.)  Plaintiffs will file

21  a formal motion for the negotiated Plaintiffs' Service Awards once preliminary approval of the Settlement is

22  granted.

23  ---

[61] The amounts of the requested incentive awards are also reasonable by reference to the amounts that
24  district courts in this Circuit have repeatedly found to be reasonable for wage and hour class action
    settlements.  *See, e.g.*, *Bernal v. Davita, Inc.*, Case No. 5:12-cv-03255-PSG, *2 (N.D. Cal, Jan. 14,
25  2014) ($10,000 incentive payment in $3.4 million wage-and-hour class settlement); *York v. Starbucks
    Corp.*, No. 08-07919 GAF, Dkt. No. 239, at *4 (C.D. Cal. Oct. 29, 2013) (approving enhancement
26  award of $10,000 in a $3 million wage-and-hour class settlement); *Ross v. US Bank Nat'l Ass'n*, No.
    07-02951-SI, 2010 U.S. Dist. LEXIS 107857 (N.D. Cal. Sept. 29, 2010) (approving enhancement
27  awards of $20,000 each to four class representatives in a $3.5 million settlement of an employment
    class action); *Stevens v. Safeway, Inc.*, No. 05-01988, 2008 U.S. Dist. LEXIS 17119, **34-37 (C.D.
28  Cal. Feb. 25, 2008) ($20,000 and $10,000 award); *Amochaev v. Citigroup Global Markets, Inc.*, No.
    05-1298 PJH (N.D. Cal. Aug. 13, 2008) (approving enhancement awards of $50,000 and $35,000 to
    employees in light of factors that included fear of workplace retaliation).

**E.      The Court Should Preliminarily Approve the Negotiated Attorneys' Fees and Costs**

Under California law,[62] the common fund method for awarding attorneys' fees is appropriate where, as here, attorneys have been instrumental in creating a settlement fund that benefits all class members.  *See Serrano v. Priest*, 20 Cal. 3d 25, 35 (1977) (noting that federal and state courts have long recognized that when attorneys create a common fund that benefits a class, the attorneys have an equitable right to be compensated from that fund); *Lealao v. Beneficial Cal. Inc.*, 82 Cal. App. 4th 19, 48 (2000) ("Courts agree that, because the percentage-of-the-benefit approach is 'results oriented rather than process-oriented, it better approximates the workings of the marketplace' than the lodestar approach." [citation omitted]).  Although California has no benchmark, California courts routinely award attorneys' fees equalling approximately one-third of the common fund's total potential value or higher.[63]  *See, e.g., Laffitte v. Robert Half Int'l*, 1 Cal. 5th 480 (2016) (affirming

---

[62] In diversity actions, federal courts look to state law in determining whether a party has a right to attorneys' fees and how to calculate those fees.  *Mangold v. Calif. Public Utilities Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995) ("Ninth Circuit precedent has applied state law in determining not only the right to fees, but also in the method of calculating the fees").  The state law governing the underlying claims in a diversity action "also governs the award of fees."  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002).  Because CAFA operates to modify the diversity requirement, "the *Erie* doctrine still applies so that state substantive law governs such claims in federal court."  *See* Tashima & Wagstaffe, Rutter Group Practice Guide: Federal Civil Procedure Before Trial, California & 9th Cir. Editions (The Rutter Group, 2015) paragraph 10:497.5.  As the Ninth Circuit observed, "even after CAFA's enactment, *Erie*-related doctrines ensure that, for the most part, removal of a CAFA case from state to federal court produces a change of courtrooms and procedure rather than a change of substantive law."  *McAtee v. Capital One, F.S.B.*, 479 F.3d 1143, 1147 (9th Cir. 2007).

[63] The amounts of the requested incentive awards are also reasonable by reference to the amounts that district courts in this Circuit  have repeatedly found to be reasonable for wage and hour class action settlements.  *See also, Albrecht v. Rite Aid Corp.*, No. 729219 (San Diego Super. Ct.) (35% award); *Weber v. Einstein Noah Restaurant Group, Inc.*, No. 37-2008-00077680 (San Diego Super. Ct.) (40% award); *Kenemixay v. Nordstroms, Inc.*, No. BC318850 (L.A. Super. Ct.) (50% award); *Leal v. Wyndham Worldwide Corp.*, No. 37-2009-00084708 (San Diego Super. Ct.) (38% award); *Gomez and LaGaisse v. 20 20 Communications*, No. RIC 528973 (Riverside Super. Ct.) (33% award); *Acheson v. Express LLC*, No. 109CV135335 (Santa Clara Super. Ct.) (33% award); *Chin v. Countrywide Home Loans, Inc.*, No.: 39-2010-00252741-CU-OE-STK (San Joaquin Super. Ct.) (30% award); *Ethridge v. Universal Health Servs.*, No. BC391958 (L.A. Super. Ct.) (33% award); *Magee v. Am. Residential Servs. LLC*, No. BC423798 (L.A. Super. Ct.) (33% award); *Blue v. Coldwell Banker Residential Brokerage Co.*, No. BC417335 (L.A. Super. Ct.) (33% award); *Silva v. Catholic Mortuary Servs., Inc.*, No. BC408054 (L.A. Super. Ct.) (33% award); *Mares v. BFS Retail & Comm. Operations LLC*, No. BC375967 (L.A. Super. Ct.) (33% award); *Blair et al. v. Jo-Ann Stores, Inc.*, No. BC394795 (L.A. Super. Ct.) (33% award); *Perez and Comeaux v. Standard Concrete*, No. 30-2008-00211820 (Orange County Super. Ct.) (33% award); *Ward v. Doyon Sec. Servs., LLC*, No. BS 9000517 (San Bernardino Super. Ct.) (33% award); *Barrett v. The St. John Companies*, No. BC354278 (L.A. Super. Ct.) (33% award); *Clymer and Benton v. Candle Acquisition Co.*, No. BC328765 (L.A. Super. Ct.) (33% award); *Dunlap v. Bank of America, N.A.*, No. BC328934 (L.A. Super Ct.) (33% award); *Taylor v. Ross Stores, Inc.*, No. RCV 065453, JCCP 4331 (San Bernardino Super. Ct.) (33% award); *Case et al. v. Toyohara America Inc.*, No. BC328111 (L.A. Super. Ct.) (33% award); *Sunio v. Marsh USA, Inc.*, No. BC328782 (L.A. Super Ct.) (33% award); *Chalmers v. Elecs. Boutique*, No. BC306571 (L.A. Super. Ct.) (33% award); *Boncore v. Four Points Hotel ITT Sheraton*, No. GIC807456 (San Diego Super.

