UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIMBERLY ROBERTS, ET AL., | Case No. 13-cv-04731-MEJ |
| Plaintiffs, | **ORDER RE: MOTION FOR FINAL APPROVAL AND MOTION FOR ATTORNEYS' FEES, LITIGATION EXPENSES, AND SERVICE AWARDS** |
| v. | |
| MARSHALLS OF CA, LLC, et al., | Re: Dkt. Nos. 94, 95 |
| Defendants. | |

## INTRODUCTION

On August 8, 2017, the Court preliminarily approved the parties' revised class action settlement. Second Prelim. Approval Order, Dkt. No. 88; *see* Revised Settlement, Dkt. No. 81-1. Plaintiffs Kimberly Roberts, Carneisha Forney, and Laurie Mullen now seek final approval of the Settlement, as well as attorneys' fees and costs. Final Approval Mot., Dkt. No. 94; Fees Mot., Dkt. No. 95. The Court held a hearing on these matters on January 18, 2018. Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS** the Motion for Final Approval and **GRANTS IN PART** the Motion for Attorneys' Fees, Expenses, and Service Awards.

## BACKGROUND

**A.      Factual Allegations**

Defendants TJ Maxx of CA, LLC ("TJ Maxx"); Marshalls of CA, LLC ("Marshalls"); and HomeGoods, Inc. ("HomeGoods") (collectively, "Defendants") are corporations engaged in the retail sales business in the State of California. Third Am. Compl. ("TAC") ¶¶ 19-22, Dkt. No. 89.[1]

---

[1] Plaintiff filed the operative TAC pursuant to paragraph 3.6 of the Revised Settlement.

T.J. Maxx and Marshalls comprise the Marmaxx Group, a division of The TJX Companies, Inc. *Id.* ¶¶ 26-27. HomeGoods is another division of The TJX Companies. *Id.* ¶ 28.

Ms. Roberts was employed by Defendants as an hourly employee from September 2010 to July 2013 at a Marshalls retail store in California. *Id.* ¶ 16. Ms. Forney worked at a Marshalls retail store in California as an hourly employee from August 2012 to June 2013. *Id.* ¶ 17. Ms. Mullen worked at a HomeGoods retails store in California from September 2013 to September 2014. *Id.* ¶ 18.

    1.    <u>Security Screenings</u>

Defendants employed non-exempt workers at their retail store locations and paid these workers an hourly wage based on a forty-hour or less work week. *Id.* ¶ 30. Plaintiffs contend Defendants instituted a uniform nationwide policy of "personal package and bag searches," which requires all hourly employees to wait in line and be searched for possible store items or merchandise taken without permission and/or other contraband. *Id.* ¶ 31. Employees are searched before leaving for their meal breaks and after clocking out at the end of their shifts. *Id.* These screenings are designed to prevent and deter employee theft. *Id.* The security checks and consequential wait time are done solely for Defendants' benefit. *Id.* Employees are not compensated for time spent waiting for these searches. *Id.*; *id.* ¶ 33.

In addition, hourly employees must remain on Defendants' premises after clocking out at the end of their shifts until they are released by managerial employees. *Id.* ¶ 32. Because hourly employees often take meal breaks and/or end their shifts at the same time, there are frequently lengthy wait times for which they are not compensated. *Id.* ¶ 33. As a result, they are not compensated for straight hours and overtime hours worked. *Id.*

Supervisors in Plaintiffs' stores implemented Defendants' corporate policy regarding security screenings and required Plaintiffs to undergo these uncompensated screenings. *Id.* ¶¶ 34-35. Plaintiffs were required to undergo personal package and bag searches before they were permitted to leave the store for their meal break and after they had clocked out at the end of their shifts. *Id.* ¶ 34.

Because Defendants failed to record the security check time and to properly calculate the

2

hourly employees' Overtime Rate of Pay, Defendants failed to provide accurate wage statements to their hourly employees identifying all hours worked and all rates in effect during the pay period. *Id.* ¶ 38.

### 2. Employee Discounts

As a benefit to employment, Defendants provided Class Members with employee discounts for clothing, shoes, and other products. *Id.* ¶ 36. However, Defendants failed to incorporate the value of employee discounts into the Regular Rate of Pay calculation, which led to the failure to properly calculate the Overtime Rate of Pay. *Id.* ¶ 37. As a result, Defendants failed to compensate employees at the proper Overtime Rate of Pay. *Id.*

### 3. Wage Statements

Defendants also failed to provide hourly employees with accurate wage statements. *Id.* ¶ 39. Specifically, Defendants provided wage statements that failed to include "the name and address of the legal entity that is the employer," the rate of pay used for calculating wages, and other required information. *Id.*

### 4. Failure to Pay Vacation Wages and Compensation Upon Discharge

Plaintiffs and other Class Members had unused vested vacation wages, which Defendants failed to pay at Plaintiffs' and Class Members' final rate of pay at the time of their termination of employment. *Id.* ¶¶ 94-95. Defendants' uniform policy of not paying all vested vacation wages at the final rate of pay at the end of employment resulted in a forfeiture of such wages. *Id.* ¶ 95.

Moreover, although Defendants were also required to pay Plaintiffs and all wages earned upon termination, Defendants failed to do so. *Id.* ¶ 108.

## B. Procedural History

Ms. Roberts initially brought this class action against The TJX Companies; Marshalls; and HomeGoods. *See* Compl., Dkt. No. 1. She subsequently amended the Complaint to name T.J. Maxx as a defendant to replace The TJX Companies. *See* First Am. Compl., Dkt. No. 27. On March 4, 2015, Ms. Roberts filed a Second Amended Complaint ("SAC") which added new claims and named Ms. Forney and Ms. Mullen as additional Plaintiffs. *See* SAC, Dkt. No. 44. Pursuant to the Revised Settlement, Plaintiffs filed the operative TAC on August 10, 2017.

The TAC asserts nine claims: (1) Failure to Pay Wages; (2) Failure to Provide Meal Breaks or Compensation in Lieu Thereof; (3) Failure to Permit Rest Breaks or Pay Compensation in Lieu Thereof; (4) Failure to Pay Overtime Compensation, Cal. Labor Code § 1194 et seq.; (5) Forfeiture of Vacation Pay, Cal. Labor Code § 227.3; (6) Failure to Furnish Accurate Itemized Wage Statements; (7) Failure to Pay Compensation upon Discharge, Cal. Labor Code §§ 201-203; (8) Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; and (9) Enforcement of the Private Attorneys' General Act of 2004 ("PAGA"), Cal. Labor Code § 2698, et seq. *Id.* ¶¶ 54-124.

### 1. First Settlement

The Court declined to preliminarily approve the First Settlement the parties negotiated in this action. First Prelim. Approval Order, Dkt. No. 77; *see* Dkt. No. 70-4, Ex. 1 (First Settlement). The Court found several issues with the proposed class definition precluded class certification under Federal Rule of Civil Procedure 23(a), including issues with typicality and adequacy of representation. *Id.* at 12-14. The Court also found individual issues predominated, precluding certification under Rule 23(b)(3). *Id.* at 15-18. Finally, the Court could not find that the First Settlement was fair, adequate, or reasonable. The Court could not determine that the First Settlement did not provide preferential treatment to certain Class Members, and the Court lacked sufficient information to determine that the First Settlement fell within the range of possible approval. *Id.* at 22-25.

The Court therefore denied Plaintiffs' initial Motion for Preliminary Approval, but allowed the parties to submit a revised proposed settlement for preliminary approval. *Id.* at 25-26.

### 2. Revised Settlement

On May 30, 2017, Plaintiffs submitted the Revised Settlement for preliminary approval. Dkt. No. 81; *see* Revised Settlement. Finding the Revised Settlement addressed the Court's concerns about the First Settlement, the Court preliminarily approved the Revised Settlement as fair, adequate, and reasonable; appointed Class Counsel for settlement purposes; approved the Notice Plan; appointed ILYM Group, Inc. as Settlement Administrator; and directed notice be sent to Class Members. Second Prelim. Approval Order, Dkt. No. 88.

**REVISED SETTLEMENT TERMS**

The key provisions of the Revised Settlement are as follows.

**A.      The Revised Settlement Class**

The Revised Settlement Class consists of "all current and former non-exempt employees who worked at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the State of California during the Class Period."  Revised Settlement ¶ 1.3.  The Class Period is defined as "October 10, 2009 through and including August 10, 2016."  *Id.* ¶ 1.8.

The Revised Settlement Class is divided into two subclasses: the Monetary Payment Class and the Prospective Relief Class.  *Id.* ¶ 1.19.  The Monetary Payment Class is defined as "all Class Members who do not submit a timely Request for Exclusion (i.e., opt-out), and therefore, are entitled to receive an Individual Settlement Payment."  *Id.*  This class is further subdivided into the Manager/Coordinator Monetary Payment Class (the "Manager/Coordinator Class") and the Non-Manager/Non-Coordinator Payment Class (the "Non-Manager/Non-Coordinator Class").  *Id.* ¶¶ 1.19, 1.17, 1.22.  The Manager/Coordinator Class consists of "all current and former non-exempt employees who worked a T.J. Maxx, Marshalls or HomeGoods branded retail store in the state of California during the Class Period" who "held a non-exempt manager title or non-exempt coordinator title."  *Id.* ¶ 1.17.  Non-Manager/Non-Coordinator Class Members are "all current and former non-exempt employees who worked a T.J. Maxx, Marshalls or HomeGoods branded retail store in the state of California during the Class Period" who "never held a manager title or coordinator title during the Class Period."  *Id.* ¶ 1.22.  Members of both subclasses must also be part of the Monetary Payment Class, that is, "all Class Members who do not submit a timely Request for Exclusion (i.e., opt-out), and therefore, are entitled to receive an Individual Settlement Payment."  *Id.* ¶ 1.19.