a fee award representing one-third of the common fund); *Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43, 66 n.11 (2008) ("[S]tudies show that . . . fee awards in class actions average around one-third of the recovery."); Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, J. of Empirical Legal Studies, Vol. 1, Issue 1, 27-78, March 2004, at 35 (independent studies of class action litigation nationwide have come to a similar conclusion that a one-third fee is consistent with market rates).

Plaintiffs will file a formal motion for the negotiated attorneys' fees and costs once preliminary approval of the Settlement is granted.

**F.  The Proposed Class Notice Adequately Informs Class Members About The Case And Proposed Settlement**

The proposed class settlement notice and claims administration procedure satisfy due process. Rule 23(c)(2) of the Federal Rules of Civil Procedure requires the Court to direct the litigants to provide Class Members with the "best notice practicable" under the circumstances, including "individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 173, 94 S. Ct. 2140, 2150, 40 L. Ed. 2d 732, 746 (1974). Under Rule 23(c)(2), notice by mail provides such "individual notice to all members." *Id.* Where the names and addresses of Class Members are easily ascertainable, individual notice through the mail constitutes the "best notice practicable." *Id.* at 175.

The Notice of Class Action Settlement ("Class Notice") was jointly drafted and approved by the Parties and provides Settlement Class Members with all required information so that each member may make an informed decision regarding his or her participation in the Settlement. The Class Notice provides information regarding the nature of the lawsuit; a summary of the substance of the settlement terms; the class definition; the deadlines by which Class Members must submit Request for Exclusions or objections; the date for the final approval hearing; the formula used to calculate settlement payments; a statement that the Court has preliminarily approved the settlement; a statement that Class Members will release the settled claims unless they opt out; and noticed of pending lawsuits with overlapping claims. Accordingly, the Notice satisfies the requirements of Rule 23(c)(2).

The Class Notice summarizes the proceedings and the terms and conditions of the Settlement in an informative and coherent manner, complying with the statement in *Manual for Complex Litigation*, *supra*, that

Ct.) (33% award); *Vivens v. Wackenhut Corp.*, No. BC290071 (L.A. Super. Ct.) (31% award); *Crandall v. U-Haul Int'l., Inc.*, No. BC178775 (L.A. Super. Ct.) (40% award).

"the notice should be accurate, objective, and understandable to Class Members . . . ." *Manual for Complex Litigation*, Third (Fed. Judicial Center 1995) ("Manual") § 30.211.  The Notice Packet states that the Settlement does not constitute an admission of liability by Defendants, and that Final Approval has yet to be made.  The Notice Packet thus complies with the standards of fairness, completeness, and neutrality required of a settlement class notice disseminated under authority of the Court.  Rule 23(c)(2)and (e); *Manual* §§ 8.21, 8.39; *Manual* §§ 30.211, 30.212.

The Settlement Administrator will mail the Class Notice to all Settlement Class Members via first class United States mail.  (Settlement Agreement ¶ 3.12.3.)  In the event Notice Packets are returned as undeliverable, the Settlement Administrator will attempt to locate a current address using, among other resources, a computer/SSN and "skip trace" search to obtain an updated address.  (*Id.*)  This method was negotiated by the Parties to maximize the Class Member notification rate while ensuring cost effective administration of the Settlement.

## V.       CONCLUSION

The Parties have negotiated a fair and reasonable settlement of claims.  Having appropriately presented the materials and information necessary for preliminarily approval, the Parties request that the Court preliminarily approve the settlement.

Dated: May 30, 2017

/S/ MARCUS J. BRADLEY
MARCUS J. BRADLEY
KILEY L. GROMBACHER
BRADLEY GROMBACHER LLP
Attorneys for Plaintiffs
KIMBERLY ROBERTS, CARNEISHA
FORNEY, and LAURIE MULLEN