Finally, the Prospective Relief Class includes "all non-exempt employees working at a T.J. Maxx, Marshalls or HomeGoods branded retail store in the state of California during the Class Period."  *Id.* ¶ 1.31.  The Prospective Relief Class is a mandatory class with no right to opt out.  *Id.*

**B.      Remedies**

The Revised Settlement provides both monetary and injunctive relief.  Defendants agree to

pay a Total Settlement Amount of $8.5 million dollars, which includes: (1) settlement payments to participating Monetary Payment Class Members; (2) up to $2,550,000 in attorneys' fees and up to $60,000 in litigation costs/expenses to Class Counsel; (3) up to $75,000 payment to the California Labor & Workforce Development Agency ("LWDA") to account for its portion of the PAGA Award; (4) up to $250,000 in Settlement Administration Costs; and (5) up to $40,000 in Service Awards for Plaintiffs. *Id.* ¶¶ 1.6, 1.26, 1.37, 1.39, 1.43. The Net Distribution Fund represents the Total Settlement Amount less the LWDA, PAGA, Service, and Class Counsel Awards—that is, approximately $5,525,000. *Id.* ¶ 1.21.

Defendants further agree to modify their wage statements.[2] *Id.* ¶ 3.13.6. Defendants agree to use the proposed revised Wage Statement Exemplar, subject to Court approval. *Id.* Defendants may update their wage statements in the future as needed. *Id.*

## C. Distribution of Funds

Each Monetary Payment Class Member will receive an Individual Settlement Payment. *Id.* ¶¶ 1.16; 3.14.3. The precise method of calculating an Individual Settlement Payment depends on whether the Class Member is part of the Manager/Coordinator or the Non-Manager/Non-Coordinator Class. The process is substantially identical for each class.

### 1. Workweek Amount

The first step requires establishing a workweek amount, which will be determined once (1) the Settlement Administrator receives all timely requests for exclusion and identifies the number of Class Members in the Manager/Coordinator and Non-Manager/Non-Coordinator Classes; and (2) the amount of the Net Distribution Fund is determined. *Id.* ¶ 3.13.4.1.

The Non-Manager/Non-Coordinator Class will have a different workweek value than that of the Manager/Coordinator Class.[3] *See id.* The Revised Settlement requires the Settlement

---

[2] At the hearing on the Motion for Preliminary Approval, Defendants represented this modification has already been implemented.

[3] The reasons for this difference are explained in the Second Preliminary Approval Order. Second Prelim. Approval Order at 25-27.

Administrator to determine the workweek amount that will apply to Non-Manager/Non-Coordinator Class Members before determining that which will apply to the Manager/Coordinator Class. *Id.* To do so, the Settlement Administrator shall determine the total number of Manager/Coordinator Workweeks ("MCWW") and the total number of Non-Manager/Non-Coordinator Workweeks ("NMNCWW"). *Id.* The Settlement Administrator shall then input those values into the following formula to solve for the Non-Manager/Non-Coordinator Class Workweek Amount ("NMNCWA"):

$$MCWW \times (NMNCWA \times 1.25)) + (NMNCWW \times NMNCWA) = \text{Net Distribution Fund}$$

*Id.*

Once the Settlement Administrator determines the NMNCWWA, it shall multiply that figure by 1.25 to calculate the Manager/Coordinator Workweek Amount ("MCWA").[4] *Id.*

### 2. Individual Settlement Payment

The second step calculates the Class Member's Individual Settlement Payment. *See id.* ¶ 3.13.4.2. The Individual Settlement Payment to each Non-Manager/Non-Coordinator Class Member will be determined by multiplying the total number of weeks the Class Member worked during the Class Period, rounded up, by the NMNCWWA. *Id.* The Individual Settlement Payment for each Manager/Coordinator Class Member will be determined by multiplying the total number of weeks the Class Member worked during the Class Period, rounded up, by the MCWA. *Id.*

**D. Unclaimed and Uncashed Funds**

Any settlement funds remaining in the Net Distribution Fund after disbursing payments to the Monetary Payment Class Members will be donated to Legal Aid at Work. *Id.* ¶ 3.13.4.4. The Revised Settlement also requires the Settlement Administrator to transmit any unclaimed funds in the Settlement Fund Account as a result of the failure to cash Individual Settlement Payment checks by the Void Date to the State of California Controller's Office, Unclaimed Property Fund, in accordance with California law regarding such escheatment. *Id.* ¶ 3.13.3.

---

[4] In other words, MCWA = NMNCWA x 1.25. Revised Settlement ¶ 3.13.4.1.

**E.      Objections and Opt-Outs**

Class Members who wish to object to the Revised Settlement must submit a written notice of objection to the Court that contains: (1) the Class Member's full name, address, signature, and last four digits of his or her social security number; (2) the case name and number; (3) the basis for the Class Member's objection; and (4) a statement as to whether the class member intends to appear at the final approval hearing. *Id.* ¶ 3.12.7; *see id.* ¶ 1.24.

To opt out of the Monetary Payment Class, Class Members must submit to the Settlement Administrator a written request for exclusion that contains: (1) the Class Member's full name, address, signature, and last four digits of his or her social security number; and (2) a statement to the effect of

> I wish to exclude myself from the monetary portion of the Settlement in *Roberts v. T.J. Maxx of CA, LLC, Marshalls of CA, LLC, HomeGoods, Inc.*, pending in the United States District Court for the Northern District of California, Case No. 3:13-cv-04731. I understand that by requesting to be excluded from the monetary portion of the Settlement, I will receive no money from the Settlement.

*id.* ¶ 3.12.6; *see id.* ¶ 1.35. Class Members may not opt out of the mandatory Prospective Relief Class. *Id.* ¶¶ 1.31, 3.12.6.

Class Members' objections or requests for exclusion must be postmarked within 60 days after the Settlement Administrator mails the Notice of Settlement to Class Members. *Id.* ¶¶ 1.36, 3.12.6, 3.12.7.

**F.      Attorneys' Fees and Costs, Service Awards, and PAGA Award**

The Revised Settlement provides for a total of up to $40,000 in service awards to Plaintiffs: a maximum of $20,000 to Ms. Roberts and $10,000 to each Ms. Forney and Ms. Mullen. *Id.* ¶¶ 1.37, 3.13.8. It further provides that Class Counsel may recover up to $60,000 in costs and $2.55 million in fees. *Id.* ¶¶ 1.5, 1.6, 3.13.9. Defendants agree not to oppose any applications for Class Counsel's fees and costs or Service Awards up to these amounts. *Id.* ¶¶ 3.13.8, 3.13.9. In addition, if the Court awards less than the full amount requested for the Service Swards or Class Counsel's fees and costs, the un-awarded amount shall be distributed to Monetary Payment Class Members. *Id.* (both).

8

Pursuant to California Labor Code section 2698, the Revised Settlement also allocates a maximum of $100,000 in PAGA penalties, subject to Court approval. *Id.* ¶¶ 1.26, 3.13.7. The Revised Settlement designates 75% of that amount to the California LWDA and 25% to Monetary Payment Class Members. *Id.* ¶ 1.26.

**G.      Settlement Administrator and Administration Costs**

The parties propose ILYM Group, Inc. ("ILYM Group") serve as Settlement Administrator. *See id.* ¶¶ 1.40, 3.4. The Settlement Administrator shall, among other things,

(1) establish (a) a toll-free telephone number; (b) a website with links to the Notice of Settlement, the Revised Settlement, and other relevant documents; and (c) a post office box for receipt of Class Members' communications;

(2) receive and review requests for exclusion;

(3) calculate and mail Individual Settlement Payments;

(4) provide weekly status reports to the parties;

(5) provide a due diligence declaration to the Court prior to the final approval hearing;

(6) pay the LWDA Award, PAGA Award, Service Awards, Class Counsel Fees and Costs Awards to the appropriate entities; and

(7) provide Class Members, Plaintiffs, and Class Counsel with the appropriate tax documents.

*Id.* ¶ 3.4.

The Settlement Administrator will be paid a maximum of $250,000 from the Total Settlement Amount. *Id.* ¶¶ 1.39, 3.13.10. Should the Court award less than this amount, the un-awarded amount shall be distributed to the Monetary Payment Class Members. *Id.* ¶ 3.13.10.

**H.      Release of Claims**

The Revised Settlement defines Released Parties as

> Defendants T.J. Maxx of CA, LLC, Marshalls of CA, LLC and HomeGoods, Inc. and their subsidiaries, affiliates and/or parents (including without limitation The TJX Companies, Inc., Marshalls of MA, Inc. and Newton Buying Company of CA, LLC), employee benefit plans sponsored or maintained by any of the foregoing, their

attorneys, and their respective successors and predecessors in interest; all of their respective officers, directors, employees, administrators, fiduciaries, trustees, beneficiaries and agents; and each of their past, present and future officers, directors, shareholders, employees, agents, principals, heirs, representatives, accountants, auditors, consultants, insurers and reinsurers.

*Id.* ¶ 1.34.

Monetary Payment Class Members agree to fully release claims

in exchange for the consideration provided by this Settlement Agreement, whether arising at law, in contract or in equity, and whether for economic or non-economic damages, restitution, injunctive relief, penalties or liquidated damages as specified in Paragraph 3.8 . . . and including without limitation all Claims that were alleged or that could have been alleged based on the facts stated in the Second Amended Complaint and Third Amended Complaint from October 10, 2009 through the Response Deadline. The only exception is for Plaintiffs' causes of action/claims for penalties alleged in *Michael Williams, Craig Davis, and Darla Eblacas, individually as aggrieved employees and on behalf of other aggrieved employees, Plaintiffs v. Marshalls of CA, LLC, The TJX Companies, Inc., T.J. Maxx of CA, LLC, HomeGoods, Inc. and Does 1-100, Defendants* (Superior Court of California, County of Los Angeles, Case No. 24 BC503806), which is also fully released by Monetary Payment Class Members, but only from October 10, 2012 (i.e., one year prior to the date the Roberts Complaint was originally filed) through the Response Deadline. This release includes a 1542 Waiver as to the MPC Released Claims only.

*Id.* ¶ 1.20.

Prospective Relief Class Members release

all Claims that were or could have been included in Plaintiffs' Second Amended Complaint and Third Amended Complaint that Defendants or the Released Parties failed to provide compliant wage statements under California Labor Code section 226 or any comparable state or federal law from the beginning of the Class Period through and including June 30, 2017, at which time Defendants shall use Wage Statements in substantially the same form as the Wage Statement Exemplar (Exhibit E to the Settlement Agreement). Although Defendants have agreed to use new wage statements in substantially the same form as the Wage Statement Exemplar by June 30, 2017, Defendants reserve the right to revise and update their wage statements in the future as Defendants deem appropriate as a result of business considerations, changes in applicable law and/or due to other factors and nothing in this Settlement Agreement requires Defendants to use the Wage Statement Exemplar in perpetuity.

*Id.* ¶ 1.32.

**A.    Legal Standard**

The Ninth Circuit maintains "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (internal quotation marks omitted).  "[S]ettlement class actions present unique due process concerns for absent class members[.]"  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998); *see Allen*, 787 F.3d at 1223 ("[T]he district court has a fiduciary duty to look after the interests of those absent class members.").  There is, for instance, "the risk that class counsel may collude with the defendants." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 944 (9th Cir. 2015) (internal quotation marks omitted).

To guard against such risks, Federal Rule of Civil Procedure 23(e) requires courts to determine whether a proposed settlement "is fundamentally fair, adequate, and reasonable." *Hanlon*, 150 F.3d at 1026; Fed. R. Civ. P. 23(e)(2) ("If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.").  The Ninth Circuit has identified eight factors courts should consider in evaluating the fairness of a class action settlement:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement.

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation omitted). Where a settlement agreement is negotiated prior to formal class certification, it is subject to a higher level of scrutiny, and a court's approval order must ensure that the settlement is not the product of collusion among the negotiating parties. *Id.* at 946-47.  "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026.  Courts cannot "delete, modify or substitute certain provisions"; rather, "[t]he settlement must stand or fall in its entirety." *Id.* (internal quotation marks omitted).

United States District Court
Northern District of California

**B.      Class Certification**

Final approval of a class action settlement requires, as a threshold matter, an assessment of whether the Class satisfies the requirements of Rule 23(a) and (b).  *See Hanlon*, 150 F.3d at 1019, 1022.  No new facts affect the Court's decision since the Court preliminarily approved the Monetary Payment Class and its subclasses pursuant to Rule 23(b)(3), as well as the Prospective Relief Class under Rule 23(b)(2).  Second Prelim. Approval Order at 12-20.  This Order incorporates by reference the Court's prior analysis under Rules 23(a) and (b)(3) as set forth in the Second Preliminary Approval Order.  The Court affirms its previous findings and certifies the Monetary Payment Class under Rule 23(b)(3) and the Prospective Relief Class under Rule 23(b)(2).

**C.      Adequacy of Notice**

Before assessing the fairness of the Settlement, the Court considers whether Class Members received adequate notice of it.  *See* Fed. R. Civ. P. 23(c)(2)(B) ("For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.").  Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  "Notice is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) (internal quotation marks omitted).

On August 18, 2017, Counsel for Defendants provided ILYM Group with a Class List containing each Class Member's name, last known address, employee number, social security number, employment status, and the number of weeks he or she worked during the Class Period. Bradley Decl. ¶ 6, Dkt. No. 94-1; Revised Molina Decl. ¶ 5, Dkt. No. 99-1.  The Class List also indicated whether the Class Member worked in a manager or coordinator position. *Id.* (both). ILYM Group checked the Class List for duplicates and other discrepancies, processed the List against the National Change of Address ("NCOA") database, and updated addresses accordingly.

Bradley Decl. ¶ 7; Revised Molina Decl. ¶¶ 5-6.

On September 8, 2017, ILYM Group mailed the Notice via U.S. First Class Mail to 82,549 potential Class Members.  Bradley Decl. ¶ 8; Molina Decl. ¶ 7 & Ex. A (Notice).  ILYM Group also established a website to provide information regarding the settlement, including the Revised Settlement, the Second Preliminary Approval Order, and the Notice.[5]  Bradley Decl. ¶ 9; Revised Molina Decl. ¶ 8.

As of December 14, 2017, a total of 12,218 Notices were returned as undeliverable. Revised Molina Decl. ¶ 9.  ILYM Group re-mailed 429 of those Notices which were returned with a forwarding address.  *Id.*  ILYM Group performed a computerized skip trace on the remaining 11,789 Notices that were returned without a forwarding address.  *Id.*  As a result, ILYM Group obtained and re-mailed the Notice to 11,158 updated addresses.  *Id.*  In total, ILYM Group re-mailed 11,587 Notices.  *Id.* ¶ 10.  There have been 1,167 Notices deemed undeliverable: 631 had no updated address, even after the skip trace; and 536 have been returned after the re-mailing.  *Id.* ¶ 11.

In addition, ILYM Group received 33 requests for exclusion and four objections.  Bradley Decl. ¶¶ 10-11; Revised Molina Decl. ¶¶ 12-13; *see* Dkt. Nos. 90-93 (objections); Dkt. No. 108-6 (list of putative class members who requested exclusion).  Taking into account the requests for exclusion, there are 82,516 participating Class Members.  Bradley Decl. ¶ 12; Revised Molina Decl. ¶ 14.

Under the circumstances, the Court is satisfied this method of providing notice was reasonably calculated and the best practicable means to notify Class Members of the Revised Settlement.  Although 1,167 Class members did not receive notice, this figure represents approximately 1.4% of the Class; the vast majority of Class Members were notified of the Revised Settlement.  Moreover, Rule 23 does not require actual notice of settlement to class members in time to opt out of the class.  Rather, notice need only be "reasonably certain to inform the absent members of the plaintiff class[.]"  *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (internal

---

[5] http://robertsclasssettlement.com/

quotation marks omitted); *see Mullane*, 339 U.S. at 319 ("[N]otice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all, since any objections sustained would inure to the benefit of all. We think that under such circumstances reasonable risks that notice might not actually reach every beneficiary are justifiable.").

**D.     Fairness, Adequacy, and Reasonableness**

In preliminarily approving the Settlement, the Court found it was "fair, reasonable, and adequate" under Rule 23(e)(2). The preliminary approval stage is "an 'initial evaluation' of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentation from the settling parties." *In re High-Tech Emp. Antitrust Litig.*, 2013 WL 6328811, at *1 (N.D. Cal. Oct. 30, 2013) (citation omitted). The Court now considers each of the *In re Bluetooth* factors to determine whether the Settlement is fair, adequate, and reasonable.

> 1.     <u>The Strength of Plaintiffs' Case; the Risk, Expense, Complexity, and Likely Duration of Further Litigation; and the Risk of Maintaining Class Action Status throughout Trial</u>

While Plaintiffs "maintained a strong belief in the underlying merits of the claims" and were "cautiously optimistic" about their chances of prevailing at trial, they recognized "there is a risk that the Court and/or jury will agree with Defendants, and thus, limit or eliminate Class Members' ability to recover on the claims at issue." Final Approval Mot. at 26, 30-31. Indeed, Defendants assert numerous defenses. *See id.* at 26-30. While Plaintiffs "believe they have valid counter-arguments to the[se] defenses," they also recognize that "the odds of a favorable verdict being reversed on appeal are not too remote to ignore." *Id.* at 30. Moreover, the Revised Settlement eliminates the need for continued litigation, the costs of which would reduce Class Members' eventual recovery. *Id.*; *see* Carter Decl. ¶ 14, Dkt. No. 95-6 ("Had the case proceeded to trial, th[e] time and the costs would have increased exponentially.").

These *Bluetooth* factors favor final approval.

> 2.     <u>The Amount Offered in Settlement</u>

"To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts primarily consider plaintiffs' expected recovery balanced against the

14

value of the settlement offer." *Harris v. Vector Mktg. Corp.*, 2011 WL 1627973, at *9 (N.D. Cal. Apr. 29, 2011) (internal quotation marks omitted).

The Revised Settlement offers monetary and injunctive relief. There are 82,516 participating Class Members who will share in the approximately $5,525,000 Net Settlement Fund. Bradley Decl. ¶ 13; *see* Revised Molina Decl. ¶ 17 (estimating Net Settlement Fund at $5,526,735.28). The $5,525,000 Net Settlement Fund is consistent with Plaintiffs' estimate that "the estimated damages involved in the California claims will exceed $5,000,000[.]" TAC ¶ 13; *see* SAC ¶ 12 (same). Participating Class Members will receive an average gross payment of $66.75, with the highest gross payment of $424.68.[6] Bradley Decl. ¶ 14; Revised Molina Decl. ¶ 18. Ms. Roberts, Ms. Forney, and Ms. Mullen will receive an estimated $186.32, $54.74, and $65.62, respectively. Bradley Decl. ¶ 49; Revised Molina Decl. ¶ 18.

The Revised Settlement also provides injunctive relief in the form of the modification of wage statements, which Defendants have already implemented. Revised Settlement ¶ 3.13.6. While Plaintiffs do not address the value of this relief in their Final Approval Motion, they argued at the preliminary approval stage that this modification furthers the purpose of California Labor Code section 226 by providing employees with "additional information, which Plaintiffs believe will reduce the risk of confusion and better allow employees to evaluate their pay and identify any issues or concerns." Second Mot. for Prelim. Approval at 34, Dkt. No. 81. "This change comes at a significant cost to Defendants and provides a substantial benefit to current employee Class Members and former employee Class Members who may be rehired by Defendants (e.g., seasonal employees who often are rehired every holiday season, etc.)." *Id.* at 30. Nothing in the record causes the Court to find this is not still the case.

The Court therefore finds the amount offered in the Revised Settlement supports final approval.

---

[6] After payments are made to participating Class Members, there will be approximately $17,000 in settlement funds remaining due to the rounding of workweek values to the nearest cent. *Id.* These funds shall be donated to Legal Aid at Work. *Id.*; Revised Settlement ¶ 3.13.4.4.

3. <u>The Extent of Discovery Completed; the Stage of the Proceedings; and the Experience and Views of Counsel</u>

Courts often "look to the amount of exchanged information prior to settlement to determine whether the parties have made an informed decision to settle the case." *Willner v. Manpower Inc.*, 2015 WL 3863625, at *4 (N.D. Cal. June 22, 2015) (citation omitted). Class Counsel engaged in formal and informal discovery, including interrogatories, document requests, and nearly a dozen depositions of Plaintiffs and Defendants' persons most knowledgeable about Defendants' labor policies and practices. Final Approval Mot. at 32; *see* Bradley Decl. ¶ 18 ("I played a lead role in investigating claims on behalf of the non-exempt employees, [including] conducting written discovery [and] taking and defending depositions. . . ."); *id.* ¶ 47 ("[A]ll Plaintiffs responded to written discovery and helped produce documents relating to their claims."). Counsel also researched claims brought, the nature of positions, the type of employer, and settlements reached in similar wage and hour cases; analyzed Defendants' labor policies and practices; and conducted a discounted valuation analysis of claims. Final Approval Mot. at 32.

There has been no motion practice besides that associated with the First and Revised Settlements. *See* Docket. Nevertheless, with the information acquired through discovery and research, Class Counsel was sufficiently prepared to consider the strengths and weaknesses of Plaintiffs' claims, Defendants' defenses thereto, and determine whether any settlement offer fairly resolved the claims. Moreover, Class Counsel are experienced class action litigators who could draw on their experience to evaluate and who support the Revised Settlement. *See* Bradley Decl. ¶¶ 17-19, 38; Cooper Decl. ¶¶ 5-8, 13, 15, Dkt. No. 95-1; Wong Decl. ¶¶ 7-10, 25, Dkt. No. 95-3; Carter Decl. ¶¶ 4-8; Setareh Decl. ¶¶ 6-8, Dkt. No. 95-11. Accordingly, these factors favor final approval.

4. <u>The Presence of a Governmental Participant</u>

As no government entity participated in this action, this factor is neutral.

5. <u>The Reaction of Class Members of the Proposed Settlement</u>

After accounting for the 33 requests for exclusion, there are 82,516 participating Class Members, accounting for 99.96% of the Settlement Class. Bradley Decl. ¶ 12; Revised Molina

16

Decl. ¶ 16.

In addition, four Class Members filed objections to the Revised Settlement.[7]  Revised Molina Decl. ¶ 13; *see* Dkt. Nos. 90-93 (objections).  The Court addresses each objection.

### a. *Helen Michael*

Helen Michael "left the company [in] April of 2013 and [] didn't receive any pay for the remaining paid time off (PTO) that [she] had earned."  Michael Obj., Dkt. No. 90.  Ms. Michael states that she "is unsure of the exact number of [PTO] hours [she] had remaining, but it was a few days' worth."  *Id.*  She contends that "[t]he PTO days I earned and didn't get the chance to take off should have been included in my last pay check with the company."  *Id.*  Ms. Michaels does not identify whether she worked at a TJ Maxx, Marhalls, or HomeGood retail location.  *See id.*

Whether her PTO should have been included in her final paycheck falls outside the scope of the Revised Settlement.  To the extent the Revised Settlement concerns unpaid monies, it addresses vested unused vacation pay and all wages earned at the time a Class member leaves employment.  It makes no mention of unpaid PTO, and nothing in Ms. Michaels' objection suggests this is a class-wide issue, rather than an individual one.  The Court cannot find the fact that Ms. Michaels did not receive compensation for her unpaid PTO at the time she left Defendants' employment renders the Revised Settlement unfair, inadequate, or unreasonable.  The Court therefore OVERRULES Ms. Michaels' objection.

### b. *Michelle Rose*

Michelle Rose worked for Marshalls from June 30, 2010 to February 18, 2015.  Rose Obj., Dkt. No. 91.  Ms. Rose states that her "hours [varied] a lot[,] no less than 32, because [she] was really needed."  *Id.*  Because of this, she "believe[s] [she] may have been owed an exclusive amount from [her] hourly wages."  *Id.*

By calculating recovery based on the number of weeks worked during the Class Period and the position the Class Member held while working for Defendants, the Revised Settlement treats

---

[7] The Court received a fifth letter from Class member Karla D. Ruelas.  Dkt. No. 96.  This letter does not contain an objection or a request for exclusion but rather indicates Ms. Ruelas' choice of remedy.  *See id.*

all Class Members equally, regardless of the weekly hours worked. That the Revised Settlement does not take into account the number of hours worked does not mean it is not fair, adequate, or reasonable. In asking for "an exclusive amount" based on her individual circumstances, Ms. Rose seeks preferential treatment under the Revised Settlement.

### c. *Morton Goldman*

Morton Goldman raises a number of concerns in his objection. *See* Goldman Obj., Dkt. No. 92. None of them warrants denying final approval.

First, Mr. Goldman objects to Defendants' denial of the allegations and "the statement that it would be financially advantageous for them to settle as opposed to engage in defensive litigation." *Id.* at 1; *see* Revised Settlement ¶ 2.6 (Defendants' reasons for settlement). Mr. Goldman does not believe it is "reasonable that it would cost [Defendants] anywhere near the proposed value of the settlement, if they are indeed truly innocent." Goldman Obj. at 1. Agreeing to settle without conceding liability is common practice. Moreover, the assertion that continued litigation would be less expensive than settlement does not recognize the fact that the parties could easily spend years litigating this matter through class certification, dispositive motions, trial, and appeals. "Employment cases—especially class action—are expensive and time consuming." *Brown v. CVS Pharmacy, Inc.*, 2017 WL 3494297, at *3 (C.D. Cal. Apr. 24, 2017) (internal quotation marks and brackets omitted)). A favorable outcome is also not guaranteed. Defendants' litigation strategy is not, in and of itself, grounds to deny final approval. On the contrary, as discussed above, the risks associated with continued litigation support settlement.

Second, Mr. Goldman objects to the amount of attorneys' fees, on the ground that Class Counsel's "request of over $2,500,000 is way too excessive and the plaintiffs['] pool is rather paltry." Goldman Obj. at 1. As explained below, the requested attorneys' fees are not unreasonable. *See infra* at 22-29.

Third, Mr. Goldman asserts that "the fact that the small awards would be subject to any taxes is just plain ludicrous." Goldman Obj. at 1. If Defendants had included the unpaid wages in Class Members' paychecks as Plaintiffs contend Defendants should have done, they would have been subject to tax withholdings at that time. That they are now is consistent with the applicable

tax laws. This does not warrant denying final approval.

Fourth, Mr. Goldman asks "if any of the [Class] members signed an arbitration agreement, wouldn't they be ineligible to receive monetary awards as a result of a class action settlement?" *Id.* at 1-2. There is no evidence that any Class Member signed an arbitration agreement, and the issue of arbitration never arose during the litigation. The Revised Settlement does not prohibit monetary payment to Class Members who signed an arbitration agreement, if any.

Fifth, Mr. Goldman is "troubled" by the fact that Class Members cannot request exclusion from the Prospective Relief Class. *Id.* at 2; *see id.* ("If I request exclusion from this, am I granted relief from this prospective relief portion?"). He states that Defendants' use of the new wage statements is "indicative of deliberate deceit by T.J. Maxx[.]" *Id.* As noted, the Revised Settlement does not allow Class Members to opt out of the Prospective Relief Class. Revised Settlement ¶ 3.12.6 ("The Prospective Relief Class is a mandatory, no opt-out class."). It is not practicable to allow some employees to receive one type of wage statement but provide a different wage statement to others. Mr. Goldman's assertion that the new wage statement is evidence of "deliberate deceit" is unfounded; rather, it is the result of settlement negotiations.

Sixth, Mr. Goldman contends Class Counsel should "be aware of any potential unknown claims." Goldman Obj. at 2; *see* Revised Settlement ¶¶ 1.20, 1.32. As discussed above, Class Counsel thoroughly investigated Defendants' practices and policies and carefully evaluated Plaintiffs' claims. The language Mr. Goldman objects to is standard in class action settlements. *See e.g.*, *In re Sony PS3 "Other OS" Litig.*, 2017 WL 5598726, at *10 (N.D. Cal. Nov. 21, 2017) (preliminarily approving class action settlement that released "all claims . . . whether known or unknown"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 2212783, at *9 (N.D. Cal. May 17, 2017) (finally approving class action settlement that released "any and all claims . . . known or unknown"). To the extent Mr. Goldman believes "that no more lawsuits may be filed against T.J. Maxx, even if they are still committing the same kinds of misconduct" (Goldman Obj. at 2), this misstates the scope of the Revised Settlement, which only applies to participating Class Members. Individuals who exclude themselves from the Settlement or who are not part of the Class are not bound by the release.

Finally, Mr. Goldman asserts he did not have "enough time to adequately respond since [he] only received the proposed settlement barely 1 month ago." *Id.* at 1; *see id.* at 3 ("The fact that settlement is being pushed through, [and] I only received this notification of settlement 1 month ago, is scary. . . ."). He also reports difficulties contacting Class Counsel. *Id.* at 1 ("I am also concerned about the instructions for contacting the Plaintiff's Attorneys, regarding questions at various addresses, as opposed to a direct phone number which is far more immediate."); *id.* at 3 ("I am not sure who I should contact since those answering the phone are not attorneys."). It is unclear why Mr. Goldman only had one month to respond. ILYM Group mailed the Notice on September 8, 2017, two months before the November 7, 2017 deadline to file an objection. Mr. Goldman's notice was not returned as undeliverable, forwarded, or subject to re-mailing. Revised Molina Decl. ¶ 17. In any event, one month is sufficient for Mr. Goldman raise his concerns, as evidenced by his timely-filed objection.

The Notice also provided Class Counsel's law firms and addresses. *See* Revised Molina Decl., Ex. A at 8. While the Notice did not provide a direct telephone number to Counsel, it provided a telephone number for ILYM Group – which Mr. Goldman used. On Friday, November 3, 2017, Mr. Goldman left a voicemail with ILYM Group that "'he has concerns about the settlement and wants us to know that he will be opting out even though he just got this.'" *Id.* ¶ 15. ILYM Group returned his phone call the next business day, November 6, 2017, and reached his voicemail. *Id.* ILYM Group advised him that in order opt out, he would need to submit a Request for Exclusion in writing no later than November 7, 2017. *Id.* ILYM Group also instructed Mr. Goldman "to contact Crystal at our office" and gave him a telephone number and extension to do so. *Id.* ILYM Group "ha[s] not had any further communication from Mr. Goldman." *Id.* Accordingly, the Court cannot find Mr. Goldman lacked a sufficient means of obtaining more information or had insufficient time to do so.

Mr. Goldman "seek[s] to delay this horrible settlement with the intent of coming up with a far better alternative." Goldman Obj. at 4. He "want[s] no part of this agreement as it is potentially constructed – since it is grossly inadequate and bloated with excessive and unreasonable attorneys' fees." *Id.* But despite his voicemail to ILYM Group and his vehement

20

objections, Mr. Goldman ultimately did not request to be excluded from the Revised Settlement, which would have allowed him to pursue his own claims. He elected to remain part of the Settlement Class. *See generally* Goldman Obj. "Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027. None of Mr. Goldman's objections show the Revised Settlement is unfair, inadequate, or the product of collusion. The Court therefore OVERRULES Mr. Goldman's objections.

             d.     *Yunus Bilici*

Yunus Bilici objects to the requested attorneys' fees. Bilici Obj., Dkt. No. 93 ("For an $8,500,000 settlement, attorneys will receive $2,550,000 and each individual member of the class will receive a very small sum. This does not seem like a good use of money."). As explained below, the requested attorneys' fees are not unreasonable and do not warrant denying final approval. *See infra* at 22-29.

             e.     *Summary*

The Court OVERRULES each of the objections and finds none of them provides a reason to deny final approval. "The relevant standard . . . is not whether the settlement is one which the court . . . considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." *Arizona v. City of Tucson*, 761 F.3d 1005, 1021 (9th Cir. 2014) (citation omitted). Moreover, the fact that so few Class Members objected or requested exclusion from the Revised Settlement indicates a general positive view of the Settlement. *See Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness."). Taken as a whole, Class Members' general lack of opposition to the Revised Settlement supports granting final approval.

        6.   <u>Summary</u>

Based on the foregoing, the *Bluetooth* factors favor final approval.

**E.    Potential Collusion**

Where a settlement is reached prior to class certification, courts must also consider whether

the settlement is the product of collusion among the negotiating parties. *In re Bluetooth*, 654 F.3d at 947. "Collusion may not always be evident on the face of a settlement, and courts therefore must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* Such signs include

> (1) when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded;
> (2) when the parties negotiate a "clear sailing" arrangement providing for the payment of attorneys' fees separate and apart from class funds, which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class; and
> (3) when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund[.]

*Id.* (internal quotation marks and citations omitted).

The Court previously considered these factors in light of the Revised Settlement. Second Prelim. Approval Order at 23-25. Nothing before the Court compels it to re-evaluate that analysis. Accordingly, the Court incorporates its analysis as set forth in its Preliminary Approval Order and finds no indication of collusion.

**F.       Summary**

In light of the foregoing analysis, the Court finds the Revised Settlement is fair, reasonable, adequate, and free of collusion. The Court therefore GRANTS Plaintiffs' Motion for Final Approval.

**MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS**

**A.       Attorneys' Fees**

Courts may award attorneys' fees and costs in a certified class action as authorized by law or by the parties' agreement. Fed. R. Civ. P. 23(h). However, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *In re Bluetooth*, 654 F.3d at 941.

"In this circuit, there are two primary methods to calculate attorneys fees: the lodestar method and the percentage-of-recovery method." *In re Online DVD*, 779 F.3d at 949. "[C]ourts

have discretion to choose which calculation method they use[.]" *In re Bluetooth*, 654 F.3d at 942. But the Ninth Circuit "encourage[s] courts to guard against an unreasonable result by cross-checking their calculations against a second method." *Id.* at 944-45 (citations omitted).

When applying either method, courts evaluate the reasonableness of the award by balancing the *Kerr* factors:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Resurrection Bay Conservation All. v. City of Seward, Alaska*, 640 F.3d 1087, 1095 & n.5 (9th Cir. 2011) (quoting *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)). "Foremost among these considerations, however, is the benefit obtained for the class." *In re Bluetooth*, 654 F.3d at 942.

2.  Analysis

The Court first considers the request for attorneys' fees under a lodestar analysis, then confirms the result by applying a percentage-of-recovery analysis.

a.  *Lodestar*

"Use of the 'lodestar method' to calculate attorney's fees under a federal fee-shifting statute is proper." *Tahara v. Matson Terminals, Inc.*, 511 F.3d 950, 955 (9th Cir. 2007) (citing *Staton*, 327 F.3d at 965). "The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer." *In re Bluetooth*, 654 F.3d at 941. This method therefore requires a two-step process: "First, a court calculates the lodestar figure by multiplying the number of hours reasonably expended on a case by a reasonable hourly rate." *Kelly v. Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016). "Second, the court determines whether to modify the lodestar figure, upward or downward, based

on factors not subsumed in the lodestar figure." *Id.* "There is a strong presumption that the lodestar is a reasonable fee." *Stetson v. Grissom*, 821 F.3d 1157, 1165 (9th Cir. 2016).

The Court appointed the following attorneys as Class Counsel for settlement purposes: Marcus J. Bradley and Kiley L. Grombacher of Bradley/Grombacher LLP; Shaun Setareh of the Setareh Law Group; Samuel A. Wong and Kashif Haque of the Aegis Law Firm, P.C.; Scott B. Cooper of The Cooper Law Firm; and Roger R. Carter of the Carter Law Firm. Second Prelim. Approval Order at 20-21. Attorneys Samantha Smith of the Cooper Law Firm and Alison Miceli, Jessica L. Campbell, and Shelly D. Song of Aegis Law Firm also worked on this matter. Cooper Decl. ¶ 19; Wong Decl. ¶¶ 18-20. Counsel expended a total of 2,320.25 hours litigating this case, broken down as follows:

| Counsel | Position | Hourly Rate | Hours Expended | Lodestar |
|---|---|---|---|---|
| Marcus J. Bradley | Senior Partner | $750 | 783 | $587,250 |
| Kiley L. Grombacher[8] | Managing Partner | $525-$600 | 787 | $452,525 |
| Shaun Setareh | Principal | $750 | 239.65 | $173,355 |
| Samuel A. Wong | Partner | $650 | 125.9 | $81,835 |
| Kashif Haque | Partner | $650 | 27.8 | $18,070 |
| Alison Miceli | Associate (former) | $450 | 19.1 | $8,595 |
| Jessica L. Campbell | Associate | $415 | 88.3 | $36,644.50 |
| Shelly D. Song | Associate | $300 | 5.8 | $1,740 |
| Scott B. Cooper | Principal | $700-$750 | 148.5 | $119,430[9] |
| Samantha A. Smith | Associate | $450 | 17.9 | |
| Roger R. Carter | Managing Partner | $700-$750 | 77.30 | $57,975 |
| **TOTALS** | -- | -- | 2,320.25 | $1,537,420[10] |

Bradley Decl. ¶¶ 17, 28-30; Cooper Decl. ¶¶ 1, 16-17, 19-20; Wong Decl. ¶¶ 1, 14, 18-20; Carter Decl. ¶¶ 1, 15-17; Setareh Decl. ¶ 12.

---

[8] During the course of the litigation, Ms. Grombacher moved from Marlin & Saltzman, where she billed at a rate of $525 per hour as an associate, to Bradley/Grombacher, where she currently bills at a rate of $600 per hour. Bradley Decl. ¶ 28. Her lodestar is calculated using a blended rate of $575. *Id.* ¶ 30.

[9] This lodestar represents the lodestar for The Cooper Law Firm, Mr. Cooper's and Ms. Smith's combined work.

[10] In their Motion, Class Counsel assert their total lodestar is $1,537,164.50. Fees Mot. at 23. Counsel confirmed Mr. Cooper's lodestar is $119,430. Suppl. Bradley Decl. ¶ 3; *compare* Bradley Decl. ¶ 32 *with* Cooper Decl. ¶ 20.

i.       Hourly Rate and Hours Expended

"A reasonable hourly rate is ordinarily the 'prevailing market rate in the relevant community.'" *Kelly*, 822 F.3d at 1099 (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)) (brackets omitted). In this case, the relevant community is the San Francisco Bay Area.

Counsel's declarations describe their skills, experience, and reputations as class action litigators, as well as their involvement in this action. *See* Bradley Decl. ¶¶ 17, 19; Cooper Decl. ¶¶ 5-12, 15-16; Wong Decl. ¶¶ 5-20; Carter Decl. ¶¶ 6-8, 12, 16; Setareh Decl. ¶¶ 5-8. The Court finds these requested rates are reasonable for wage and hour class action attorneys in the Bay Area with commensurate experience. *See Slezak v. City of Palo Alto*, 2017 WL 2688224, at *6 (N.D. Cal. June 22, 2017) (approving rates between $265 and $600 per hour); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 263 (N.D. Cal. 2015) (collecting cases and finding rates of $650, $400, and $375 per hour reasonable).

"Beyond establishing a reasonable hourly rate, a party seeking attorneys" fees bears the burden to "document[ ] the appropriate hours expended." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983). Counsel must exercise sound "billing judgment" as to the number of hours worked, eliminating excessive, redundant, or unnecessary hours, and provide billing records supporting the time claimed. *Id.* at 433-34. Class Counsel "is not required to record in great detail how each minute of his time was expended," but should "identify the general subject matter of his [or her] time expenditures." *Id.* at 437 n.12.

Class Counsel's records show they spent their time investigating claims; conducting and reviewing discovery; communicating with Plaintiffs, Class Members, and co-counsel; performing legal research; drafting pleadings and motions; participating in mediation; and preparing for and making court appearances. Bradley Decl. ¶¶ 18, 31; Cooper Decl. ¶ 20; Wong Decl. ¶ 24; Carter Decl. ¶ 15; Setareh Decl. ¶¶ 4, 12. Based on Class Counsel's declarations, the Court finds they and their staff expended a reasonable number of hours on this litigation. *See Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[T]rial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to

achieve auditing perfection.  So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time.").

ii.      Lodestar Calculation

Applying the reasonable hourly rates to the number of hour reasonably billed, Class Counsel's lodestar is $1,537,420.  "After determining the lodestar, the Court divides the total fees sought by the lodestar to arrive at the multiplier."  *Bellinghausen*, 306 F.R.D. at 265.

"[A]ttorneys' fees in common fund cases are not paid by the losing defendant, but by members of the plaintiff class, who shoulder the burden of paying their own counsel out of the common fund."  *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994).  But "[t]here is nothing unfair about contingency enhancements in common fund cases because of the equitable notion that those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it."  *Id.* (citing *Boeing Co. v. Van Gemert*, 444 U.S. 472, 477 (1980)).  On the contrary, "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases."  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002).  "[A]ttorneys whose compensation depends on their winning the case must make up in compensation in the cases they win for the lack of compensation in the cases they lose."  *Id.* (internal quotation marks and brackets omitted); *see Hopkins v. Stryker Sales Corp.*, 2013 WL 496358, at *4 (N.D. Cal. Feb. 6, 2013) (Multipliers "account for the risk Class Counsel assumes when they take on contingent-fee cases.").

Plaintiffs request a multiplier of 1.65, for a total of $2,550,000.  Fees Mot. at 23.  This multiplier, which falls at the low end of the range of multipliers, is appropriate.  *See Vizcaino*, 290 F.3d at 1051 n.6 (9th Cir. 2002) ("Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."  (internal quotation marks and brackets omitted)).  As discussed above, there are significant risks to this litigation that made an outcome favorable to Plaintiffs uncertain.  *See also* Wong Decl. ¶ 25 ("Had the litigation continued, Defendant would undoubtedly have mounted an aggressive defense at the certification stage and at the merits stage.  A defeat at one of these stages could have foreclosed the possibility of Aegis recovering any remuneration for their time and effort.").  Counsel litigated this case on a

1   contingency fee basis and have yet to receive any fees or reimbursements for costs.  Cooper Decl.

2   ¶ 16; Wong Decl. ¶ 25; Carter Decl. ¶ 14; Setareh Decl. ¶ 9.  Class Counsel also rejected other

3   work in order to focus on this matter.  Bradley Decl. ¶ 26; Setareh Decl. ¶¶ 10-11.  As such, the

4   Court finds a multiplier of 1.65 and the requested $2,550,000 attorneys' fees are reasonable.

5                    b.     *Percentage-of-Recovery*

6          "Under the percentage-of-recovery method, the attorneys' fees equal some percentage of

7   the common settlement fund[.]"  *In re Online DVD*, 779 F.3d at 949.  In the Ninth Circuit, "courts

8   typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing

9   adequate explanation in the record of any 'special circumstances' justifying a departure."  *In re*

10  *Bluetooth*, 654 F.3d at 942.  "The benchmark percentage should be adjusted, or replaced by a

11  lodestar calculation, when special circumstances indicate that the percentage recovery would be

12  either too small or too large in light of the hours devoted to the case or other relevant factors."  *Six*

13  *Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

14         The requested $2,550,000 in attorneys' fees represents approximately 30% of the Total

15  Settlement Amount.  While higher than the benchmark amount, such a percentage is not

16  uncommon in wage and hour class action settlements such as this.  *See Ruch v. AM Retail Grp.,*

17  *Inc.*, 2016 WL 1161453, at *12 (N.D. Cal. Mar. 24, 2016) (finding as reasonable fee award

18  totaling no more than 30% of the settlement amount in wage and hour class action settlement);

19  *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *28 (N.D. Cal. Apr. 1, 2011),

20  *supplemented*, 2011 WL 1838562 (N.D. Cal. May 13, 2011) (approving attorneys' fee of 42% of

21  common fund in wage and hour class action); *Hightower v. JPMorgan Chase Bank, N.A.*, 2015

22  WL 9664959, at *11 (C.D. Cal. Aug. 4, 2015) ("[A]n award of 30% is consistent with awards

23  granted in similar complex [wage and hour] litigation."); *Stevenson v. Dollar Tree Stores, Inc.*,

24  2011 WL 4928753, at *5 (E.D. Cal. Oct. 17, 2011) ("[I]n California, where wage and hour class

25  actions have settled prior to trial for millions of dollars, it is not uncommon for an attorneys' fee

26  award to be in the realm of 25% to 30% of the settlement and, thus, in excess of $ 1 million."

27  (internal quotation marks omitted)).  Moreover, as noted, an award of 30% of the common fund

28  represents a small multiplier of Class Counsel's lodestar.  *See Edwards v. Nat'l Milk Producers*

*Fed'n*, 2017 WL 3616638, at *9 (N.D. Cal. June 26, 2017), *objections overruled*, 2017 WL 3623734 (N.D. Cal. June 26, 2017) ("Rather than abandon the percentage-of-recovery method, the best way to guard against a windfall is first to examine whether a given percentage represents too high a multiplier of counsel's lodestar." (internal quotation marks omitted)).

The percentage-of-funds analysis accordingly confirms $2,550,000 is an appropriate fee award.

### 3. Summary

A modest enhancement of Class Counsel's reasonable lodestar is reasonable under these circumstances. The resulting figure – $2,550,000 – is confirmed as reasonable under a percentage-of-funds analysis. The Court therefore awards attorneys' fees in the amount of $2,550,000.

## B. Costs

The Revised Settlement provides for, and the Court preliminarily approved, costs in the amount of $60,000. Revised Settlement ¶¶ 1.5, 3.13.9; Second Prelim. Approval Order at 23. Counsel and their firms expended the following costs litigating this action:

| Law Firm | Costs |
|---|---|
| Bradley/Grombacher LLP and Marlin & Saltzman[11] | $58,830.29 |
| The Setarah Law Firm | $1,153.47 |
| The Cooper Law Firm | $3,565.31 |
| Aegis Law Firm | $1,640.06 |
| The Carter Law Firm | $475.50 |
| **TOTAL** | $65,664.63 |

Bradley Decl. ¶ 41 & Exs. 1-2; Cooper Decl. ¶ 21 & Ex. A; Wong Decl. ¶ 26 & Ex. 2; Carter Decl. ¶ 20 & Ex. 2; Setareh Decl. ¶ 9 & Ex. A.

These expenses include out-of-pocket, unreimbursed fees incurred while litigating this matter, including filing fees; mediation fees; travel costs; postage; service fees; copying expenses; court reporter fees; deposition expenses; telephone charges; and scanning fees. *See id.* (all). Although Class Counsel's total costs amount to more than the $60,000 allocated in the Revised

---

[11] Mr. Bradley and Ms. Grombacher worked at both Marlin & Saltzman and Bradley/Grombacher over the course of this litigation.

Settlement for costs, "Counsel will not seek fees in excess of $60,000." Bradley Decl. ¶ 42. Having reviewed the requested costs, the Court finds they are reasonable and recoverable. The Court therefore awards costs in the amount of $60,000.

## C.  Administration Costs

The Revised Settlement allocates, and the Court preliminarily approved, up to $250,000 in Settlement Administration Costs. Revised Settlement ¶¶ 1.39, 3.13.10; Second Prelim. Approval Order at 32-33.

Ms. Molina declares that as of December 20, 2017, ILYM Group has incurred $125,211.59 in administration costs. Revised Molina Decl. ¶ 19. Ms. Molina anticipates ILYM Group will incur an additional $123,053.13 in costs. *Id.* This total – $248,264.72 – is greater than ILYM Group's initial estimate. *See* Hartranft Decl. ¶ 9 & Ex. B, Dkt. No. 85 (estimating costs to be $229,151.23).[12]

While the actual costs are likely to be greater than the quoted amount, they are still less than the maximum amount set forth in the Revised Settlement. Mr. Bradley further clarifies that Plaintiffs seek only $248,264.72. Suppl. Bradley Decl. ¶ 6. The Court finds this amount is reasonable and awards administration costs in this amount.

## D.  Service Awards

Service or incentive "awards are discretionary . . . , and are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. "[D]istrict courts must be vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives." *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1164 (9th Cir. 2013). "Many courts in the Ninth Circuit have . . . held that a $5,000 incentive award is 'presumptively reasonable.'" *Gaudin v. Saxon Mortg. Servs., Inc.*, 2015 WL 7454183, at *10 (N.D. Cal. Nov. 23,

---

[12] Ms. Molina explains this increase is due to the establishment of a settlement website and "the actual mail postage rate that was not accounted for in [ILYM Group's] initial cost estimate." Revised Molina Decl. ¶ 19.

2015) (collecting cases).

"To determine the reasonableness of a requested incentive payment, courts consider the proportionality between the incentive payment and the range of class members' settlement awards." *Willner*, 2015 WL 3863625, at *9. Where there is a "very large differential in the amount of damage awards between the named and unnamed class members[,]" such differential record must be supported by the record. *Staton*, 327 F.3d at 978.

"Incentive awards typically range from $2,000 to $10,000." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 267 (N.D. Cal. 2015) (collecting cases). "In the Ninth Circuit, a $5,000 incentive award is consistent with the amount courts typically award as incentive payments." *Villanueva v. Morpho Detection, Inc.*, 2016 WL 1070523, at *7 (N.D. Cal. Mar. 18, 2016) (collecting cases) (internal quotation marks omitted).

The Revised Settlement allocates a maximum of $40,000 in service awards for the named Plaintiffs: Ms. Roberts shall receive no more than $20,000, and Ms. Forney and Ms. Mullen shall each receive no more than $10,000. Revised Settlement ¶ 3.13.8. The Court previously noted two concerns about the size of the proposed service awards. First, based on the record before the Court at the preliminary approval stage, the only significant difference between the named Plaintiffs' contributions was that Ms. Roberts sat for a two-day deposition, whereas Ms. Forney and Ms. Mullen only sat for one-day depositions. Second Prelim. Approval Order at 27-28 (citing First Roberts Decl. ¶ 14, Dkt. No. 70-6; First Mullen Decl. ¶ 14, Dkt. No. 70-7; First Forney Decl. ¶ 14, Dkt. No. 70-8). Second, the $10,000 and $20,000 awards are disproportionate to Class Members' anticipated recovery. *Id.* at 28 (citing *Smith v. Am. Greetings Corp.*, 2016 WL 2909429, at *10 (N.D. Cal. May 19, 2016) ("[T]o determine the reasonableness of a requested incentive payment, courts consider the proportionality between the incentive payment and the range of class members' settlement awards."))).

1. Plaintiffs' Contributions

The Court again notes that the named Plaintiffs' declarations are largely identical. *See* Second Prelim. Approval Order at 27-28. Ms. Roberts, Ms. Mullen, and Ms. Forney each participated in every aspect of this case, from pre-litigation investigation through settlement

discussions, and had numerous discussions with their attorneys.  Second Roberts Decl. ¶ 11, Dkt. No. 95-8; Second Mullen Decl. ¶ 11, Dkt. No. 95-9; Second Forney Decl. ¶ 11, Dkt. No. 95-10. All Plaintiffs "spent a considerable amount of time learning about California labor laws, deciding whether remedial action should be taken, how it should be taken, and searching for attorneys." Second Roberts Decl. ¶ 12; Second Mullen Decl. ¶ 12; Second Forney Decl. ¶ 12.  Each Plaintiff also educated her attorneys about Marshalls', HomeGoods', or T.J. Maxx's policies and practices, searched for relevant documents, and helped her counsel understand the company structure. Second Roberts Decl. ¶ 13; Second Mullen Decl. ¶ 13; Second Forney Decl. ¶ 13.

Plaintiffs prepared and sat for depositions.  Second Roberts Decl. ¶ 14; Second Mullen Decl. ¶ 14; Second Forney Decl. ¶ 14.  Ms. Roberts sat for a two-day deposition, which required her to take off work and travel from her home in Vacaville to San Francisco.  Second Roberts Decl. ¶ 14.  Ms. Mullen and Ms. Forney each sat for a one-day deposition.  Second Mullen Decl. ¶ 14; Second Forney Decl. ¶ 14.  Plaintiffs also worked with their counsel to prepare discovery responses and affidavits.  Second Roberts Decl. ¶ 15; Second Mullen Decl. ¶ 14; Second Forney Decl. ¶ 14.

In total, Ms. Roberts estimates she has spent over 100 hours on this litigation.  Second Roberts Decl. ¶ 16; *but see* First Roberts Decl. ¶ 20 ("I estimate that I have spent between 60 and 65 hours in the litigation of this case.").  Ms. Mullen expended approximately 72 hours, and Ms. Forney estimates she spent between 30 to 35 hours on this case.  Second Mullen Decl. ¶ 15; Second Forney Decl. ¶ 15.

Plaintiffs declare they took risks in litigating this lawsuit.  Second Roberts Decl. ¶¶ 22-23; Second Mullen Decl. ¶¶ 21-22; Second Forney Decl. ¶¶ 21-22.  It would be "financially devastating" if Plaintiffs lost and had to pay Defendants' litigation costs.  Second Roberts Decl. ¶ 22; Second Mullen Decl. ¶ 22; Second Forney Decl. ¶ 22.  In addition, Plaintiffs expect that "because of the size and notoriety of this case," future employers and supervisors will know of their involvement.  Second Roberts Decl. ¶ 23; Second Mullen Decl. ¶ 23; Second Forney Decl. ¶ 23.  Plaintiffs each assert that "[a]ny prospective employer doing a cursory internet search on me and my employment history will learn of my role in this litigation."  *Id.* (all).  As a result,

United States District Court
Northern District of California

Plaintiffs risk the potential stigma of being a class representative in a labor dispute, which may affect their future employment prospects. *Id.* (all); *see* Jan. 18, 2018 Oral Argument at 10:10 (arguing Ms. Roberts took risks by associating her name with this employment class action).

2. <u>Analysis</u>

Ms. Forney's and Ms. Mullen's requested $10,000 service awards fall within the range of service awards granted in this district, albeit on the high side. *See Bellinghausen*, 306 F.R.D. at 267. However, as the Court noted in its First and Second Preliminary Approval Orders and at the hearing, Ms. Roberts' proposed $20,000 award is well outside this range. First Prelim. Approval Order at 24; Second Prelim. Approval Order at 27-28; Jan. 18, 2018 Oral Argument at 10:07. Plaintiffs argue an enhanced award is justified for Ms. Roberts because she was the first Plaintiff to file a lawsuit and her participation in this case spans several months more than the other Plaintiffs. Fees Mot. at 27. This in and of itself does not warrant a $20,000 award.

A $20,000 award is four times greater than this district's presumptively reasonable $5,000 service award. *See Isquierdo v. W.G. Hall, LLC*, 2017 WL 4390250, at *7 (N.D. Cal. Oct. 3, 2017) (noting a "$5,000 service award . . . is 'presumptively reasonable' in the Ninth Circuit"). At the hearing, counsel for Plaintiffs argued the need avoid a "chilling effect" and to incentivize potential plaintiffs to come forward. Jan. 18, 2018 Oral Argument at 10:09. Counsel did not offer any reasons why $20,000 is necessary to achieve this effect, particularly in light of their request for only $10,000 for Ms. Forney and Ms. Mullen.

In determining an appropriate service award, courts consider whether the proposed amount is proportional to class members' payments under the settlement. *See Staton*, 327 F.3d at 977. Courts routinely reject awards that are disproportionate to class members' recovery. *See Roe v. Frito-Lay, Inc.*, 2017 WL 1315626, at *8 (N.D. Cal. Apr. 7, 2017) (reducing service award from $10,000 to $5,000 where "[a] $10,000 incentive award is substantially disproportionate to class members' anticipated recovery of $193.45"); *Smith v. Am. Greetings Corp.*, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) (in wage and hour class action, reducing $7,500 service award to $5,000 where requested award was 4.7 times greater than average class members' average recovery of $1,608.16); *Willner*, 2015 WL 3863625, at *9 (in wage and hour class action,

rejecting requested $11,000 award in favor of $5,000 award where expected average settlement payment was $605.02); *Burden v. SelectQuote Ins. Servs.*, 2013 WL 3988771, at *6 (N.D. Cal. Aug. 2, 2013) (in class action against employer, rejecting proposed $10,000 award that nearly three times the largest amount paid to any class member and awarding $5,000). In this case, a $20,000 award is more than 300 times greater. This strongly weighs against such a high award.

Counsel emphasized the fact that this is an employment case and argued it should not be compared to consumer class actions, given the aforementioned personal risks Ms. Roberts took. *Id.* at 10:10. That this is an employment action does not, in and of itself, justify a $20,000 service award. On the contrary, named plaintiffs in employment class actions regularly receive the awards that fall within the $5,000 and $10,000 range, if not less. *See, e.g.*, *Smith*, 2016 WL 362395, at *10; *Willner*, 2015 WL 3863625, at *9; *Burden*, 2013 WL 3988771, at *6; *Villanueva*, 2016 WL 1070523, at *7 (finding $2,500 service award "fair and reasonable" in wage and hour class action); *Covillo v. Specialtys Café*, 2014 WL 954516, at *8 (N.D. Cal. Mar. 6, 2014) (awarding $8,000 in service awards in wage and hour class action); *see also Myles v. AlliedBarton Sec. Servs., LLC*, 2014 WL 6065602, at *6 (N.D. Cal. Nov. 12, 2014) ("Absent a particularized showing of expenses incurred or injury suffered by [the named plaintiff] (above and beyond those of the other proposed class members), an enhancement award is inappropriate.").

Finally, Ms. Roberts has not spent considerably more time on this litigation than the other named Plaintiffs. Plaintiffs' counsel argued that Ms. Roberts "invested a significant amount of time," noting "she was the first to file" a lawsuit. Jan. 18, 2018 Oral Argument at 10:08. But Ms. Roberts spent approximately 100 hours on this litigation, compared to Ms. Mullen's 72 hours – a difference of only 28 hours. *See* Second Roberts Decl. ¶ 16; Second Mullen Decl. ¶ 15. Ms. Mullen and Ms. Forney both seek $10,000, despite the fact that Ms. Mullen dedicated approximately twice the amount of time Ms. Forney devoted. *See* Second Mullen Decl. ¶ 15; Second Forney Decl. ¶ 15 (estimating she spent 30-35 hours on litigation). Plaintiffs do not explain why, all other things being equal, Ms. Roberts' additional 28 hours of work warrants an extra $10,000, whereas the additional 37-42 hours of work by Ms. Mullen compared to Ms. Forney's does not. Plaintiffs do not, for instance, suggest that the additional $10,000 compensates

Ms. Roberts for the time she took off work to attend her two-day deposition and the travel expenses incurred therefor. *See also* Second Mullen Decl. (no indication that she lost wages or incurred travel expenses due to deposition); Second Forney Decl. (same).

While the work Ms. Roberts performed was significant, it was also standard for a named plaintiff in a class action lawsuit. *See Roe*, 2017 WL 1315626, at *8 (noting "[p]laintiff's contributions, though significant, would be necessary in any class action" where plaintiff spent approximately 96 hours meeting with class counsel to discuss case strategy, assisting in drafting and reviewing court filings, and being available for settlement negotiation). Courts have reduced service awards for named plaintiffs who have made comparable contributions in prosecuting class actions. *See, e.g.*, *id.* (reducing service award from $10,000 to $5,000); *Ko v. Natura Pet Prod., Inc.*, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012) (reducing service award from $20,000 to $5,000 where "plaintiff expended approximately 50-100 hours directly related to the representation of the class" on gathering and reviewing facts, reviewing pleadings and discovery, and participating in mediation; noting that "[e]ven though Plaintiff will receive a lower than requested award, she will still be compensated handsomely for her time; the $5,000 award results in either a $100 or $50 hourly rate for the 50-100 hours Plaintiff expended on this case."); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *31 (N.D. Cal. Apr. 1, 2011), *supplemented*, 2011 WL 1838562 (N.D. Cal. May 13, 2011) (approving $5,000 service award for plaintiffs who invested between 36 and 100 hours on litigation).

In light of the foregoing, the Court finds $10,000 sufficiently compensates Ms. Roberts for her work as a named Plaintiff. The Court thus awards $10,000 each to Ms. Roberts, Ms. Forney, and Ms. Mullen.

## CONCLUSION

The Court **GRANTS** Plaintiffs' Motion for Final Approval and **GRANTS IN PART** Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards. The Court thus **ORDERS** the following:

1.    The Revised Settlement is finally approved as fair, reasonable, and adequate for the reasons set forth above.

2.      Marcus J. Bradley and Kiley L. Grombacher of Bradley/Grombacher LLP; Shaun Setareh of the Setareh Law Group; Samuel A. Wong and Kashif Haque of the Aegis Law Firm, P.C.; Scott B. Cooper of The Cooper Law Firm; and Roger R. Carter of the Carter Law Firm are confirmed as Class Counsel for settlement purposes.

3.      Class Counsel are awarded $2,550,000 in attorneys' fees and $60,000 in costs.

4.      Kimberly Roberts, Carneisha Forney, and Laurie Mullen are confirmed as Class Representatives.

5.      Kimberly Roberts, Carneisha Forney, and Laurie Mullen shall each receive a $10,000 service award.

6.      ILYM Group, Inc. is confirmed as Settlement Administrator.

7.      Settlement Administration Costs are awarded in the amount of $248,264.72.

8.      ILYM Group shall distribute the Individual Settlement Payments and Service Awards in accordance with the Revised Settlement.

9.      Pursuant to paragraphs 3.13.8 and 3.13.10 of the Revised Settlement, unawarded Services Awards and Settlement Administration Costs shall be made available for distribution to Monetary Payment Class Members.

10.     Each member of the Monetary Payment Class who did not properly request exclusion (i.e., class members not listed in Docket No. 108-6) shall be bound to the terms of the Revised Settlement.

11.     Class Members who did not properly request exclusion shall be deemed to have released the Monetary Payment Class Released Claims and the Prospective Relief Class Released Claims and shall be enjoined from prosecuting these claims against the Released Parties.

12.     No later than 180 days of this Order, Defendants shall file with the Court a report certifying compliance with the terms of the Revised Settlement.

13.     The Court shall retain jurisdiction over this matter, including over the interpretation, implementation, and enforcement of the Revised Settlement.

14.     This Order shall constitute a final judgment in this action.

The Court shall conduct a status conference on August 2, 2018 at 10:00 a.m. in Courtroom

B, 450 Golden Gate Avenue, San Francisco, California. No later than seven days before the status conference, the parties shall file a joint status report indicating (1) the number of Class Members who have cashed their settlement checks, (2) the amount of uncashed funds, (3) any issues the parties believe should be addressed, and (4) a proposed course of action for remedying such issues, if any.

**IT IS SO ORDERED.**

Dated: January 23, 2018

_____
MARIA-ELENA JAMES
United States Magistrate Judge